# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| American Efficient LLC and Affirmed Energy LLC,<br><br>       Plaintiffs,<br><br>  v.<br><br>Federal Energy Regulatory Commission; Mark C. Christie, Willie L. Phillips, David Rosner, Lindsay S. See, and Judy W. Chang, *in their official capacities as Commissioners of the Federal Energy Regulatory Commission*,<br><br>      Defendants. | Case No.  1:25-cv-68<br><br><br><br>**<u>COMPLAINT</u>** |

## INTRODUCTION

1. This case involves an ongoing, unconstitutional administrative adjudication and other ongoing, unconstitutional exercises of executive power by a federal agency that, left unchecked, will force Plaintiffs American Efficient LLC and Affirmed Energy LLC (collectively, "American Efficient") out of business.  Only relief by this Court can prevent grievous abuses of agency power from crippling the business operations of American Efficient.

2. In *SEC v. Jarkesy*, the Supreme Court held that the Seventh Amendment to the U.S. Constitution bars the Securities and Exchange Commission ("SEC") from imposing a civil monetary penalty for securities fraud through administrative

1

adjudication because such claims are "legal in nature." 603 U.S. 109, 122-123 (2024).

That decision—based on statutory antifraud authority that closely resembles provisions

enforced by the Federal Energy Regulatory Commission ("FERC" or the

"Commission")—renders unconstitutional FERC's ongoing effort to use in-house

proceedings to assess staggering and unprecedented penalties against American

Efficient, all without the protections of a jury trial. Making matters worse, FERC's

years-long investigation of American Efficient—an investigation that itself has had

crippling collateral consequences for the company—is unconstitutional under Article II

of the U.S. Constitution because of FERC's improper insulation, as an "independent"

agency, from presidential oversight. American Efficient brings this action to enjoin

FERC's administrative adjudication and investigation of American Efficient, each of

which exceeds constitutional limits.

3.      As a result of a misconceived investigation driven by career staff, FERC

issued an Order to Show Cause and Notice of Proposed Penalty on December 16, 2024

("Order to Show Cause"), to American Efficient (and affiliates) requiring it to "show

cause why" it "should not" be held liable for $722 million in civil penalties and over

$250 million in disgorged profits—by far the largest proposed penalty in FERC's

history. *American Efficient, LLC*, 189 FERC ¶ 61,196 (2024). Under the Federal Power

Act, respondents such as American Efficient faced with these administrative orders to

show cause must choose between two unconstitutional paths. They may proceed before

the Commission in an abbreviated penalty proceeding after which, if the Commission

2

itself adjudicates a violation, it "shall promptly assess [a] penalty, by order." 16 U.S.C. § 823b(d)(3)(A). If that penalty is not paid within 60 days, FERC may then institute a separate action in federal district court to "affirm[]" FERC's "assessment of the civil penalty." *Id.* § 823b(d)(3)(B). Alternatively, a respondent may elect a hearing before a FERC Administrative Law Judge ("ALJ"), after which FERC may assess civil penalties. *Id.* § 823b(d)(2)(A). Neither statutory path, however, complies with the Seventh Amendment because neither path affords American Efficient a jury trial before FERC decides guilt or imposes civil penalties.

4. FERC's Order to Show Cause—requiring American Efficient to elect between equally unconstitutional options for civil penalty assessment—violates the Seventh Amendment and Article III of the U.S. Constitution. As the Supreme Court explained in *Jarkesy*, the Seventh Amendment prohibits in-house administrative adjudication of claims that are "legal in nature," and imposing a punitive civil penalty— a legal remedy—"effectively decides" that a suit "implicates the Seventh Amendment." 603 U.S. at 124-125. Further, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty," *id.* at 132, which the claims here plainly are.

5. The Order to Show Cause is the culmination of a deeply misguided investigative process that itself exceeds the limits of Article II of the U.S. Constitution. FERC is a nominally "independent" federal agency, housed within the Department of Energy, that wields significant executive power but whose Commissioners can be

3

removed by the President only for cause, 42 U.S.C. § 7171(b)(1), a clear violation of Article II. FERC oversees the Nation's interstate transmission of power under three major statutes (including, as relevant, the Federal Power Act) that vest it with authority to promulgate binding rules, initiate coercive investigations, bring litigation without the supervision or involvement of the Department of Justice, and assess staggering civil penalties administratively.

6. FERC has wielded that extensive executive power against American Efficient for more than three years. Specifically, FERC has taken paradigmatic executive action by pursuing a sprawling investigation of American Efficient that has had devastating collateral consequences for the company and initiating an adjudicatory proceeding to impose crushing penalties. But the President has no ability to control or direct the investigation given FERC's nominally independent status. The Constitution does not tolerate such significant, and destructive, exercises of executive power by actors unaccountable to the President. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 224-225, 231-232 (2020); *Collins v. Yellen*, 594 U.S. 220 (2021). Instead, Article II plainly vests the executive power—all of it—in the President and requires that the President retain sufficient control to supervise the exercise of executive power on the President's behalf, including by removing officers. FERC's ongoing investigation of American Efficient transgresses those constitutional limits.

7. The threats posed by the Order to Show Cause and FERC's investigation have inflicted substantial, irreparable injury on American Efficient. American Efficient

4

accordingly seeks declaratory and injunctive relief against FERC's impending

unconstitutional adjudication and its constitutionally illegitimate exercises of executive

power.

## PARTIES

8.     American Efficient LLC is a Delaware limited liability company with its

principal place of business at 703 Foster Street, Durham, North Carolina 27701.

9.     Affirmed Energy LLC is a wholly owned subsidiary of American Efficient

that operates its programs in accordance with PJM tariffs approved by FERC.  Its

principal place of business is Durham, North Carolina.

10.     FERC is a federal administrative agency established within the U.S.

Department of Energy.  FERC is empowered to "establish[], review, and enforce"

licenses, permits, and rates for the transmission and wholesale sale of electric energy in

interstate commerce, *see* 42 U.S.C. § 7172(a)(1); investigate violations or potential

violations of the Federal Power Act, and adjudicate those violations, *see* 16 U.S.C.

§§ 823b, 825*o*-1; subpoena witnesses and compel testimony, *id.* § 825f(b); require the

production of documents; and assess statutory penalties for asserted violations of the

Federal Power Act, *see id.* § 823b(d).

11.     Mark C. Christie (Chairman), Willie L. Phillips, David Rosner, Lindsay S.

See, and Judy W. Chang (collectively, "Commissioners") are Defendants in their official

capacity as Commissioners of FERC.

5

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction because this case arises under the U.S. Constitution and the laws of the United States.  28 U.S.C. § 1331.

13.     Plaintiffs have a right to relief based on the federal Declaratory Judgment Act.  28 U.S.C. § 2201.

14.     Jurisdiction is proper regardless of statutory provisions for eventual Article III review because Plaintiffs are being subjected to an illegitimate proceeding led by an illegitimate decisionmaker.  *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191-192 (2023).

15.     Venue is proper in the Middle District of North Carolina under 28 U.S.C. § 1391(e).  FERC is an "agency of the United States" and its Commissioners are "officer[s] or employee[s] of the United States or any agency thereof acting in [their] official capacit[ies]."  *Id.*  Because Plaintiffs reside in the Middle District of North Carolina and "no real property is involved in the action," venue is proper.  *Id.*

## STANDING

16.     American Efficient has standing under Article III of the U.S. Constitution to challenge FERC's ongoing unconstitutional adjudicative proceeding and its unconstitutional exercises of executive authority.  "To establish Article III standing, a plaintiff must show that it has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'"  *Collins*, 594 U.S. at 242 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

6

17.     Injury in fact exists where a plaintiff "sustain[s] injury from an executive act that allegedly exceeds the official's authority." *Seila Law*, 591 U.S. at 211.  In related contexts, the Supreme Court has explained that unconstitutional agency proceedings create a "here-and-now injury" by subjecting private parties to "an unconstitutionally structured decisionmaking process." *Axon Enter.*, 598 U.S. at 191-192.  That is the case here.  As described below, FERC has commenced an agency adjudication against American Efficient that transgresses the constitutional limits of the Seventh Amendment and Article III.  In addition, as also described below, through its investigation and Order to Show Cause, FERC is wielding quintessentially executive powers against American Efficient, despite the fact that its officers (FERC's Commissioners) are not removable by the President at will.  FERC and its Commissioners are thus unconstitutionally insulated from the President's supervision and control.  The Supreme Court's "precedents have long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President." *Seila Law*, 591 U.S. at 212.

18.     These injuries also threaten substantial, real-world harm to American Efficient's business operations.  FERC is seeking to adjudicate the imposition of enormous civil penalties on American Efficient, the largest in FERC's history (nearly $1 billion of proposed civil penalties and disgorgement).  If American Efficient must pay these penalties, it would cause American Efficient to cease operations as a going

7

concern.  FERC's investigation has also had debilitating collateral consequences for American Efficient, including impairing American Efficient's ability to secure capital and debt financing.  For example, PJM Interconnection, L.L.C. ("PJM")—a regional transmission organization that operates capacity auctions in which American Efficient has participated since 2014, as described below at ¶¶ 20-28—has withheld approximately $100 million of American Efficient's own cash collateral based on a purported connection between FERC's ongoing investigation and certain credit provisions of the PJM tariff, *see infra* ¶ 83.  As a result of these conditions, American Efficient's efforts to meet its existing commitments to the capacity markets and satisfy its obligations to third-party creditors are threatened.

19.     A favorable judicial decision would redress these injuries.  Judicial intervention is necessary to ensure that a jury adjudicates any legal claims against American Efficient, in proceedings overseen by an Article III judge prior to the imposition of penalties, and that ongoing executive actions taken by FERC involving American Efficient are properly supervised by the President and taken by a publicly accountable decisionmaker.

## STATEMENT OF FACTS

## I.     American Efficient's Participation In Wholesale Capacity Markets

20.     American Efficient is one of the nation's largest aggregators of distributed energy efficiency resources.  To offer energy efficiency resources in capacity markets, American Efficient contracts with manufacturers, distributors, and retailers of energy

efficient products, and acquires exclusive contractual rights to the capacity reductions associated with energy efficient products. To obtain those contractual rights, American Efficient compensates its program partners with per-unit compensation for each unique energy efficient product they sell. After acquiring these rights, American Efficient then bundles the energy savings from a large number of individual products and offers these energy efficiency resources into the wholesale capacity market.

21. American Efficient has done so for the last decade by offering energy efficiency resources in FERC-regulated capacity auctions, consistent with FERC precedent and FERC-approved tariff rules.[1] In these capacity auctions, private parties (such as American Efficient) make binding future commitments to provide "capacity" to produce electricity or to reduce electricity consumption in the future. *See TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 114 (D.C. Cir. 2013) (describing how capacity auctions work). Before American Efficient is permitted to participate in a capacity auction, it must submit (for RTO approval) rigorous measurement and

---

[1] "Tariffs" are documents approved by FERC that govern the rates, terms, and conditions for wholesale electricity markets, and that set the terms for these capacity auctions overseen by entities called regional transmission organizations ("RTOs"). Under the Federal Power Act and the "filed-rate doctrine," all "rates, terms and conditions of service" must be publicly filed with, and approved by, the Commission. *See Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) ("As incorporated into the Federal Power Act, regulated entities are required to file with FERC 'schedules showing all rates and charges ... and the classifications, practices, and regulations affecting such rates and charges.' Once filed, 'no change shall be made ... in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public' in another filing with FERC.") (quoting 16 U.S.C. §§ 824d(c)-(d)).

validation methodologies that involve detailed calculations of the "load" (or energy usage) reductions from its energy efficient resources.

22.  By participating in a capacity auction, American Efficient must make binding forward commitments to deliver capacity reductions in future delivery years. It backs those commitments with significant collateral that places it at risk of material loss if it is ultimately unable to aggregate, measure, verify, and deliver sufficient capacity to meet its obligations.

23.  In this manner, American Efficient's projects internalize, for the wholesale capacity markets, small reductions in energy usage, and in exchange American Efficient receives payment for meeting its commitments to deliver binding capacity reductions to those markets. Using this proven project design, American Efficient has, over the past decade, captured and aggregated capacity reductions from hundreds of millions of efficient products sold and installed by customers.

24.  These auctions are overseen by RTOs (such as PJM or Midcontinent Independent System Operator, Inc. ("MISO")). RTOs are a "voluntary organization of electric transmission owners, transmission users and other entities approved by the Commission" and subject to FERC's oversight. *Regional Transmission Organization (RTO)*, FERC Glossary;[2] *see also* 18 C.F.R. § 35.34. Through a capacity auction, an RTO generally seeks to procure a sufficient supply of electricity to meet its prediction of

---

[2]  https://www.ferc.gov/industries-data/market-assessments/overview/glossary (last accessed Jan. 28, 2025).

energy demand several years into the future. Owners of capacity that agree to produce electricity to be delivered in the future, and entities—like American Efficient—that agree to provide reductions in electricity consumption then offer that capacity for sale into the auction. The RTO accepts offers until it has purchased enough capacity to satisfy anticipated demand. All sellers whose capacity offers are accepted for a geographic region receive the auction "clearing price." Auction market participants are obligated, by the threat of stringent penalties, to satisfy their promised share of capacity. *See, e.g.*, *PJM Interconnection, L.L.C.*, 185 FERC ¶ 61,204, P 4 (2023) (describing failures of certain generating units to perform during Winter Storm Elliott resulting in estimated penalties of nearly $2 billion).

25. The Commission has authorized—indeed, encouraged—the participation of energy efficiency resource providers such as American Efficient in the supply side of wholesale capacity markets since 2006. *See PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, P 131 (2006). The Commission approved the introduction of energy efficiency resources on the supply side of the PJM market in 2009. *See PJM Interconnection, L.L.C*, 126 FERC ¶ 61,275, P 130 (2009) ("We believe that energy efficiency is a critical part of efficient energy markets, and should be treated comparably

to other types of resources, by being allowed to participate in base residual auctions and be paid the auction clearing price when they are accepted in the auction.").[3]

26.    American Efficient developed its business model transparently.  Before entering the wholesale markets, American Efficient consulted extensively with legal, technical, and regulatory experts to develop its methodology for estimating energy savings and to ensure compliance with relevant tariffs.  After developing its business model, American Efficient continued to collaborate with RTOs to ensure ongoing compliance.  For example, in American Efficient's regular submissions to the RTOs, it has provided the material terms of its business, including sample copies of contracts with its program partners.

27.    Virtually all energy efficiency resources reach the RTO capacity markets as aggregations of energy efficiency products—typically offered into the market by utilities or third parties, such as American Efficient, that have contracted for the rights to energy savings from individual products.  That is in part because RTOs impose minimum resource-size requirements to participate in the capacity markets, and energy savings

_____

[3]    While the Commission approved revisions to PJM's tariff that would "prospectively sunset Energy Efficiency Resource participation in PJM's wholesale capacity market" on November 5, 2024, *PJM Interconnection, L.L.C.*, 189 FERC ¶ 61,095, P 1 (2024), those revisions do not affect the lawfulness of American Efficient's previous participation in PJM's capacity markets, which complied with the PJM tariff and with FERC regulations.  American Efficient moved for a stay and for reconsideration of FERC's order approving said revisions on December 5, 2024.  On January 6, 2025, the Commission issued a notice summarily denying that request for reconsideration by operation of law, while stating its intent to issue an order at a later date to address the request for reconsideration.  *PJM Interconnection, L.L.C.*, 190 FERC ¶ 62,005 (2025).

from individual energy efficient products purchased by end-use consumers would be far too small for such customers to meet those threshold requirements.

28.     Despite FERC's approval of the inclusion of energy efficiency resources in wholesale capacity markets, FERC's Office of Enforcement informed American Efficient in May 2021 that it had opened an investigation into its subsidiaries' capacity market operations in PJM.  The FERC notices and resulting Order to Show Cause are described in further detail below, *see* ¶¶ 37-45.  That investigation was likely commenced unilaterally by the Office of Enforcement based on authority delegated from the Commission.  *See* 18 C.F.R. § 375.311 (delegating authority to the Office of Enforcement).  Regardless of whether the Commission ultimately approved the start of the investigation or the Office of Enforcement acted on its own, the President had no ability to control or supervise the investigation given FERC's "independent" status.

## II.     FERC's Authority To Assess Civil Penalties Administratively

29.     The Federal Power Act authorizes FERC to assess civil penalties, of up to $1,544,521 per day per violation, against "[a]ny person who violates" chapter II of the Federal Power Act or "any provision of any rule or order thereunder."  16 U.S.C. § 825*o*-1(b); *Civil Monetary Penalty Inflation Adjustments*, 89 Fed. Reg. 1806, 1807 (Jan. 11, 2024).  Before FERC may "issu[e] an order assessing a civil penalty," it must provide notice of a proposed penalty.  16 U.S.C. § 823b(d)(1).  By regulation, FERC purports to satisfy the notice requirement by issuing an order to show cause to a

13

suspected wrongdoer.  *See* 18 C.F.R. § 385.209(a)(2); *FERC v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 894-895 (4th Cir. 2020).

30.     As the Fourth Circuit has explained, "[t]he [order to show cause] describes the alleged violations and directs the recipient to demonstrate why FERC should not assess the proposed penalty."  *Powhatan*, 949 F.3d at 895.  Under FERC's regulations, an order to show cause commences a "contested on-the-record proceeding" before FERC.  18 C.F.R. § 385.2201(c)(1)(i).  Such orders frequently threaten substantial civil penalties ranging from tens to hundreds of millions of dollars.  *See, e.g.*, *Amaranth Advisors L.L.C.*, 120 FERC ¶ 61,085, P 1 (2007) (approximately $300 million in civil penalties); *Boyce Hydro Power LLC*, 173 FERC ¶ 61,217, P 1 (2020) ($15 million); *BP America Inc.*, 144 FERC ¶ 61,100, P 1 (2013) (nearly $30 million).

31.     The statute creates two pathways for agency adjudication after the issuance of an order to show cause.  First, a respondent can elect an abbreviated agency proceeding in which FERC "shall promptly assess" a civil penalty "by order."  16 U.S.C. § 823b(d)(3)(A); *see also Powhatan*, 949 F.3d at 895.  Under this option, FERC considers a respondent's answer and determines whether to "issue a penalty if it f[inds] that [the respondent] committed the alleged violations."  *FERC v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 188 (D. Mass. 2016); *accord American Efficient, LLC*, 189 FERC ¶ 61,196, PP 3-4 (2024).  This agency procedure involves "extensive factfinding and the application of law to fact," *Powhatan*, 949 F.3d at 900, and indeed FERC orders assessing penalties typically contain dozens of pages (at least) with extensive analysis of

14

the facts and the law culminating in an order where the Commission determines a violation of law and assesses penalties based on that determination. *See, e.g.*, *GreenHat Energy LLC*, 177 FERC ¶ 61,073 (2021) (138 pages); *Coaltrain Energy*, 155 FERC ¶ 61,204 (2016) (101 pages). There is no opportunity for a jury trial before liability is determined or penalties are assessed.

32. When the Commission assesses a penalty, it traditionally directs the respondent to "pay the United States Treasury by wire transfer … within 60 days of the issuance of th[e] order." *E.g.*, *Vitol Inc. & Federico Corteggiano*, 169 FERC ¶ 61,070, P 247 (2019); *ETRACOM LLC & Michael Rosenberg*, 155 FERC ¶ 61,284, P 200 (2016). If a respondent fails to pay within 60 days, then "interest payable to the United States will begin to accrue pursuant to the Commission's regulations at 18 C.F.R. § 35.19a [] from the date that payment is due." *Vitol*, 169 FERC ¶ 61,070, P 247(A); *ETRACOM*, 155 FERC ¶ 61,284, P 200(A) (similar). A FERC penalty assessment thus creates a duty to pay.

33. After a FERC penalty assessment order, if the penalty is "not [] paid within 60 calendar days after the assessment order," FERC may "institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty." 16 U.S.C. § 823b(d)(3)(B). In this separate action, the district court "shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in Part, such assessment." *Id*. The statute accordingly does not

15

provide a means for respondents to obtain judicial review of a FERC penalty assessment order other than by violating the order and being subjected to the separate, FERC-initiated district court proceeding.

34.     Second, a respondent may pursue an agency hearing under the Administrative Procedure Act before a FERC ALJ.  *See* 16 U.S.C. § 823b(d)(2)(A) (citing 5 U.S.C. § 554).  Exceptions to the ALJ's initial decision may be filed with the Commission.  *See* 18 C.F.R. § 385.711.  Following a "determination of violation, the Commission shall assess the penalty, by order."  16 U.S.C. § 823b(d)(2)(A).  The respondent may then seek review of the penalty and order in a federal appellate court. *Id*. § 823b(d)(2)(B).  Again, this option affords no right to a jury trial before FERC imposes civil penalties.

35.     Under either path, civil penalties are plainly designed to punish and deter. FERC accordingly "take[s] into consideration the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner" in determining the amount of the civil penalty.  16 U.S.C. § 825*o*-1(b).  What is more, according to FERC, its "Penalty Guidelines are designed to generate a penalty range that is high enough to serve to provide just punishment [and] deterrence."  *Revised Policy Statement on Penalty Guidelines*, 132 FERC ¶ 61,216, P 194 (2010).

36.     In addition, despite no express statutory authorization to do so, *infra* ¶ 55, FERC typically assesses "disgorgement" liability separately from a civil penalty.

16

### III. FERC's Investigation Of American Efficient And Proposed Penalty Assessment

37. On December 16, 2024, FERC issued the Order to Show Cause, based on the findings of its Office of Enforcement following the investigation initiated in May 2021, requiring American Efficient to "show cause why they should not" be held liable for $722 million in civil penalties and over $250 million in disgorged profits.

38. The Order to Show Cause began an agency adjudication. Indeed, FERC cannot claim otherwise, considering that its longstanding and unchanged position by both regulation and by policy—along with its litigation position within this Circuit[4]— is that an order to show cause commences an adjudication. *See* 18 C.F.R. § 385.209(a)(2) ("The Commission may initiate a proceeding against a person by issuing an order to show cause."); *Revised Policy Statement On Enforcement*, 123 FERC ¶ 61,156, P 37 (2008) ("[A]n Order to Show Cause commences a Part 385 proceeding.").

39. American Efficient and its affiliates must now answer and "show[] cause why they should not be found to have violated" the provisions they are accused of violating, to "show[] cause why their alleged violations should not warrant an order requiring" disgorgement of profits, and to "show[] cause why their alleged violations should not warrant an order requiring them to be assessed" a substantial civil penalty. *American Efficient, LLC*, 189 FERC ¶ 61,196, P 6. The Order to Show Cause carries

---

[4]    Brief of Plaintiff-Appellee FERC, *FERC v. Powhatan Energy Fund, LLC*, No. 18-2326 (4th Cir. Mar. 18, 2019), ECF No. 27 ("The order to show cause begins a 'contested on-the-record proceeding' … in which the Commission acts as a neutral decision maker.").

17

immediate, coercive consequences. FERC has threatened to assess a civil penalty of $722 million, *id.* at P 6(D), and disgorgement of approximately $253 million plus interest and "additional unjust profits" received after April 2024. *Id.* at P 6(C). In addition, American Efficient was required to choose one of the two procedural pathways outlined above, *supra* ¶¶ 31-34.

40. The Order to Show Cause threatens to assess civil penalties and disgorgement based on two legal theories alleged by the Office of Enforcement: (1) market manipulation (namely, fraud) in violation of the Federal Power Act and FERC rules, and (2) violations by American Efficient of the PJM and MISO Tariffs. *American Efficient, LLC*, 189 FERC ¶ 61,196, P 1.

41. With respect to the market manipulation theory, the Federal Power Act makes it unlawful for any entity "to use or employ, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance … in contravention of such rules and regulations as the Commission may prescribe." 16 U.S.C. § 824v(a). The statute references the Exchange Act's provisions on securities fraud, 15 U.S.C. § 78j(b), for the meaning of the terms "any manipulative or deceptive device or contrivance." 16 U.S.C. § 824v(a).

42. Section 1c.2 of FERC's regulations, 18 C.F.R. § 1c.2(a), also called the Anti-Manipulation Rule, provides that it shall be "unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or

18

sale of transmission services" "(1) To use or employ any device, scheme, or artifice to defraud, (2) To make any untrue statement of a material fact or to omit to state a material fact … or (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity." FERC's Anti-Manipulation Rule closely resembles the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5, regarding securities fraud. Indeed, the Commission has confirmed that its Anti-Manipulation Rule "is modeled after 10(b) of the Exchange Act." *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4244, 4249 (Jan. 26, 2006).

43. The Office of Enforcement also alleges breaches of tariffs by American Efficient. "Tariffs," as that term is used in the energy-regulation context, are a "compilation of all effective rate schedules of a particular company or utility," and "include General Terms and Conditions along with a copy of each form of service agreement." *Tariff*, FERC;[5] *supra* ¶ 21 n. 1. Tariffs accordingly define the rights and obligations of market participants and play an analogous role, and are an alternative, to bilateral contracts. *See Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 531 (2008) (describing the role of contracts and tariffs under the Federal Power Act). Proposed tariffs must be filed with FERC for authorization, and once authorized, tariffs "carr[y] the force of federal law." *Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004). By statute, FERC can assess civil penalties for violations of tariffs through its in-house adjudication process.

---

[5]        https://www.ferc.gov/about/what-ferc/about/glossary (last accessed Jan. 29, 2025).

44.     American Efficient vigorously contests the Office of Enforcement's allegations.  As American Efficient has explained throughout the FERC investigation, its operations have fully complied with the tariffs and its energy efficiency program satisfies all of the requirements for participation in capacity auctions.  American Efficient has provided robust evidence that it was forthcoming with the RTOs and transparent about how its program functions consistent with all RTO tariff provisions, and accordingly American Efficient did not engage in market manipulation or fraud.  American Efficient will again respond to OE's allegations in its response to FERC's Order to Show Cause.  Yet despite the fundamental lack of support for the claims levied against it, American Efficient has been ensnared for years in FERC investigatory, and now adjudicatory, proceedings with no avenue for judicial review.

45.     Facing a statutory deadline to select between the Prompt Penalty Assessment and ALJ Pathways, 16 U.S.C. § 823b(d)(1), American Efficient elected the Prompt Penalty Assessment Pathway on January 15, 2024, preserving all of its rights, including its constitutional objections to FERC's investigation and penalty proceeding.

## IV.     FERC's Proceedings Violate the Seventh Amendment and Article III

### A. Article III And The Seventh Amendment Limit Agency Adjudication

46.     Under Article III of the U.S. Constitution, the "judicial [p]ower of the United States, shall be vested" in the Supreme and lower courts, and "shall extend to all [c]ases, in [l]aw and [e]quity," arising under U.S. law.  U.S. Const. art. III, §§ 1-2.  Congress may not "withdraw from judicial cognizance any matter which, from its

20

nature, is the subject of a suit at the common law, or in equity, or admiralty." *Jarkesy*, 603 U.S. at 132. Further, the Seventh Amendment guarantees that "[i]n [s]uits at common law ... the right of trial by jury shall be preserved." U.S. Const. amend. VII. This right to a trial by jury "embrace[s] all suits which are not of equity or admiralty jurisdiction" and applies equally to statutory claims, so long as the statutory claim is "legal in nature." 603 U.S. at 122.

47. In *Jarkesy*, the Supreme Court held that Article III and the Seventh Amendment barred the SEC from imposing civil penalties for securities fraud via in-house adjudication. *Jarkesy*, 603 U.S. at 119-120. The Court first held that the Seventh Amendment's jury trial right applied because the securities fraud action was "legal in nature." *Id*. In particular, the Court found that the remedy—a monetary civil penalty—was "all but dispositive," because civil penalties are "a type of remedy at common law that could only be enforced in courts of law." *Id*. at 123. The Court explained that, while some forms of monetary relief can be equitable, "money damages are the prototypical common law remedy." *Id.* "What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" *Id.* Because the SEC's civil penalties are designed to punish and deter, they are "a type of remedy at common law that could only be enforced in courts of law," which "effectively decide[d]" that the Seventh Amendment jury trial right applies. *Id.* at 123, 125.

21

48.     The Court next reasoned that the "close relationship" between the securities

fraud causes of action in the case and common law fraud "confirm[ed] that conclusion"

that the Seventh Amendment applies. *Jarkesy*, 603 U.S. at 125.  Both causes of action,

the Court explained, "target[ed] the same basic conduct: misrepresenting or concealing

material facts." *Id.*  Congress and the SEC, moreover, chose to use the common law

term "fraud" as well as other common law terms of art in defining securities fraud. *Id.*

While federal securities fraud and common law fraud are not "identical," the Court

concluded that they bear a sufficiently close relationship to confirm that an action for

securities fraud is "legal in nature." *Id.* at 126.

49.     Finally, the Court considered and rejected an argument that the claim at

issue fell under the "public rights exception" to Article III jurisdiction. *Jarkesy*, 603

U.S. at 127.  Under the "public rights" exception, "Congress may assign [a] matter for

decision to an agency without a jury, consistent with the Seventh Amendment." *Id.*

Public rights are a narrow class of matters that "historically could have been determined

*exclusively* by [the executive and legislative] branches." *Id.* at 128.  The Court

emphasized that "[t]he public rights exception" must be narrowly interpreted and applied

because it is "an *exception,*" and one that has "no textual basis in the Constitution." *Id.*

at 131.  "[E]ven with respect to matters that arguably fall within the scope of the public

rights doctrine, the presumption is in favor of Article III courts." *Id*. at 112.

50.     The Court explained that Congress may not "withdraw from judicial

cognizance any matter which, from its nature, is the subject of a suit at the common law,

or in equity, or admiralty." *Jarkesy*, 603 U.S. at 132. "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory." *Id.* at 128. Because the claims at issue in *Jarkesy* "provid[ed] civil penalties, a punitive remedy that … could only be enforced in courts of law" and "target[ed] the same basic conduct as common law fraud, employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles," Congress could not "withdraw [securities fraud claims] from judicial cognizance." *Id*. at 134 (quotation marks omitted).

### B. FERC's Adjudicatory Proceeding Violates The Seventh Amendment

51.     *Jarkesy* compels the conclusion that FERC's penalty adjudication process cannot constitutionally be applied against American Efficient. FERC's claims against American Efficient are obviously "legal in nature." 603 U.S. at 122. They therefore carry the right to a jury trial in an Article III court, which neither pathway for FERC's agency proceedings provides in a manner that complies with the Seventh Amendment.

52.     To begin, as in *Jarkesy*, FERC's primary remedy as stated in the Order to Show Cause—civil penalties—is "all but dispositive" as to whether the Seventh Amendment applies because civil penalties are a remedy that historically "could be enforced only in courts of law." 603 U.S. at 123. A monetary remedy is "legal … if it is designed to punish or deter the wrongdoer," *id.*, and FERC has made clear that its civil penalties are designed to ensure "punishment" and "deterrence," *see Revised Policy Statement on Penalty Guidelines,* 132 FERC ¶ 61,216, P 194 (2010). The statute,

23

moreover, requires FERC to consider the "seriousness of the violation" in determining the amount of penalty, 16 U.S.C. § 825*o*-1(b); *Jarkesy* similarly held that a focus on culpability demonstrates the legal nature of a civil penalty, *see* 603 U.S. at 123-124. And the statute requires FERC, if it finds violations, to issue an order assessing a civil penalty. 16 U.S.C. § 823b(d)(3)(A).

53.     While the Order to Show Cause also seeks disgorgement, its disgorgement claim does not alter the application of the Seventh Amendment. First, "disgorgement is not a traditional equitable remedy," *Liu v. SEC*, 591 U.S. 71, 93 (2020) (Thomas, J., dissenting), and so the Seventh Amendment jury trial right applies to it, like other legal claims, *e.g.*, *Coastal Oil & Gas Corp. v. FERC*, 782 F.2d 1249, 1253 (5th Cir. 1986) ("We can see no way to characterize the 'disgorgement' remedy in the present case as anything other than a penalty.").

54.     Second, even if disgorgement could be considered equitable, "[w]hen legal and equitable claims are joined in the same action, 'the right to jury trial on the legal claim, including all issues common to both claims, remains intact.'" *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990). Because FERC seeks both disgorgement and penalties based on common issues of fact, under our constitutional system, those facts must be found by a jury.

55.     Third, FERC lacks statutory authority to seek disgorgement. While the statute authorizes FERC to assess civil penalties, *e.g.*, 16 U.S.C. § 825*o*-1(b), no similar provision authorizes disgorgement. FERC has previously claimed that the authority to

24

order disgorgement derives from its generic power "to perform any and all acts … as it may find necessary or appropriate to carry out the provisions of [the FPA]." *Id.* § 825h. But that general provision cannot supersede Congress's more specific choice to confer authority only to assess penalties for violations. When Congress wants to confer upon agencies authority to impose disgorgement or equitable relief, it knows how to do so. *See, e.g.*, 15 U.S.C. § 78u-2(e) (authorizing SEC to order disgorgement); 7 U.S.C. § 13a-1(d)(3)(B) (authorizing Commodity Futures Trading Commission to seek disgorgement).

56.  Finally, even if disgorgement were equitable, equitable claims too must be assessed by an Article III court, *see infra* ¶¶ 62-67.

57.  In addition, the causes of action at issue bear a "close relationship" to common law claims, which "confirms th[e] conclusion" that American Efficient is entitled to a jury trial, rather than an agency adjudication, before a penalty is assessed. *Jarkesy*, 603 U.S. at 125.

58.  The market manipulation theory is based on legal authorities that are a near carbon copy of the securities fraud statute and regulation at issue in *Jarkesy*. *See supra* ¶ 42; *Prohibition of Energy Market Manipulation*, 71 Fed. Reg. 4244, 4246 (Jan. 26, 2006) ("[T]he Commission has modeled the final rule on [SEC] Rule 10b-5."); *Jarkesy*, 603 U.S. at 125 (discussing 15 U.S.C. § 78j(b) and Rule 10b-5). For the same reasons as in *Jarkesy*, the market manipulation cause of action thus bears a "close relationship" to common law fraud. *Id.*

59.     FERC's tariff claims also bear a close, albeit not "identical," relationship to common law claims.  *Jarkesy*, 603 U.S. at 126.  FERC tariffs are analogous to contracts.  Although "federal tariffs are the law, not *mere* contracts," *Bryan*, 377 F.3d at 429 (emphasis added), tariffs serve as alternatives to bilateral contracts, and they set forth the terms and conditions governing participation in interstate electricity markets.  *See Old Dominion Elec. Coop. v. PJM Interconnection, LLC,* 24 F.4th 271, 276 (4th Cir. 2022); *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998)) ("As the relevant regulatory tariffs, the PJM Tariff and Operating Agreement together 'conclusively and exclusively enumerate the rights and liabilities of the contracting parties.'"); *Shell Energy N. Am. (US), L.P. v. FERC*, 107 F.4th 981, 985 (D.C. Cir. 2024) (tariffs are an alternative to bilateral contracts); *see also, e.g.*, MISO Tariff § 12B.4 ("For the purpose of this federal participation provision, the term 'Contract' shall mean this Tariff.").

60.     FERC thus applies general contract-law principles in resolving tariff disputes.  *E.g.*, *Nicole Gas Production, Ltd*., 105 FERC ¶ 61,371, P 9 (2003) ("Like a contract, a tariff must be interpreted to give meaning to all provisions of the tariff."); *Midcontinent Indep. Sys. Operator, Inc.*, 186 FERC ¶ 61,088, P 29 ("Commission customarily interprets agreements filed before it in accordance with general contract law").  And there is no question that contract-law claims are "the stuff of traditional actions at common law."  *1616 Reminic Ltd. P'ship v. Atchison & Keller Co.*, 704 F.2d 1313, 1317 (4th Cir. 1983); *accord*, *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1245 (3d Cir. 1994) ("breach of contract is traditionally a legal claim").  Thus,

26

although FERC's tariff-violation claims are not "identical" to private contract-law actions, the "close relationship" between the tariff and contract claims "confirms that this action is 'legal in nature.'" *Jarkesy*, 603 U.S. at 126.

61.     In light of the proposed remedies, which "effectively decide[] that this suit implicates the Seventh Amendment right," as well as the "close relationship" between the causes of action and common law claims, *Jarkesy*, 603 U.S. at 125, FERC's claims cannot be tried in an agency proceeding that denies a Seventh Amendment jury trial right.

### C.  FERC's Claims Implicate Private Rights That May Not Be Adjudicated Outside Article III Courts

62.     FERC's claims against American Efficient do not fall into the narrow "public rights exception" to Article III jurisdiction.  Instead, just like the SEC's claims in *Jarkesy*, FERC's claims relate to private rights, and therefore "an Article III court must decide [them], with a jury if the Seventh Amendment applies."  *Jarkesy*, 603 U.S. at 127.

63.     When a suit is "in the nature of an action at common law," like the claims here, *supra* ¶¶ 51-61, "then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory."  *Jarkesy*, 603 U.S. at 128.

64.     That also applies to disgorgement.  Even if "disgorgement" were considered an equitable remedy—it is not, *supra* ¶ 53—Congress may not "withdraw from judicial cognizance" even matters "in equity."  *See Jarkesy*, 603 U.S. at 132.  It does not matter whether the claim arises from "novel statutory regimes," or whether the

27

government prosecutes the action. *Id.* at 139. Instead, "what matters is the substance of the suit." *Id.* at 135. Here, where "the Government has created claims whose causes of action are modeled on common law," where the agency's object is to "regulate transactions between private individuals interacting in a pre-existing market" (American Efficient and its RTOs), and where it "provide[s] a type of remedy available only in law courts" (civil money penalties), the suit must be adjudicated in an Article III court. *Id.* at 135-136. FERC's claims, therefore, may not be adjudicated in-house under either pathway contemplated by 16 U.S.C. § 823b(d).

65. The possibility of a subsequent proceeding—initiated by FERC—in federal district court, involving *de novo* review, and following a violation of an assessment order under 16 U.S.C. § 823b(d)(3)(A), *supra* ¶ 31, does not remedy the Seventh Amendment or Article III violations. Those constitutional provisions attach to the agency proceeding itself and prohibit the agency from "compel[ling] respondents to defend themselves before an agency rather than before a jury in federal court." *Jarkesy*, 603 U.S. at 115. Here, because American Efficient has elected the Prompt Penalty Assessment Pathway, the Commission will "review the full record" and—assuming that the Commission agrees with the Office of Enforcement—issue an order finding a violation and assessing penalties against American Efficient. That order will direct American Efficient to pay the penalty by wire transfer to the United States within 60 days, and interest will begin accruing at 60 days. *Supra* ¶ 32. Following the assessment proceeding and order, for American Efficient to obtain Article III review under the

28

statute, American Efficient must violate the assessment order by refusing to pay the penalty and thus subject itself to running interest. *Id.* FERC must then choose to initiate a new proceeding in federal court to "affirm" the penalty assessment. 16 U.S.C. § 823b(d)(3)(B). A private party's Seventh Amendment and Article III rights cannot depend on having to make such a choice to violate an agency penalty order or on a separate proceeding after the agency has already adjudicated liability–especially one the respondent cannot itself initiate. American Efficient is entitled to an Article III court and a jury trial prior to adjudication and penalty assessment.

66. American Efficient's injuries will be heightened if the agency assesses a penalty, regardless of whether FERC may eventually initiate a separate Article III proceeding to affirm any penalties imposed. Additionally, refusing to comply with FERC's penalty assessment would itself impose additional injury because interest would begin to accrue on the deadline to comply with the final agency order, rather than following any order from an Article III court.

67. Because American Efficient is entitled to an adjudication of the claims against it in an Article III court and before a jury, FERC's unconstitutional proceedings must be enjoined.

## V.   FERC's Structure Violates The Separation Of Powers And Subjects American Efficient To Constitutionally Illegitimate Exercises Of Executive Power

68. The constitutional violations described above are compounded by FERC's very structure, which violates Article II. The Constitution does not permit politically

29

unaccountable entities protected from presidential removal to wield executive power, such as the investigation and baseless allegations leveled against American Efficient, unchecked by properly appointed and supervised officials. Instead, it imposes constraints on the exercise of governmental power to ensure that the government remains, as always, answerable to the public.

### A. The Constitution Constrains The Exercise Of Executive Power

69. Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. The command of those provisions is clear: the Nation's "'executive Power'—all of it—is 'vested in a President.'" *Seila Law*, 591 U.S. at 204 (quoting U.S. Const. art. II, § 1, cl. 1.).

70. "[B]ecause it would be 'impossib[le]' for 'one [person]' to 'perform all the great business of the State,' the Constitution assumes that lesser executive officers will 'assist the supreme Magistrate in discharging the duties of his trust.'" *Seila Law*, 591 U.S. at 213.

71. But, even recognizing the need for the President to delegate, Article II and longstanding constitutional principles of accountability require presidential oversight of the officers that assist the President in carrying out executive duties. "Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).

30

72.     The Supreme Court's decision in *Myers v. United States* established that the President's "power of removing those [administrative officers] for whom he cannot continue to be responsible" "is essential to the execution of the laws by him." 272 U.S. 52, 117 (1926).  "[T]o hold otherwise would make it impossible for the President … to take care that the laws be faithfully executed."  *Id.* at 164.

73.     "These lesser officers must remain accountable to the President" via his power to remove them, "for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'"  *Seila Law*, 591 U.S. at 213-214.

74.     In addition to undermining the President's ability to carry out his or her constitutional responsibilities, constraints on the President's removal power frustrate the ability of the public to hold the President accountable for the execution of the law.  "[T]he Framers made the President the most democratic and politically accountable official in Government.  Only the President (along with the Vice President) is elected by the entire Nation.  And the President's political accountability is enhanced by the solitary nature of the Executive Branch, which provides 'a single object for the jealousy and watchfulness of the people.'"  *Seila Law*, 591 U.S. at 224.

75.     "The diffusion of power carries with it a diffusion of accountability."  *Free Enter.*, 561 U.S. at 497.  But depriving the President of at-will removal power "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts."  *Id.* at 498.  Ensuring the direct political

31

accountability of officials wielding executive power is critical to ensuring "the chain of dependence," *id.*, on the public's "ongoing supervision and control of the elected President." *Seila Law*, 591 U.S. at 200. For those reasons, the Constitution requires—consistent with the government of, by, and for the people it established—that "the lowest officers, the middle grade, and the highest, [all] depend, as they ought, on the President, and the President on the community." *Free Enter.*, 561 U.S. at 498. "Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" *Id.* at 498.

## B. FERC's Executive Power

76.     FERC is nominally an "independent" federal agency, but it is housed within an executive agency, the Department of Energy. 42 U.S.C. §§ 7171(a), (i).

77.     FERC exercises executive power. FERC has a broad mandate to regulate the interstate transmission of electricity, natural gas, and oil. It oversees the wholesale sale of electricity in interstate commerce, monitors and investigates energy markets, enforces regulatory requirements via civil penalties, and much more.

78.     FERC's statutory jurisdiction to accomplish its mission is staggering. It is responsible for administering at least "three major statutes": the Federal Power Act, the Natural Gas Act, and the Natural Gas Policy Act. *ASARCO, Inc. v. FERC*, 777 F.2d 764, 774 (D.C. Cir. 1985) (Scalia, J.); *see also* 16 U.S.C. § 824(b) (Federal Power Act); 15 U.S.C. § 717*o* (Natural Gas Act); *id.* § 3411 (Natural Gas Policy Act).

32

79.    Those statutes vest FERC with authority to exercise an array of quintessential executive powers.  Most relevant here, FERC has investigative and enforcement powers related to the nation's energy markets.  FERC's investigative power includes the authority to "investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine" whether an entity subject to the Federal Power Act "has violated or is about to violate" a provision of that Act or a "rule, regulation, or order" promulgated by FERC.  16 U.S.C. § 825f(a); *see also id.* § 825h (rulemaking authority).  FERC is empowered to "subpena [*sic*] witnesses, compel their attendance, take evidence, and require the production" of records that "[FERC] finds relevant or material to the inquiry."  *Id.* § 825f(b).

80.    FERC has wielded those authorities against American Efficient in various ways through a wide-ranging, years-long investigation by FERC's Office of Enforcement.  As part of that investigation, Office of Enforcement Staff issued numerous demands for information, calling for the company's communications with PJM, American Efficient's agreements with its program partners, historical data regarding American Efficient's transactions with program partners, and American Efficient's submissions to PJM, among other categories of documents.  And FERC used its subpoena authority to depose American Efficient's current and former employees, and to gather voluminous information from multiple third parties.

81.    American Efficient complied with those expansive demands, producing tens of thousands of documents.  Those documents included multiple examples of

33

American Efficient engaging with the RTOs to explain its business model and ensure compliance with tariff requirements, and receiving numerous approvals from PJM permitting its energy efficiency resources to participate in capacity auctions.

82.     FERC also has the authority to seek massive civil penalties of up to $1,544,521 per day per violation for asserted violations of the Federal Power Act or the statute's implementing regulations.  16 U.S.C. § 825*o*-1(b); *supra* ¶ 29.  FERC is also empowered to file civil actions in federal court seeking injunctions against private parties it believes to have violated the Federal Power Act without supervision from the Department of Justice.  16 U.S.C. § 825m(a); *id*. § 823b(d)(6)(A); 18 C.F.R. § 385.1509(b).

83.     In this case, as described above, FERC seeks to impose close to $1 billion in civil penalties and disgorged profits from American Efficient, and its Office of Enforcement claims FERC is authorized to impose around $5.8 billion in penalties.  *See American Efficient, LLC*, 189 FERC ¶ 61,196, at Sec. VIII.  FERC's investigation alone has already subjected American Efficient to devastating collateral consequences.  Based on the investigation, for over 18 months, PJM has withheld what now amounts to over $100 million of American Efficient's cash collateral (payments American Efficient previously made to back up capacity-reduction commitments that have since been met) and capacity market bonus payments that are past due, which PJM claims is necessary under its credit provisions to protect against the risk of an adverse determination in the FERC investigation.  The investigation and PJM's actions have also substantially

34

impaired American Efficient's ability to secure lending essential to sustain its business. Those collateral consequences will only worsen should FERC wield its executive power to assess massive civil penalties against American Efficient before the merits of its claims have been adjudicated by a jury in an Article III court.

### C. FERC Commissioners Are Improperly Insulated From The President's Removal Authority

84.    At FERC's helm sit five Commissioners, appointed by the President, "by and with the advice and consent of the Senate." 42 U.S.C. § 7171(b)(1). The Commissioners are appointed for staggered five-year terms, and no more than three of the Commissioners "shall be members of the same political party." *Id.* The President designates one of the five Commissioners to serve as Chairman. *Id.*

85.    Despite the fact that FERC Commissioners wield wide-ranging executive powers, Congress shielded them from presidential supervision. The President cannot remove FERC Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." 42 U.S.C. § 7171(b)(1). Those limits, the Supreme Court has made clear, "impose a meaningful restriction on the President's removal authority." *Seila Law*, 591 U.S. at 230.

86.    The Supreme Court has recognized only two exceptions to the constitutional mandate that officers wielding executive power must be removable at the President's will. These exceptions represent "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218. First, under *Morrison v. Olson*, "Congress c[an] provide tenure

35

protections to certain *inferior* officers with narrowly defined duties." *Seila Law*, 591

U.S. at 204; *accord id.* at 217-218. Second, the Supreme Court has articulated carefully

circumscribed circumstances in which a principal officer may be subject to only for-

cause presidential removal. *Id.* at 204. Neither applies here.

87.    *First*, there is no serious argument that FERC Commissioners are

constitutionally "inferior" officers because they occupy permanent, not temporary,

offices and wield significant executive authority. Although "the line between 'inferior'

and 'principal' officers is one that is far from clear," the Supreme Court has identified

factors for determining on which side of the line an individual falls. *Morrison*, 487 U.S.

at 671.

88.    Across all of those factors, FERC Commissioners qualify as principal

officers. Like all principal officers, FERC Commissioners are appointed by the

President with the Senate's advice and consent. 42 U.S.C. § 7171(b)(1); *Morrison*, 487

U.S. at 670. In addition, FERC Commissioners are subject to removal by the President

alone, as opposed to being subject to removal by a "higher Executive Branch official"

other than the President that would "indicate[] that [they are] to some degree 'inferior' in

rank and authority." *Morrison*, 487 U.S. at 671. What is more, FERC Commissioners

are hardly restricted to the performance of "only certain, limited duties." *Id.* at 671-672.

Rather, they exercise sweeping powers, "formulat[ing] policy for the Government [and]

the Executive Branch," *id*. at 671-672, and they are empowered with the "authority to

bring the coercive power of the state to bear on millions of private citizens and

36

businesses, imposing even billion-dollar penalties through administrative adjudications and civil actions," *Seila Law*, 591 U.S. at 219-220.

89.     FERC exists perpetually and exercises wide-ranging and ongoing statutory authority, and thus is neither "limited in jurisdiction" nor "limited in tenure."  *Morrison*, 487 U.S. at 671-672.  This distinguishes FERC from the independent counsel held to be an "inferior officer" in *Morrison*—who was restricted to the investigation and prosecution of "certain federal officials suspected of certain serious federal crimes" and whose office was "'temporary' in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated."  *Id* at 672.

90.     *Second*, FERC Commissioners do not satisfy the *Humphrey's Executor* exception, as elaborated by the Supreme Court in *Seila Law* and *Collins v. Yellen*.  In *Humphrey's Executor*, the Court upheld restrictions on the President's authority to remove FTC Commissioners.  295 U.S. 602, 632 (1935).  In doing so, it recognized an exception to the general rule against such restrictions where an agency "cannot in any proper sense be characterized as an arm or an eye of the executive," but rather performs quasi-legislative and quasi-judicial functions.  *Id*. at 628.  The limitations on the President's authority to remove FTC Commissioners were constitutionally permissible because the FTC was led by a "multimember body of experts" that exercised "'no part of the executive power.'"  *Seila Law*, 591 U.S. at 215-216 (quoting *Humphrey's Executor*, 295 U.S. at 628).

37

91.     The Court has since clarified that this exception is narrow and its "contours … depend upon the characteristics of the agency before the Court." *Seila Law*, 591 U.S. at 215.  Whether the exception applies depends on whether an agency "closely resemble[s] the FTC Commissioners" as understood by *Humphrey's Executor*.  *Id.* at 217.

92.     Although FERC, like the New Deal-era FTC, is a multimember body, its structure—and the significant executive power granted to FERC—falls well outside the limited *Humphrey's Executor* exception.  Unlike the situation as the Court understood it with respect to the FTC (in 1935) in *Humphrey's Executor*, *see Seila Law*, 591 U.S. at 215-216, FERC exercises significant executive powers in administering significant responsibilities under multiple statutes, including the Federal Power Act.

93.     In *Seila Law*, the Supreme Court explained that an agency—there, the Consumer Financial Protection Bureau ("CFBP")—wields "quintessentially executive power" when it "possesses the authority to promulgate binding rules fleshing out … federal statutes, … unilaterally issue[s] final decisions awarding legal and equitable relief in administrative adjudications … [and exercises] enforcement authority [that] includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court."  591 U.S. at 218-219.  Just like the CFPB, FERC has the authority to do all of those things.  FERC promulgates binding rules fleshing out the major statutes it administers.  *See, e.g.*, 16 U.S.C. § 825h (granting rulemaking authority under the Federal Power Act to FERC); 15 U.S.C. § 717*o* (same

38

for Natural Gas Act). FERC "may dictate and enforce policy for a vital segment of the economy"—the nation's interstate electricity markets—"affecting millions of Americans." *Seila Law,* 591 U.S. at 225; *see also* 42 U.S.C. § 7172(a) ("vest[ing]" FERC with broad authority related to the Federal Power Act and Natural Gas Act); 16 U.S.C. § 824(b)(1) (stating FERC "shall have jurisdiction over all facilities for [the] transmission or sale of electric energy."). It does so by "issu[ing] final regulations, oversee[ing] adjudications, set[ting] enforcement priorities, initiat[ing] prosecutions, and determin[ing] what penalties to impose on private parties." *Seila Law*, 591 U.S. at 225; *see also* 16 U.S.C. § 825f (empowering FERC to investigate potential violations of the Federal Power Act); *id.* § 825*o*-1(b) (same for assessment of civil penalties based on violations of the Federal Power Act).

94. FERC is also empowered to file civil actions seeking injunctions against private parties it believes to have violated the Federal Power Act. 16 U.S.C. § 825m(a). FERC Commissioners "investigate any facts, conditions, practices, or matters which it may find necessary or proper in order to determine" whether an entity subject to the Federal Power Act "has violated or is about to violate" a provision of the Federal Power Act or "rule, regulation, or order" promulgated by FERC pursuant to the Federal Power Act. 16 U.S.C. § 825f(a); *see also id.* § 825h. As part of this investigative authority, "any member of the Commission, or any officer designated by it," may "subpena [*sic*] witnesses, compel their attendance, take evidence, and require the production" of records that "[FERC] finds relevant or material to the inquiry." *Id.* § 825f(b).

39

95.    And FERC has statutory authority to assess massive statutory civil penalties—up to $1,544,521 per day per violation—for asserted violations of the Federal Power Act or regulations promulgated thereunder.  16 U.S.C. § 825*o*-1(b); *supra* ¶ 29.

96.    The Supreme Court has explained that an agency's receipt of funds outside the appropriations process undermines the President's ability to influence agency leadership during the annual appropriations process and thus "further aggravates the agency's threat to presidential control."  *Seila Law*, 591 U.S. at 226.  That aggravating factor is present here:  FERC receives significant funding outside the congressional appropriations process.  Specifically, under the Federal Power Act, FERC "shall … assess and collect" substantial "fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year."  42 U.S.C. § 7178(a)(1).  Such fees are subject to FERC's discretion so long as they are "computed on the basis of methods that the Commission determines, by rule, to be fair and equitable."  *Id.* § 7178(b).  This characteristic "makes it even more likely that the agency will 'slip from the Executive's control, and thus from that of the people.'"  *Seila Law*, 591 U.S. at 226.

97.    Finally, FERC's structure skews political accountability in other ways that distinguish it from the FTC of the New Deal era.  That is because FERC not only enjoys removal restrictions that insulate it from the President's command, but is also embedded within the Department of Energy, a core executive agency.  42 U.S.C. § 7171(a).  That nesting structure obfuscates the President's accountability to the public for the

40

significant executive powers FERC wields: overseeing the nation's interstate transmission and wholesale sales of power. Contrary to the Supreme Court's holding that the Constitution requires "a clear and effective chain of command," *Free Enter.*, 561 U.S. at 497-498, in the executive structure to ensure the public's "ongoing supervision and control of the elected President," *Seila Law*, 591 U.S. at 200, FERC's unusual structure blurs the lines of accountability between the President, the Department of Energy, and FERC. That structure breaks the "chain of dependence" between executive officers such as FERC Commissioners and the President. *Free Enter.*, 561 U.S. at 498.

98. Even the Department of Energy cannot exercise meaningful authority over FERC. FERC "shall not be responsible to or subject to the supervision or direction of any officer, employee, or agent of any other part of the Department." 42 U.S.C. § 7171(d). If anything, the Federal Power Act renders the Department of Energy—an executive agency—beholden to FERC in certain respects. FERC can make demands for information on the Secretary of Energy, *id.* § 7177, and the Secretary is obligated to "provide to the Commission such support and facilities as the Commission determines it needs to carry out its functions," *id.* § 7171(c). That inverted chain of command "subverts the President's ability to ensure that the laws are faithfully executed"—as well as the public's ability to pass judgment on his efforts. *Free Enter.*, 561 U.S. at 498.

**D. The Order To Show Cause Compounds FERC's Violation Of The Separation Of Powers**

99. FERC's structure alone violates Article II. But FERC's decision to initiate proceedings by issuing its Order to Show Cause compounds that violation. The urgent

41

need for relief is stark. American Efficient has been forced to elect one of two unconstitutional avenues of agency adjudication. Because neither option is constitutional, the fact that American Efficient could have selected either is irrelevant to the constitutionality of FERC proceedings.

100. Under the first option—the Prompt Penalty Assessment Pathway, which American Efficient elected—FERC first formally finds a violation, then "assess[es] [a] penalty, by order," and then could seek to "affirm[] th[at] assessment" before a district court if American Efficient fails to comply. 16 U.S.C. §§ 823b(d)(3)(A), 823b(d)(3)(B). That assessment itself violates the Seventh Amendment and Article III for the reasons explained *supra* at ¶¶ 46-67.

101. In addition, after assessing such a penalty, FERC then switches its judicial hat for that of the executive as it decides whether to seek to "affirm[]" the penalty assessment before a district court if "the civil penalty [is] not [] paid within 60 calendar days." 16 U.S.C. § 823b(d)(3)(B). FERC's efforts to affirm steep penalties it has already assessed would be an exercise of executive power at its zenith. Removing the proceedings even further from presidential oversight, FERC attorneys, rather than the Department of Justice, is charged with filing and prosecuting the case. *See* 16 U.S.C. § 823b(d)(6)(A); 18 C.F.R. § 385.1509(b). That raw exercise of executive power is unconstitutional for the reasons above, and the Article II violation is even more apparent given the complete lack of presidential control. *See Seila Law*, 591 U.S. at 199 (describing "the power to seek daunting monetary penalties against private parties in

42

federal court" as "a quintessentially executive power not considered in *Humphrey's Executor*").

102.  Had American Efficient elected the second option, the ALJ Pathway, it would have been forced to litigate its defenses before a FERC ALJ.  *See* 16 U.S.C. § 823b(d)(2)(A).  The Commission would then review the decision of the ALJ and assess a penalty, by order, after a determination of a violation.  Within 60 days of the final Commission order assessing a penalty, American Efficient could have sought judicial review under the Administrative Procedure Act of the Commission's order in the appropriate federal appellate court under the APA's deferential standard of review. *Id*. § 823b(d)(2)(B).

103.  That process is constitutionally illegitimate for numerous reasons.  As the Supreme Court explained in *Jarkesy* and as explained above, FERC's ALJ proceedings that purport to adjudicate private rights and that culminate in the assessment of civil penalties patently violate Article III and the Seventh Amendment.

104.  In addition, FERC's ALJ structure independently violates the Appointments Clause of Article II, which directs that Congress "may by Law vest the Appointment of [] inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  U.S. Const. art. II, § 2.  As FERC has admitted, its ALJs are inferior executive officers to which Article II's Appointments Clause applies.  *See Total Gas & Power N. Am, Inc.*, 176 FERC ¶ 61,026, P 193 (2021).

43

105.   That concession is correct.  FERC's ALJs are appointed for their full careers, 5 C.F.R. § 930.204(a), and with significant tenure protections, 5 U.S.C. § 7521(a).  They also exercise substantial discretionary authority in conducting administrative hearings.  *See* 18 C.F.R. § 385.504.

106.   The appointment of FERC ALJs does not comply with the Appointments Clause, for two reasons.  First, the Supreme Court has stated that inferior executive officers must be appointed by the head of a "Department"—"a freestanding component of the Executive Branch, not subordinate to or contained within any other such component."  *Free Enter.*, 561 U.S. at 511.  But FERC is not a "freestanding component" and is instead "contained within" the Department of Energy.  42 U.S.C. § 7171(a).  FERC is therefore not "a 'Departmen[t]' for the purposes of the Appointments Clause," and its Commissioners lack authority to appoint inferior officers like ALJs.  *Free Enter.*, 561 U.S. at 511.

107.   But even if FERC were a department whose head has the authority to appoint inferior officers, the relevant head would be the full FERC Commission, not the Chairman.  But FERC ALJs are appointed by the FERC Chairman, not the full Commission.  42 U.S.C. § 7171(c).

108.   The Supreme Court's reasoning in *Free Enterprise* compels the conclusion that FERC's Chairman cannot be a "Head of Department[]" authorized to appoint inferior officers under Article II.  There, the Court rejected the argument that the full SEC Commission could not constitutionally appoint SEC ALJs.  In doing so, it

44

determined that the SEC collectively, rather than the Chairman acting alone, qualified as the "Head" of the department that could appoint inferior officers. 561 U.S. at 512.

109. It so held because the Commissioner's powers were generally vested in the Commission jointly, and the Chairman alone operated only administrative and executive functions. *Free Enter.*, 561 U.S. at 512. Further, the Court noted, the Reorganization Act requires that "the President, by and with the advice and consent of the Senate," appoint any head of agency. But the President alone—rather than the President with the advice and consent of the Senate—appointed the Chairman from among the Commissioners. *Id.* Thus, the Court concluded, the Chairman alone could not be regarded as the Head of the agency for purposes of the Reorganization Act; on the other hand, "[t]he Commission as a whole … does meet the requirements of the [Reorganization] Act." *Id.* All of those factors supported the finding that the SEC Commission collectively, rather than the Chairman, qualified as the Head of a Department under Article II. *Id.* at 512-513.

110. The same circumstances present in *Free Enterprise* apply here, such that the full Commission, rather than the FERC Chairman acting alone, qualifies as the "Head" of the department. Congress generally vested FERC's powers in the full Commission. 42 U.S.C. § 7172. The Chairman alone is responsible only "for the executive and administrative operation of the Commission." *Id.* § 7171(c). And the President alone, without the advice and consent of the Senate, selects the Chairman from among the Commissioners. *Id.* § 7171(b)(1). Thus, the Chairman acting alone in

45

appointing the FERC ALJs cannot satisfy the Appointment's Clause requirements, and FERC's ALJ structure violates the Constitution.

111.    Second, FERC's ALJ structure violates Article II because a double layer of removal protections unconstitutionally insulates FERC's ALJs from presidential control. The ALJs exercise executive power but may only be removed for "good cause established and determined by the Merits Systems Protection Board."  5 U.S.C. § 7521(a).  But members of the Merits Systems Protection Board may be "removed by the President only for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1202(d).  Supreme Court precedent prohibits a double layer of removal protections: "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President."  *Free Enter.*, 561 U.S. at 484.  For this additional reason, FERC's ALJ structure violates the Constitution.

## COUNT I

## (FERC's Order to Show Cause Violates the Seventh Amendment and Article III)

112.    American Efficient realleges and incorporates all preceding paragraphs here.

113.    The Seventh Amendment to the U.S. Constitution provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.

46

114. The Seventh Amendment extends to all suits which are "legal in nature" regardless of whether the claims derive from statute. *Jarkesy*, 603 U.S. at 122.

115. In addition, under Article III, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Jarkesy*, 603 U.S. at 132.

116. Here, FERC's claims against American Efficient are legal in nature, as evidenced by both the remedies sought and the substance of the causes of action, and FERC is pursuing them through its in-house adjudication procedures. Neither of the two possible pathways for such in-house adjudication affords a jury and neither comports with the Seventh Amendment or Article III.

117. FERC's adjudicatory proceedings against American Efficient therefore violate both the Seventh Amendment and Article III. The Order to Show Cause and the adjudicatory proceeding begun by the Order to Show Cause must be vacated and enjoined to prevent irreparable injury to American Efficient.

## COUNT II

**(FERC's Investigation of American Efficient Violates Article II of the Constitution)**

118. American Efficient realleges and incorporates all preceding paragraphs here.

119. Article II requires principal executive officers that wield significant executive authority to be removable at will by the President.

47

120.   FERC Commissioners are principal executive officers who wield significant executive authority, but the President may remove them only for "inefficiency, neglect of duty, or malfeasance in office." 42 U.S.C. § 7171(b)(1).

121.   FERC has deployed its executive powers to American Efficient's detriment. FERC's Office of Enforcement has pursued an extensive investigation into American Efficient's participation in capacity markets that has required American Efficient to devote substantial time and resources and substantially impaired the operation of its business.  Enforcement staff have issued lengthy allegations that have imposed severe collateral consequences on American Efficient.  Following that investigation, FERC, through the issuance of its Order to Show Cause, has signaled its intent to use its enforcement authority to assess civil penalties and disgorgement approaching $1 billion, threatening American Efficient's existence simply by virtue of the Order.  The President has not had the ability to supervise or control any of this.

122.   FERC's structure violates the separation of powers and Article II's reservation of all executive power to the President.  And American Efficient has been, and continues to be, injured by FERC's exercise of unchecked executive authority by virtue of FERC's investigation and Order to Show Cause, none of which has been authorized by a properly accountable officer.

123.   Because FERC's investigation and Order to Show Cause are the result of its unconstitutional exercise of executive power, unchecked by any properly accountable

48

officer, FERC's investigation and its adjudication and enforcement of the Order to Show Cause must be enjoined to prevent further irreparable injury to American Efficient.

## PRAYER FOR RELIEF

WHEREFORE, American Efficient LLC and Affirmed Energy LLC request entry of a judgment awarding the following relief:

a. A declaration that FERC's adjudicatory proceeding against American Efficient violates the Seventh Amendment and Article III.

b. A declaration that the for-cause removal provision applicable to FERC Commissioners in 42 U.S.C. § 7171(b)(1) violates Article II of the United States Constitution, by impermissibly denying the President's authority to remove FERC Commissioners at will.

c. A declaration that FERC's investigation of American Efficient is unlawful because FERC lacks the constitutional authority to undertake the investigation.

d. A preliminary and permanent injunction prohibiting FERC from continuing its investigation of American Efficient, unless and until FERC Commissioners are subject to at-will removal by the President.

e. A preliminary and permanent injunction prohibiting FERC from pursuing its claims against American Efficient unless and until ratified by FERC Commissioners subject to at-will removal by the President.

49

f.    A preliminary and permanent injunction setting aside the Order to Show

Cause issued by FERC against American Efficient on December 16, 2024,

and an order enjoining enforcement of the Order to Show Cause.

g.    A preliminary and permanent injunction prohibiting FERC from pursuing

its claims against American Efficient through either pathway of its agency

proceedings.

This the 29th day of January, 2025.

Respectfully submitted,

/s/ *Mark A. Hiller*
Mark A. Hiller
N.C. Bar No. 50004
Robinson, Bradshaw &
    Hinson, P.A.
1450 Raleigh Road
Chapel Hill, NC 27517
Phone: (919) 328-8800
MHiller@robinsonbradshaw.com

Cary B. Davis
N.C. Bar No. 36172
Robinson, Bradshaw &
    Hinson, P.A.
101 N. Tryon St, Suite 1900
Charlotte, NC 28246
Phone: (704) 377-2536
CDavis@robinsonbradshaw.com

Seth P. Waxman*
Kelly P. Dunbar*
Wilmer Cutler Pickering
    Hale and Dorr LLP

50

2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
Phone: (202) 663-6000
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
kelly.dunbar@wilmerhale.com

Suedeen G. Kelly*
John N. Estes*
Jenner & Block LLP
1099 New York Avenue, NW
   Suite 900
Washington, DC 20001-4412
Phone: (202) 639-6044
Fax: (202) 639-6066
Skelly@jenner.com
JEstes@jenner.com

*Attorneys for Plaintiffs American Efficient LLC and Affirmed Energy LLC*

* Local Rule 83.1(d) special appearance forthcoming.