# Exhibit 1

189 FERC ¶ 61,196
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Chairman;
                        Mark C. Christie, David Rosner,
                        and Lindsay S. See.

| | |
|---|---|
| American Efficient, LLC | Docket No. IN24-2-000 |
| Modern Energy Group LLC | |
| MIH LLC | |
| Midcontinent Energy LLC | |
| Wylan Energy, L.L.C. | |
| Affirmed Energy LLC | |

ORDER TO SHOW CAUSE AND NOTICE OF PROPOSED PENALTY

(Issued December 16, 2024)

1.      Pursuant to Rule 209(a)(2) of the Commission's Rules of Practice and Procedure,[1] the Commission's Revised Policy Statement on Enforcement,[2] and the Commission's Statement of Administrative Policy Regarding the Process for Assessing Civil Penalties,[3] the Commission directs American Efficient, LLC, its various subsidiary companies,[4] and its corporate parents[5] (collectively, American Efficient, Company, or Respondents) to show cause why they should not be found to have violated (i) Section 222 of the Federal Power Act (FPA), 16 U.S.C. § 824v, and section 1c.2 of the Commission's regulations through a manipulative scheme and course of business in PJM and MISO that extracted millions of dollars in capacity payments for a purported energy efficiency project that did not actually cause reductions in energy use;[6] and (ii) provisions of MISO's Open Access

---

[1] 18 C.F.R. § 385.209(a)(2) (2024).

[2] *Enforcement of Statutes, Regulations and Orders*, 123 FERC ¶ 61,156, at PP 35–36 (2008).

[3] *Process for Assessing Civil Penalties*, 117 FERC ¶ 61,317, at P 5 (2006).

[4] Affirmed Energy LLC, Wylan Energy L.L.C., Midcontinent Energy LLC, and Maple Energy LLC.

[5] Modern Energy Group LLC and MIH LLC.

[6] 18 C.F.R. § 1c.2 (2024).

Transmission, Energy and Operating Reserve Markets Tariff and PJM's Open Access Transmission Tariff for failure to satisfy the tariff requirements for participation as an Energy Efficiency Resource ("EER"). The Commission also directs Respondents to show cause why they should not (i) disgorge $2,116,057, plus interest, in unjust profits back to MISO and $250,937,821, plus interest, in unjust profits back to PJM; (ii) disgorge additional unjust profits received between April 2024 and the date of any future order of the Commission directing disgorgement, plus interest, back to PJM; and (iii) pay a civil penalty in the amount of $722,000,000. Respondents may seek a modification of the amounts above consistent with Section 31(d)(4) of the FPA.[7] Pursuant to Rule 213(a) of the Commission's Rules of Practice and Procedure,[8] the Commission directs Respondents to file an answer with the Commission within 30 days of the date of this order. Office of Enforcement staff (Enforcement staff) may reply to Respondents' answer within 30 days of the filing of the answer. The Commission will consider these pleadings as part of its review of this proceeding.

2.      This case presents allegations by Enforcement staff of Respondents' violations of the PJM and MISO Tariffs, and Respondents' manipulative scheme and course of business to defraud ISO/RTO capacity markets. These allegations arose out of an investigation conducted by Enforcement staff and are described in the Enforcement Staff Report and Recommendation (Enforcement Staff Report).[9] Issuance of this order does not indicate Commission adoption or endorsement of the Enforcement Staff Report.

3.      The Enforcement Staff Report alleges that American Efficient has received hundreds of millions of dollars in capacity payments from PJM and MISO from 2014 through the present for a purported energy efficiency capacity program (the "Program") that did not reduce the demand for energy and violated the PJM and MISO Tariffs. Enforcement staff assert that the Program violates provisions in the PJM and MISO Tariffs requiring EERs to (1) cause reductions in electricity use, (2) have a nexus with end-use customer projects, and (3) own or have contractual rights to those projects. The Enforcement Staff Report further asserts that any one of those tariff violations made American Efficient ineligible to participate in the PJM and MISO capacity markets and, therefore, that American Efficient further violated the PJM and MISO Tariffs by

---

[7] Under Section 31(d)(4) of the FPA, 16 U.S.C. § 823b(d)(4), the Commission may "compromise, modify, or remit, with or without conditions, any civil penalty which may be imposed . . . at any time prior to a final decision by the court of appeals . . . or by the district court."

[8] 18 C.F.R. § 385.213(a) (2024).

[9] The Enforcement Staff Report is attached to this order as Appendix A. The Enforcement Staff Report describes the background of Enforcement staff's investigation, findings and analysis, and recommended sanctions.

participating in those auctions while it was ineligible to do so.  Enforcement staff also
allege that American Efficient knowingly or recklessly misled the ISO/RTOs to capture
payments for capacity that American Efficient could not deliver.  Such conduct,
according to the Enforcement Staff Report, constitutes a course of business that
defrauded, and continues to defraud, the capacity markets and impairs their proper
operation.

4.      In light of the allegations contained in the Enforcement Staff Report, the
Commission directs Respondents to respond to this order as set forth above.[10]  This order
also is the notice of proposed penalty required pursuant to Section 31 of the FPA.[11]  In
their answer to this order, Respondents can choose between either (a) an administrative
hearing before an ALJ at the Commission prior to the assessment of a penalty under
Section 31(d)(2)(A), or (b) a prompt penalty assessment by the Commission under
Section 31(d)(3)(A).  If Respondents elect an administrative hearing before an ALJ, the
Commission will issue a hearing order unless it is determined that the matter can be
resolved in a summary disposition; if Respondents elect a prompt penalty assessment,
and if, after a review of the full record, the Commission finds a violation, the
Commission will issue an order assessing a penalty.  If such penalty is not paid within
60 days of assessment, the Commission will commence an action in a United States
district court for an order affirming the penalty.[12]  Unless Respondents make an election
within 30 calendar days after receipt of notice under Section 31(d)(1) to have Section
31(d)(3) apply with respect to such penalty, pursuant to Section 31(d)(2)(A) the
Commission will conduct an administrative hearing before an ALJ and Respondents'
review procedures will be limited to the procedures provided under Section 31(d)(2)(B),
and we will treat the Respondents as having waived any right to a jury trial that may
apply under the Seventh Amendment.

5.      The Commission authorizes Enforcement staff to disclose information obtained
during the course of the investigation as necessary to advance this matter.

---

[10] Under 18 C.F.R. § 385.213(c), Respondents must file an answer that provides a
clear and concise statement regarding any disputed factual issues and any law upon
which they rely.  Respondents must also, to the extent practicable, admit or deny,
specifically and in detail, each material allegation contained in the Enforcement Staff
Report and set forth every defense relied upon.  Failure to answer an order to show cause
will be treated as a general denial and may be a basis for summary disposition under
Rule 217.  18 C.F.R. § 385.213(e)(2).

[11] 16 U.S.C. § 823b(d).

[12] FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B).  *See also Process for
Assessing Civil Penalties*, *supra,* note 3.

6.      The Company has stated in a filing in Docket No. EL24-113-000 ("Complaint Docket") that there are identical or substantially similar claims in the Complaint Docket to Enforcement staff's investigation underlying this matter.  On June 21, 2024, the Company submitted a letter regarding its Response to Enforcement staff's notice under 18 C.F.R. § 1b.19.  In its letter, the Company referenced the Complaint Docket and another complaint (Docket No. EL24-118-000) and made statements that may be considered ex parte communications.  Consequently, we filed the Company's letter in the Complaint Docket and Docket No. EL24-118-000.  On July 22, 2024, the Company emailed several other documents directly to the Commission that also may be considered ex parte communications.  Consequently, on September 4, 2024 we  filed those additional documents in the Complaint Docket, Docket No. EL24-118-000,  and in two additional dockets: Docket No. EL24-124-000, a complaint American Efficient filed against PJM based on PJM's hold on American Efficient's collateral; and Docket No. EL24-126-000, a complaint the PJM IMM filed against PJM concerning PJM's payments to EER providers.

The Commission orders:

(A)      Within 30 days of the date of this order, Respondents must file an answer in accordance with Rule 213 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213, showing cause why they should not be found to have violated FPA section 222, 16 U.S.C. § 824v, and 18 C.F.R. § 1c.2, and why Respondents should not be found to have violated PJM's Open Access Transmission Tariff,[13] and MISO's Open Access Transmission Tariff.[14]

(B)      Within 30 days of the date of this order, Respondents must file an answer in accordance with Rule 213 of the Commission's Rules of Practice and Procedure, 18

---

[13] Specifically, (i) the definition of "Energy Efficiency Resource" in the PJM Reliability Assurance Agreement (RAA) and (ii) PJM Tariff Attachments DD.4.1, DD.4.4, DD.4.6, DD.5.5, DD.5.5A, and DD.5.6.1 and PJM RAA Schedule 6.L.2 by submitting sell offers for Capacity Resources into PJM's capacity auctions without meeting the definitions of "Energy Efficiency Resource," "Base Capacity Energy Efficiency Resource," "Annual Energy Efficiency Resource," or "Summer-Period Energy Efficiency Resource" set forth in Article 1 of the PJM Tariff and in Schedules 1 and 6 of the PJM RAA.

[14] Specifically, (i) the definition of "Energy Efficiency Resource" and section 69A.4.4, 69A.4.5, 69A.7.1, and 69A.7.2 of MISO's Tariff by offering Zonal resource Credits into MISO's Planning Resource Auction without meeting the definitions of "Energy Efficiency Resource" set forth in section 1.E, section 69A.3.2, and Attachment UU of the MISO Tariff (and, therefore, without meeting the definition of "Planning Resource" set forth in section 1.P of the MISO Tariff).

C.F.R. § 385.213, showing cause why their alleged violations should not warrant an order requiring them to disgorge $2,116,057, plus interest, in unjust profits back to MISO and $250,937,821, plus interest, in unjust profits back to PJM, or a modification of that amount consistent with Section 31(d)(4) of the FPA.

      (C)    Within 30 days of the date of this order, Respondents must disgorge additional unjust profits received between April 2024 and the date of any future order of the Commission directing disgorgement, plus interest, back to PJM.

      (D)    Within 30 days of the date of this order, Respondents must file an answer in accordance with Rule 213 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213, showing cause why their alleged violations should not warrant an order requiring them to be assessed a civil penalty in the amount of $722,000,000, or a modification of this amount consistent with Section 31(d)(4) of the FPA.

      (E)    In any answer, Respondents should address any matter, legal, factual or procedural, that it would urge in the Commission's consideration of this matter.  To the extent that Respondents cite any material not cited in the Enforcement Staff Report, Respondents are directed to file one (1) copy of such material on CD-ROM or DVD in the captioned docket and to serve a copy of same on Enforcement staff.  If the materials are confidential, Respondents may file them nonpublicly.  However, the Commission retains the authority to disclose any information as necessary to carry out its jurisdictional responsibility or to meet legal disclosure requirements.

      (F)    Pursuant to Section 31(d)(1) of the FPA, within 30 days of the date of this order, Respondents may also make an election to have the procedures set forth in Section 31(d)(3) of the FPA apply to this proceeding.  Under that provision, if the Commission finds a violation, the Commission will issue a penalty assessment and, if not paid within 60 days of the order assessing penalties, the Commission will institute an action in the appropriate United States district court.  Should Respondents fail to make a timely election under Section 31(d)(1) to have Section 31(d)(3) apply with respect to such penalty, the procedures of Section 31(d)(2) will apply and Respondents' review procedures will be limited to the procedures provided under Section 31(d)(2)(B), and we will treat the Respondents as having waived any right to a jury trial that may apply under the Seventh Amendment.

     (G)    Within 30 days of the filing of the answer by Respondents, Enforcement staff may file a reply with the Commission.

By the Commission.  Commissioner Chang is not participating.

( S E A L )

Debbie-Anne A. Reese,<br>
Secretary.

**Appendix  A**



# FEDERAL ENERGY REGULATORY COMMISSION

**American Efficient, LLC**
**Modern Energy Group LLC**
**MIH LLC**
**Midcontinent Energy LLC**
**Wylan Energy, L.L.C.**
**Affirmed Energy LLC**

**Docket No. IN24-2-000**

**Enforcement Staff Report and Recommendation**

Office of Enforcement

# TABLE OF CONTENTS

I.   Executive Summary ............................................................................................... 1

II.  Background ........................................................................................................... 5

   A.  American Efficient and Its Affiliates ................................................................ 5

   B.  EERs and the Capacity Markets ....................................................................... 6

   C.  Summary of Relevant Tariff Obligations .......................................................... 8

      1.  Definitions of "Energy Efficiency Resource" .............................................. 8

      2.  History of EERs in PJM ............................................................................ 10

      3.  History of EERs in MISO .......................................................................... 13

III. Timeline of Investigation ..................................................................................... 13

IV.  American Efficient's Program Extracts Money From the Capacity Markets ........... 16

   A.  American Efficient's Capacity Market Program ............................................... 16

   B.  History of American Efficient's Participation in PJM, MISO, and ISO-NE ........... 24

      1.  American Efficient's Participation in PJM's Capacity Auctions ................... 24

      2.  American Efficient's Participation in MISO's Capacity Auctions ................. 28

      3.  American Efficient's Submission of M&V Plans and PIMV Reports to PJM and
          MISO ...................................................................................................... 30

      4.  MISO's Disqualification of American Efficient ........................................... 32

      5.  ISO-NE's Rejection of American Efficient's Efforts to Expand Its Program ..... 33

   C.  American Efficient's Finance Partners ............................................................ 36

      1.  Investment Bank and Investment Bank Affiliate ....................................... 36

      2.  Investment Company ............................................................................... 38

   D.  American Efficient Used False and Misleading Information to Gain Entry to and
       Participate in the Capacity Markets ............................................................... 39

      1.  American Efficient Passed Off a Market Research Program as Capacity ....... 40

      2.  American Efficient Misled PJM and MISO Regarding the Fundamental Design
          of Its Program ......................................................................................... 41

      3.  American Efficient Misrepresented Key Elements of Its Programs to PJM and
          MISO ...................................................................................................... 45

4.  American Efficient Intentionally Withheld Material Information Regarding Its Program from PJM and MISO ........................................................................49

V.  Violations ........................................................................................................53

A.  American Efficient Has Violated the PJM and MISO Tariffs ...............................53

1.  American Efficient Has Violated the Tariff Requirements that an EER Be Designed to Achieve Reductions in Energy Consumption ...........................................53

2.  American Efficient Has Violated the Tariff Requirement That EERs Must Have a Nexus to End-Use Customers, their Facilities, or their Sites ...................................62

3.  American Efficient Has Violated the Tariff Requirements That an EER Possess Contractual Rights from End-Use Customer Projects ...................................................64

4.  American Efficient Has Violated the PJM and MISO Tariffs by Claiming Capacity Without a Valid "Energy Efficiency Resource"..........................................68

B.  American Efficient Has Engaged in Market Manipulation.......................................69

1.  Legal framework of market manipulation ................................................................70

2.  American Efficient's Fraudulent and Deceitful Course of Business Impaired and Obstructed the PJM and MISO Capacity Markets ........................................................74

3.  American Efficient made knowingly false, and knowingly or recklessly misleading, material misrepresentations in furtherance of its fraudulent scheme and course of business ........................................................................................................79

4.  American Efficient's capacity bids were subject to the Commission's jurisdiction 95

VI.  Liability of Modern Energy Group for American Efficient's Conduct .....................95

A.  Modern Energy Group Has Been Directly Involved in Carrying Out the Scheme.96

B.  Modern Energy Group Should be Held Liable for Its Subsidiaries' Actions..........98

VII.  American Efficient's Defenses are Not Persuasive ...................................................102

A.  American Efficient's Causation Arguments Ignore the Purposes of the Capacity Markets and the Plain Text of the Tariffs ........................................................................102

B.  American Efficient's Program is Unlike the EER Program Designs of Other Capacity Market Participants............................................................................................106

C.  American Efficient Was Neither Honest nor Transparent with PJM or MISO, and "Approvals" of the Technical Elements and Representations in American Efficient's Submissions Do Not Excuse American Efficient's Violations......................................110

1.  American Efficient Had Only Limited Communications with ISO/RTO Staff Concerning How the Company's Program Operated.................................................111

Case 1:25-cv-00068-TDS-JEP    Document 19-1    Filed 03/03/25    Page 11 of 175

　　　　2.  American Efficient's Deceptive Conduct Shows That the Company Did Not Engage with ISO/RTO Staff in Good Faith ................................................................118

　　D.  The Company's Economic Arguments are Inapplicable to American Efficient's Program ................................................................................................................120

　　　　1.  American Efficient is not an aggregator of EERs ..................................................120

　　　　2.  Dr. Schatzki opined only on generalities and did not provide any conclusions specific to American Efficient's Program ..................................................................122

　　E.  Whatever Contract Rights American Efficient Acquires From its Program Partners Are Not the Rights Required by the Tariffs....................................................126

　　F.  American Efficient Responds to the Nexus Requirement with a Series of Distractions ................................................................................................................131

　　G.  American Efficient's Argument That Its Program Provides Necessary Information to the ISO/RTOs Is Unfounded ..................................................................132

　　H.  Nothing in the PJM Stakeholder Process Regarding EERs Undermines Staff's Interpretation of the PJM Tariff ..................................................................133

　　I.  PJM's Recent Filing in An Active Complaint Docket Does Not Support American Efficient' s Position ........................................................................................139

VIII.　　Remedies and Sanctions ....................................................................................141

　　A.  American Efficient Civil Penalty Analysis ..................................................................142

　　　　1.  Application of the Statutory Factors ......................................................................142

　　　　2.  Application of the Penalty Guidelines ..................................................................143

　　B.  Disgorgement ..............................................................................................................148

　　C.  Ability to Pay ..............................................................................................................150

IX.  Conclusion ..................................................................................................................150

Case 1:25-cv-00068-TDS-JEP     Document 19-1     Filed 03/03/25     Page 12 of 175

# I.    EXECUTIVE SUMMARY

Office of Enforcement staff ("Enforcement" or "staff") submits this report to the Federal Energy Regulatory Commission ("Commission") setting forth its findings of fact and conclusions of law regarding the investigation of American Efficient LLC and its affiliates (including its corporate parents, Modern Energy Group LLC and MIH LLC) (collectively, "American Efficient" or "Company").  Staff concludes that American Efficient violated section 222 of the Federal Power Act ("FPA"), 16 U.S.C. § 824v (2018); the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2024); Midcontinent Independent System Operator, Inc.'s ("MISO") Open Access Transmission, Energy and Operating Reserve Markets Tariff ("MISO Tariff"); and PJM Interconnection, L.L.C.'s ("PJM") Open Access Transmission Tariff and Reliability Assurance Agreement ("RAA") (collectively, "PJM Tariff").[1]

The Commission approved the creation of the capacity markets to help balance electricity supply and demand to ensure grid reliability and prevent blackouts.  It allowed Energy Efficiency Resources ("EERs") to participate in those markets to help reduce electricity demand.  At the Commission's direction, the grid operators (called "ISO/RTOs")  in New England (ISO New England, Inc., or "ISO-NE"),  the Mid-Atlantic (PJM), and the Mid-Continent (MISO) regions of the country incorporated energy efficiency into their capacity markets and allowed EERs to receive capacity payments for reducing demand.

American Efficient has exploited those markets, enriching itself, its individual investors, its various holding companies, and its investment bank counterparties by receiving capacity payments for a purported energy efficiency project ("Program") that does not actually do anything to reduce demand.  Over the past ten years, the Company has cleared half a billion dollars in capacity without offering any real energy efficiency, providing any demand reductions, or making the grid any more reliable.  Its Program receives more capacity payments than any single generator in PJM, and it offers nothing in return.

---

[1] The PJM Tariff defines the RAA as "that certain Reliability Assurance Agreement Among Load Serving Entities in the PJM Region, on file with FERC as PJM Interconnection L.L.C. Rate Schedule FERC No. 44, and as amended from time to time thereafter."  Absent a citation to a specific section, general references herein to the PJM Tariff include both the PJM Tariff and the RAA.

1

What American Efficient passes off as energy efficiency in its capacity supply offers really is just market research. It buys sales data of energy efficient products from large retailers like The Home Depot, Lowes, and Costco and then figures out how many MWs of electricity would be saved if end-use customers installed those products and used them in accordance with predictive models. It then bids those energy savings into the capacity markets as if it caused the savings. But American Efficient does not cause the energy savings. In fact, it has nothing to do with the end-use customers or the home improvement and other projects that actually cause the savings associated with the use of those energy efficient products. It does not even tell those customers that it is bidding those savings into the capacity markets and getting rich on those customers' work.

American Efficient claims that it obtained the rights to payments for the energy savings caused by customer projects by purchasing from manufacturers, distributors, and retailers "environmental attributes" associated with the energy efficient products that end-use customers used as part of their projects. It claims to have purchased those environmental attributes when it purchased the sales data from its retailer partners and argues that ownership of the attributes gives it the right to take any potential capacity payments away from end-use customers, even though it has no agreement with those customers, has no rights to those customers' projects, and does not ever tell the customers that the Company is purporting to take their rights away. Nevertheless, American Efficient has amassed a fortune in capacity payments by paying retailers a few cents per product for sales data and environmental attributes and then claiming that this gives the Company the right to benefit from end-use customers' efforts. But American Efficient's collection of sales data and environmental attributes does not qualify the Program as an EER under the MISO or PJM tariff requirements.

Staff is unaware of any comparable program. American Efficient's theory of environmental attributes is inconsistent with the ISO/RTOs' Tariffs' requirements for EER participation. The capacity markets pay providers for causing reductions in energy use, not for abstract characteristics of retail products. American Efficient has not caused any of the reductions in energy use it has taken credit for and whatever value these sales data and environmental attributes may have, they don't qualify as EERs under the PJM and MISO Tariffs.

Staff is not the first to reach this conclusion. Some of the ISO/RTOs and ISO/RTO Independent Market Monitors ("IMMs") realized years ago that American Efficient was misusing their capacity markets. American Efficient's Program started small, offering a relatively small amount of capacity (9.2 MWs of capacity, worth $400,000) associated with lightbulb sales in PJM, but it grew quickly as the Company incorporated more and more data from more and more stores. As it grew, it spread to

2

other ISO/RTOs. The Company initially cleared 10.6 MWs (worth $518,000) in the ISO-NE Forward Capacity Auction ("FCA") and 98 MWs (worth $54,000) in the MISO Planning Resource Auction ("PRA"). But those ISO/RTOs saw through American Efficient's Program. They realized that the Program did not cause any energy reductions and was not a legitimate EER under their tariffs. Accordingly, when the Company sought to expand the Program in ISO-NE from 10.6 MWs to 189 MWs, ISO-NE and its IMM sent a series of emails and letters critiquing the Program and then disqualified the Company from expanded participation in the FCA. In one of those letters, ISO-NE explained that it never would have qualified any of American Efficient's capacity if it had understood the true nature of the Program from the beginning. Similarly, when the Company expanded its Program in MISO from 98 MWs in 2017 to 650 MWs in 2020, the MISO IMM and MISO itself took a closer look at the Program and concluded that it did not comply with the MISO Tariff. MISO disqualified American Efficient from its capacity markets in March 2021 after it identified fundamental defects and tariff violations in nearly every aspect of the Company's Program. The MISO IMM and the PJM IMM later referred the Company and its Program to Enforcement for potential enforcement action,[2] and American Efficient's Policy Director left the Company, concluding that it had become nothing more than a "wealth transfer" from ratepayers and was being run in a manner that was "at best unethical."

The detailed explanations that ISO-NE and MISO offered for why the Program did not comply with their respective Tariffs (including the Program's failure to cause any reductions in electricity use) did not cause the Company to make substantive changes to the Program. Nor did the Company discuss those concerns with PJM, even though the provisions governing EERs in ISO-NE and MISO were nearly identical to the ones in PJM. To the contrary, the Company expressly decided to keep information about those disqualifications from PJM because American Efficient's leadership was nervous that PJM might follow suit with its own disqualification.

Faced with disqualifications in ISO-NE and MISO, American Efficient decided to dramatically expand the Program in PJM, the only ISO/RTO that still allowed it to participate. The Company brought on new investment bank partners to help fuel its conversion of sales data into PJM capacity payments, and it even sold part of its capacity

---

[2] Staff is aware that, on May 31, 2024, the PJM IMM filed a complaint with the Commission against American Efficient and other "Indicated Energy Efficiency Sellers." *See* Ind. Market Monitor for PJM, Compl., Docket No. EL24-113 (filed May 31, 2024). This Staff Report does not address potential violations by any entity other than American Efficient, and staff offers no opinion on the Complaint or any of the legal arguments or factual assertions contained therein.

revenue stream to one of those partners. American Efficient used that new capital to expand the Program from sales data on just lightbulbs to data on myriad other consumer products, including appliances, window treatments, caulk, and shower heads. This expanded Program has resulted in dramatic year-over-year capacity revenue growth in PJM. Indeed, for the most recent three PJM delivery years (2022/2023, 2023/2024, and 2024/2025), American Efficient has, on average, offered and cleared 4,607 MW per PJM delivery year with average PJM delivery year revenues of $86.7 million. In total, American Efficient has cleared 20,751 MW and $473,667,758 in capacity payments since entering PJM's capacity market in 2014. In recent years, its market data Program has absorbed nearly three-quarters of the entire EER capacity market in PJM. The Company's investment bank partners have bragged about the abnormally high returns on investment they have received, and American Efficient told them that it expected to clear as much as $1.34 billion in capacity over five upcoming PJM BRAs.

American Efficient defrauded the markets and ISO/RTOs by presenting its market data Program as a capacity resource. To carry out that scheme and ensure that it maximized its capacity payments, American Efficient concealed the true nature of the Program by making false statements to market regulators. For example, it claimed that it provided "incentives" and reductions in energy usage. Without any evidence or factual basis, the Company also claimed that its Program influenced or even dictated customer behavior. The Company also repeatedly represented to PJM and MISO that its Program met the respective tariffs' EER definitions when the Program did not. Finally, American Efficient also withheld material information from PJM and MISO to avoid scrutiny of its capacity market activities.

In sum, based on the facts and legal authorities set forth below, staff finds that American Efficient's Program fails to meet the relevant provisions in the PJM and MISO Tariffs because it: (1) does not cause reductions in electricity consumption, (2) lacks the nexus to end-use customer projects required by those Tariffs, and (3) does not include the required ownership or contractual rights in end-use customer projects. American Efficient violated multiple provisions of the MISO Tariff through March 2021, when MISO disqualified the Program from its capacity markets. Staff further finds that American Efficient has violated, and continues to violate, the Commission's Anti-Manipulation Rule and multiple provisions of the PJM Tariff. American Efficient deceived PJM and MISO into paying it hundreds of millions of dollars by, among other things, falsely representing that its Program satisfied the tariff obligations to qualify as an EER. But the Program did not satisfy those obligations.

Staff understands that the Company continues to seek additional money from the PJM capacity market and, in fact, cleared tens of millions of additional dollars of capacity

4

in the most recent PJM capacity auction that closed on July 23, 2024.[3] Accordingly, staff recommends that the Commission issue an Order to Show Cause and Notice of Proposed Penalty to American Efficient requiring it to show cause why (i) it did not violate Section 222 of the Federal Power Act, 16 U.S.C. § 824v (2018), and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2024); (ii) it did not violate the provisions of the PJM Tariff set forth in Appendix A-1 of this Staff Report; (iii) it did not violate the provisions of the MISO Tariff set forth in Appendix A-2 of this Staff Report; (iv) it should not disgorge $2,116,057, plus interest, in unjust profits back to MISO and $250,937,821, plus interest, in unjust profits back to PJM; (v) it should not disgorge additional unjust profits received between April 2024 and the date of any future order of the Commission directing disgorgement, plus interest, back to PJM; and (vi) it should not pay a civil penalty in the amount of $722 million.

## II.     BACKGROUND

### A.     American Efficient and Its Affiliates

Modern Energy Group LLC ("Modern Energy Group") is a multinational "structured finance firm that invests in EERs and other [Distributed Energy Resources]."[4] It "invests in EERs" through American Efficient, a wholly owned subsidiary of Modern Energy Group affiliate MIH LLC.

American Efficient participates in ISO/RTO capacity markets through various subsidiary companies. It currently participates in PJM's capacity market through its subsidiary, Affirmed Energy LLC ("Affirmed"), and previously participated in PJM through Affirmed's predecessor, Wylan Energy, L.L.C. ("Wylan"). American Efficient participated in MISO's capacity market from 2017–2021 through its subsidiary,

---

[3] On July 5, 2024, American Efficient filed a complaint with the Commission against PJM, challenging PJM's decision to hold the Company's collateral (Docket No. EL24-124-000). On July 15, 2024, American Efficient and PJM filed in that docket a Joint Motion to Stay Proceedings with an attached Stipulation and Standstill Agreement. The agreement capped the number of MWs American Efficient was permitted to offer into the recently completed 2025/26 BRA.

[4] EIG-00018274 (Modern Energy Group marketing slides).

Midcontinent Energy LLC ("Midcontinent"). American Efficient also participates in ISO-NE's capacity market through its subsidiary Maple Energy LLC ("Maple").[5]

Consistent with (1) the way in which American Efficient summarized its affiliates' conduct in its September 5, 2023 Response to FERC Enforcement Staff's Preliminary Findings ("Preliminary Findings Response") and the structure of those companies, (2) American Efficient's direct involvement in relevant conduct, and (3) because the Program has operated nearly identically across all ISO/RTOs, staff herein describes the relevant activities in the various ISO/RTOs as having been taken by American Efficient rather than its individual subsidiaries.

## B. EERs and the Capacity Markets

Maintaining the balance between electricity supply and demand is crucial to maintaining grid reliability and avoiding blackouts and other grid failures.[6] Grid operators ensure that balance, in part, by confirming that there is enough generating capacity available to meet demand, as determined by a load forecast.[7] ISO-NE, MISO, and PJM traditionally have paid generators to commit to provide a certain number of MWs of electricity (capacity) in exchange for capacity payments (payments that are funded by ratepayers).[8] These ISO/RTOs also allow certain resources that reduce demand (rather than increase supply), including EERs, to offer into their capacity

---

[5] On January 31, 2019, the ISO-NE Internal Market Monitor referred Maple to Enforcement for potential enforcement action after Maple sought to dramatically increase its qualified capacity in that ISO/RTO. Staff sent Maple a document preservation letter on February 1, 2019. In September 2019, ISO-NE disqualified the company, in part, from its EER capacity market, leaving Maple with a relatively small number of existing MWs in that market. Accordingly, staff did not pursue the referral further at that time, though it did not make any finding that Maple's conduct was consistent with the ISO-NE tariff.

[6] *See generally* U.S. Department of Energy, *How it Works: The Role of a Balancing Authority*, https://www.energy.gov/sites/default/files/2023-08/Balancing%20Authority%20Backgrounder_2022-Formatted_041723_508.pdf.

[7] *See* Federal Energy Regulatory Commission, Office of Energy Policy and Innovation, *Energy Primer, A Handbook for Energy Market Basics*, at 72 (Dec. 2023).

[8] *See id.* at 77–78, 85–86, 89–90; *see also Advanced Energy Mgmt. Alliance v. FERC*, 860 F.3d 656, 659–60 (D.C. Cir. 2017) (per curiam).

6

markets.[9]  The Commission authorized EERs to participate in capacity markets based on their ability to reduce demand, which can be just as valuable as an increase in supply when it comes to keeping the grid in balance and ensuring that there are adequate resources to meet demand.

Typically, EER providers undertake projects that are designed to achieve reductions in electricity consumption and then bid the savings from their projects into the capacity markets.  The ISO/RTOs allow EER providers to bid a project into the capacity market for a set number of years (typically four)[10] from the date of installation.  The most common type of EER is a distribution utility energy efficiency program.  These programs are typically implemented under state statutes or state commission orders and are usually funded via a surcharge on customer bills.[11]  They often include a portfolio of activities that cause demand reductions, such as retail markdowns of energy efficient products, direct incentives to residential customers to install energy efficient products or appliances, or direct incentives to commercial and industrial customers to retrofit their businesses with energy efficient systems and processes.[12]  Before the energy savings are bid into the market, the relevant state commission will typically have reviewed them under a measurement and verification process.[13]  The EERs demonstrate and validate the energy savings resulting from their projects by using assessments like engineering reviews, automated project tracking systems, telephone or web interviews with customers or contractors, metering, customer billing analysis, and customer site visits.[14]

---

[9] As discussed below, on November 5, 2024, in Docket No. ER 24-2995, the Commission approved PJM's proposal to remove EERs from its capacity market following the 2025/2026 Delivery Year.

[10] PJM Manual 18B, Energy Efficiency Measurement & Verification, section 1.2 (Revision 05, effective September 21, 2022) ("PJM Manual 18B"); MISO Business Practice Manual 11: Resource Adequacy at section 4.2.8 (Revision 29, effective October 1, 2023) ("MISO Manual 11").

[11] *See, e.g.*, PJM_AE-0000000428.0008, at 3 (Post-Installation Measurement and Verification Report for Energy Efficiency Resources, DY 2022–23, [Company Name Redacted] Energy Efficiency Project (May 6, 2022)).

[12] *See, e.g.*, PJM_AE-0000000431.0003, at v–vi (Post-Installation Measurement and Verification Report, Prepared for [Company Name Redacted] (May 10, 2022)).

[13] *See, e.g.*, PJM_AE-0000000428.0008, at 3.

[14] *See, e.g.*, PJM_AE-0000000431.0003, at iv.

7

Other examples of EER capacity projects are large-scale commercial and industrial retrofits to replace less efficient products, systems, or processes. Examples of such projects in PJM include a school district that installed energy efficient lighting and made building envelope improvements at identified schools,[15] a university that implemented projects to improve the efficiency of its campus' chilled water distribution system,[16] and a development corporation that installed energy efficient lighting systems at specified municipal buildings.[17] These projects measure the energy usage of the newly installed technology against the energy usage of what had been in place before, and then offer those savings as capacity.

## C.    Summary of Relevant Tariff Obligations

PJM and MISO have permitted EERs to participate in their capacity markets since 2009 and 2012, respectively.[18] Staff has set out the text of the most relevant provisions of the PJM Tariff and MISO Tariff in Appendices A-1 and A-2, respectively, and discusses those provisions in detail in section V.A below. Staff sets out the relevant definitions here as background for the immediate discussion.

### 1.    Definitions of "Energy Efficiency Resource"

The PJM and MISO Tariffs define EERs similarly and establish nearly identical requirements. In both markets, an EER must include one or more projects that are designed to achieve a continuous reduction in electric energy consumption at an end-use customer's retail site or on a retail customer's facilities.[19] Although neither tariff includes an express definition of "project," both tariffs state that a project "include[es] *installation* of more efficient devices or equipment or *implementation* of more efficient

---

[15] *See* PJM_AE-0000000012.0001 (Initial Measurement & Verification Plan, 2017/18 DY, [Name Redacted] School District (Apr. 12, 2014)).

[16] *See* PJM_AE-0000000021.0002 (Initial M&V plan – [Redacted] Central Plant Optimization (Apr. 12, 2014)).

[17] *See* PJM_AE-0000000116.0008 (Updated Post-Installation M&V report for [Redacted] Development Corporation (Aug. 4, 2016)).

[18] *Midwest Indep. Transmission Sys. Operator, Inc.*, 139 FERC ¶ 61,199, at P 236 (2012); *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275, at PP 137–39 (2009).

[19] PJM Reliability Assurance Agreement ("RAA"), Schedule 6, section L.1; MISO Tariff, Module E-1, section 69A.3.2.

8

processes or systems."[20] Thus, the tariffs indicate that "more efficient devices or equipment" alone do not constitute a project. Rather, the tariffs indicate that a project entails the "installation" or "implementation" of such products.

To offer an EER into the capacity markets, a market participant must possess ownership or equivalent contractual rights in the EER.[21] PJM defines an EER as a capacity resource comprising a project, meaning that possessing contractual rights to the EER necessarily requires possessing contractual rights to a relevant project.[22] MISO defines an EER as a resource "in which the Market Participant possesses ownership or equivalent contractual rights, from an end-use customer project."[23]

In full, PJM defines "Energy Efficiency Resources" in Article 1 of the RAA as:

> [A] project, including installation of more efficient devices or equipment or implementation of more efficient processes or systems, meeting the requirements of Reliability Assurance Agreement, Schedule 6 and exceeding then current building codes, appliance standards, or other relevant standards, designed to achieve a continuous (during the summer and winter periods described in such Schedule 6 and the PJM Manuals) reduction in electric energy consumption that is not reflected in the peak load forecast prepared for the Delivery Year for which the Energy Efficiency Resource is proposed, and that is fully implemented at all times during such Delivery

---

[20] PJM RAA, Schedule 6, section L.1 (emphasis added); MISO Tariff, Module E-1, section 69A.3.2 (emphasis added). *See also Advanced Energy Economy*, 161 FERC ¶ 61,245, at P 59 (2017) (noting that EERs in PJM are "by definition, composed of retail customer actions that reduce load").

[21] MISO Tariff, Module E-1, section 69A.3.2; PJM Tariff, Attachment DD, section 5.5A.

[22] PJM Tariff, Attachment DD, section 5.5 (permitting capacity market sellers to submit sell offers for a capacity resource "only if such seller owns or has the contractual authority to control the output or load reduction capability of such resource and has not transferred such authority to another entity prior to submitting such Sell Offer").

[23] MISO Tariff, Module E-1, section 69A.3.2.

9

Year, without any requirement of notice, dispatch, or operator intervention.

RAA Article I includes a nearly identical definition for "Annual Energy Efficiency Resource." Attachment DD, Schedule 5.5 of the PJM Tariff allows Capacity Resource owners to sell Capacity "only if such seller owns or has the contractual authority to control the output or load reduction capability of such resource . . . ."

Module M, Section 69A.3.2 of the MISO Tariff defines Energy Efficiency Resource in a similar way:

> An Energy Efficiency Resource is a Planning Resource, in which the Market Participant possesses ownership or equivalent contractual rights, from an end-use customer project (including the installation of more efficient devices or equipment or implementation of more efficient processes or systems) . . . exceeding then-current building codes, appliance standards, or other relevant standards, designed to achieve a continuous reduction in electric energy consumption during On Peak daylight hours.

Attachment UU of the MISO Tariff further clarifies that EERs are "specific projects *resulting in* installed measures on retail customer facilities *that achieve* a permanent reduction in electric energy usage while maintaining a comparable quality of service."[24] Attachment UU also requires that Measurement and Verification ("M&V") plans include "project-specific M&V methods and techniques that will be used to determine and verify the expected Coincident Peak Demand reduction (*i.e.*, demand reduction) *resulting from* an EE Resource."[25]

## 2. History of EERs in PJM

The provisions in the PJM and MISO Tariffs adding energy efficiency to their respective capacity markets resulted from lengthy processes, involving multiple Commission orders, settlements, and stakeholder reports. PJM took its first steps towards authorizing energy efficiency to participate in its capacity market as part of a 2006 settlement that obligated PJM to, among other things, "establish additional process[es] within the PJM region for pursuing and supporting demand response and incorporating

---

[24] MISO Tariff, Attachment UU (emphasis added).

[25] *Id.* (emphasis added).

10

energy efficiency applications."[26] The Commission approved that settlement, noting that "[i]n broad terms, the Settlement does promote energy efficiency, in that greater price awareness is likely to incent users to . . . use energy more efficiently,"[27] and ordered PJM to file a status report on the incorporation of energy efficiency applications.[28]

PJM filed proposed tariff amendments regarding energy efficiency on December 12, 2008, as part of a much larger reform of PJM's capacity market.[29] It explained that, "[f]or the most part, the changes to incorporate energy efficiency in [the Reliability Pricing Model] appear in a new section M to Schedule 6 of the RAA . . . ."[30] The section M set out in that filing is nearly identical to how that section appears today. On March 26, 2009, the Commission approved that proposal with minor changes.[31] In a later filing addressing whether transmission projects could participate as EERs, PJM clarified that it historically "has repeatedly" interpreted the term "Energy Efficiency Resources" to apply only to "resources reducing electric energy consumption behind the End-Use Customer's meter,"[32] and it did not believe that this included transmission projects. PJM, therefore, proposed to add the phrase "at the End-Use Customer's retail site" to the definition of "Energy Efficiency Resource"[33] "to provide clarification that a project qualifying as an Energy Efficiency Resource is one that is installed at the End-Use Customer's retail site."[34]

---

[26] Explanatory Statement to Agreement of the Settling Parties, Docket No. ER05-1410, at 50 (Sept. 29, 2006).

[27] *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,331, at P 131 (2006).

[28] *Id*. P 7.

[29] *See PJM Interconnection L.L.C.*, Docket No. ER09-412 (Dec. 12, 2008).

[30] *Id*. at 30.

[31] *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at PP 137–139.

[32] PJM Transmittal Letter, Docket No. ER11-1909, at 1–2 (Oct. 26, 2010), https://www.pjm.com/directory/etariff/FercDockets/32/20101026-er11-1909-000.pdf.

[33] *Id*. at 2–3.

[34] *Id*. at 1. The Commission approved this amendment via delegated letter order. *PJM Interconnection, L.L.C.*, Docket No. ER11-1909-000, at 1 (Dec. 20, 2010).

11

In 2016, PJM changed its load forecasting models and methodology to incorporate anticipated energy efficiency.[35] Absent other changes, this alteration would have resulted in the double-counting of energy efficiency (as both a reduction in capacity demand through a decrease in the load forecast, and an increase in capacity supply). To avoid such double-counting, and the reliability problems it could cause, PJM implemented an energy efficiency "add-back" mechanism. The mechanism returns or "adds back" all cleared EER MWs to the capacity demand curve.[36] Accordingly, EERs in PJM increase total capacity costs to customers and do not displace other resources.[37] In June 2017, PJM published a white paper in which it observed that the add back adjustments that it makes "in order to pay energy efficiency a capacity payment" are not "appropriate for energy efficiency improvements that would have been made regardless of wholesale market participation."[38]

On November 5, 2024, in Docket No. ER 24-2995, the Commission approved PJM's proposal to remove EERs from its capacity market following the 2025/2026 Delivery Year. The Tariff now states that the provisions addressing EERs "shall be effective only through the 2025/2026 Delivery Year," and that "[t]hereafter, no Energy Efficiency Resources shall qualify to be offered into the RPM Auctions beginning with the 2026/2027 Delivery Year." The conduct addressed in this Staff Report concludes with American Efficient's participation in the July 2024 BRA (for the 2025/2026 Delivery Year), *i.e.* the last Delivery Year in which EERs will participate in PJM's capacity markets.

---

[35] PJM Interconnection, *Load Forecasting Model Whitepaper*, at 23–30 (2016) ("PJM Load Forecasting Whitepaper").

[36] PJM Manual 18, PJM Capacity Market, Revision: 58, Effective Date: November 15, 2023 ("PJM Manual 18"), section 2.4.5.

[37] *See Calpine Corporation*, 171 FERC ¶ 61,034, at PP 74–77 (2020) (Glick, Comm'r, dissenting). EERs represent additional resources that customers must pay for, but that do not count towards meeting "the Reliability Requirement of the RTO and each affected LDA." *See* PJM Manual 18, section 2.4.5.

[38] PJM Interconnection, *Demand Response Strategy*, at 39 (2017), *available at* https://www.pjm.com/~/media/library/reports-notices/demand-response/20170628-pjm-demand-response-strategy.ashx.

### 3. History of EERs in MISO

On July 20, 2011, MISO proposed tariff amendments to allow EERs to participate in its capacity market.[39] As it explained, "MISO is proposing to add Energy Efficiency Resources as a new type of Planning Resource to promote Energy Efficiency Resources in the MISO Region consistent with Commission Smart Grid policies and also because Energy Efficiency Resources really do reduce Demand and so assist in meeting MISO reliability standards."[40]

The Commission approved those amendments on June 11, 2012, but it required MISO to make two changes: (1) add a requirement that a market participant seeking to offer an EER must have "ownership or equivalent contractual rights" over that resource; and (2) specify in the tariff the data and other information that such market participants must provide, and explicitly require that they file a M&V plan.[41] MISO made the required compliance submission, with the additional ownership/contractual rights language and the M&V requirements spelled out in Attachment UU, on July 11, 2012.[42] The Commission accepted that filing without comment.[43]

## III. TIMELINE OF INVESTIGATION

Both the MISO IMM and the PJM IMM referred American Efficient's subsidiaries in their respective markets to staff in April 2021.[44] Staff opened a preliminary, non-

---

[39] MISO FERC Electric Tariff, Fourth Revised Vol. No. 1.

[40] *See* Letter from A. Iler to K. Bose, Docket No. ER11-4081, at 11 (July 20, 2011).

[41] *Midwest Indep. Transmission Sys. Operator, Inc.*, 139 FERC ¶ 61,199, at P 236 (2012). The Commission also directed MISO to add a definition for "unforced capacity" as it applies to EERs or explain why such a definition is not necessary. *See id.*

[42] *See* Letter from A. Iler to K. Bose, Docket No. ER11-4081 (July 11, 2012).

[43] *See Midwest Indep. Transmission Sys. Operator, Inc.*, 153 FERC ¶ 61,230, at P 115 (2015).

[44] Potomac Economics, "Referral of Midcontinent Energy, LLC for violations of Section 69.A.3.2 of the MISO Tariff and Attachment UU, and for violations of 18 CFR 35.41.b Market Behavior Rules and 18 CFR 1.c.2 Prohibition of Electric Energy Market Manipulation" (April 2, 2021); Monitoring Analytics, "Market Violation/Manipulation Referral" (April 16, 2021).

public investigation of American Efficient in May 2021. Over the following year, staff had numerous telephone calls and meetings with Company leadership and its counsel and collected documents through data requests to American Efficient and third parties including MISO, PJM, ISO-NE, and the IMMs.

In May 2022, staff met with counsel for American Efficient to discuss the information staff had gained through factfinding, as well as the legal theories American Efficient asserted in its defense. Following that meeting, American Efficient submitted a white paper to staff on June 21, 2022, setting out factual assertions, legal arguments, and policy arguments that American Efficient claimed either showed no violations had occurred or that enforcement actions were not necessary ("June 2022 Submission"). Staff conducted additional written discovery in the year that followed receipt of the June 2022 Submission.

Staff issued preliminary findings to American Efficient on July 14, 2023 ("Preliminary Findings"). American Efficient submitted its Preliminary Findings Response on September 5, 2023, with a white paper of legal arguments and an affidavit from Todd Schatzki, an economist ("Schatzki Declaration"). Following receipt of American Efficient's Preliminary Findings Response, staff sought to take investigative testimony from key personnel at American Efficient, but American Efficient refused to make its employees voluntarily available for testimony. More specifically, on October 6, 2023, American Efficient sent a letter to the Chairman informing him that it was not going to make witnesses available in response to staff's request.[45]

Given the Company's lack of cooperation, staff asked the Commission to convert the preliminary investigation into a formal one, which the Commission did on October 30, 2023. Following the Commission's grant of subpoena authority upon converting to a formal investigation, staff issued subpoenas and took testimony of two current Company employees: the Company's Chief Markets Officer and the Company's Head of Origination. Staff also took testimony from the former Senior Director/Policy Director ("Former Policy Director") at Modern Energy Group.[46] The Former Policy Director testified that American Efficient's General Counsel had told her that the Company had ceased cooperating with staff and that the Company preferred that she also not cooperate

---

[45] *See* Letter from S. Kelly to Chairman, at 5 (Oct. 6, 2023).

[46] The Former Policy Director testified that she left American Efficient because the Company "was at best unethical," Tr. 110:10–12 (Former Policy Director), and that she no longer wanted to be associated with its Program, which she characterized as a "wealth transfer" from rate payers. *Id.* at 113:25–114:2.

14

with staff.[47]  She rejected the Company's preference and testified voluntarily.  Staff also conducted an investigative interview with the Former CEO of American Efficient,[48] and spoke briefly with an ex-PJM employee who now works for the PJM IMM that referred American Efficient for potential enforcement action.  Staff also issued subpoenas *duces tecum* to third parties, including American Efficient's investors, an investment company specializing in energy investments ("Investment Company") and one of the world's largest investment banks ("Investment Bank") and an affiliated entity of the Investment Bank ("Investment Bank Affiliate").

In addition to refusing to cooperate with the investigation, American Efficient also provided misleading information to the Commission.  For example, in an October 2023 letter to the Chairman's office, American Efficient claimed that "the RTOs themselves have not recognized or followed Enforcement's novel tariff interpretation."[49]  In fact, ISO-NE and MISO—as well as the market monitors for ISO-NE, MISO, and PJM—had all by then concluded that American Efficient's Program violates the relevant tariff provisions on EERs.  Separately, in July 2023 the Company sent a letter to PJM in which it stated that "[a]nother subsidiary of American Efficient, Midcontinent Energy LLC ('Midcontinent'), *operates*"—present tense—"similarly in MISO's capacity market."[50]  At both the time this letter was sent to PJM and when it was later forwarded to the Chairman's office, Midcontinent had been disqualified from the MISO capacity market and was no longer permitted to operate in MISO.[51]

Pursuant to 18 C.F.R. § 1b.19, staff provided American Efficient with notice on May 22, 2024, that it intended to recommend that the Commission issue an Order to

---

[47] Tr. 12:17–20 (Former Policy Director).

[48] The Company provided both the Chief Markets Officer and the Former CEO copies of staff's Preliminary Findings and the Company's response to review prior to those witnesses speaking with staff.  Tr. 8:20–25 (Chief Markets Officer); Recorded Interview with Former CEO, Jan. 30, 2024 ("Former CEO Interview") at 0:03:54–0:04:01.  Staff recognizes that reviewing those documents may have affected the responses the witnesses provided to staff's questions.

[49] Letter from S. Kelly to Chairman, at 4 (Oct. 6, 2023).

[50] July 24, 2023 letter from Affirmed Energy LLC to PJM, at page 2 (emphasis added).

[51] *See infra* section IV.B.4.

15

Show Cause (1b.19 Notice).[52]  Pursuant to Commission regulations, American Efficient's response to the 1b.19 Notice was due within 30 days.  In the late afternoon of June 21, 2024, the day on which the response was due, the Company sent staff a letter stating that it had not completed work on its response and planned to submit a response on a later date.[53]  One month later, on July 22, 2024, American Efficient filed an untimely response to staff's notice (1b.19 Response).

Staff addresses the substance of the 1b.19 Response below.[54]  The 1b.19 Response raised nearly identical arguments to those set forth in the Company's September 2023 Preliminary Findings Response, and the only attachment to the 1b.19 Response was the same Schatzki Declaration that was attached to the Preliminary Findings Response.

## IV.  AMERICAN EFFICIENT'S PROGRAM EXTRACTS MONEY FROM THE CAPACITY MARKETS

### A.  American Efficient's Capacity Market Program

American Efficient monetizes, through the capacity markets, independent customer decisions to purchase energy efficient products by buying sales data and, purportedly, "environmental attributes" from retailers and then seeking capacity payments for the energy reductions associated with the customers' anticipated use of those products.  It does so through a capacity market "project" that it has defined during this investigation to be:

> [T]he multipronged operation . . . encompassing the manufacture and sale of consumer products in concert with Program Partners, the payments to Program Partners for every eligible energy efficient product unit sold, and all of the

---

[52] Affirmed Energy LLC, Letter to Commission, Docket No. EL24-113-000, at 1 (filed June 18, 2024) (stating publicly that staff provided notice pursuant to 18 C.F.R. § 1b.19).

[53] June 21, 2024 letter from American Efficient to J. Burdick and J. Medovoy.

[54] Staff has taken the untimeliness of the Company's 1b.19 Response into account in its civil penalty analysis as one of numerous instances of non-cooperation in this investigation.

16

        activities necessary to aggregate, measure, verify, and deliver
        the load reductions into capacity markets.[55]

The Company carries out its capacity market operations through three separate divisions: (1) Origination, (2) Research and Development ("R&D"), and (3) Energy Market Participation. Through its Origination division, American Efficient enters into "Program Agreements" with manufacturers, distributors, and retailers of energy efficient products. American Efficient refers to these counterparties as its "Program partners." These partners have included some of the largest home improvement and consumer product retailers in the United States, as well as major lighting product manufacturers and distributors. Examples include:

---

[55] Preliminary Findings Response at 23. American Efficient refers to this project as its "program," and so does staff.

**Table 1 – American Efficient's Program Partners**[56]

| Retailers | Manufacturers / Distributors |
|---|---|
| The Home Depot | Acuity Brands |
| Lowe's | TCP Lighting |
| Ace Hardware | RAB Lighting |
| Walmart | MaxLite |
| Sam's Club | GE-Current |
| Costco | Hubbell |
| Target | Feit Electric |
| Dollar Tree | Koninklijke Philips |
| Family Dollar | Global Value Lighting |
| Dollar General | Cree Lighting |
| Wegman's | L'Image Home Products |
| Stop and Shop | Altair Lighting |
| Giant Food | HD Supply |
| 1000bulbs.com | EiKO |
| e-conolight.com | Graybar Electric |

Through the Program Agreements, American Efficient pays its partners for data on their sales of energy efficient products included in the Program over a recent historic period (typically one month). The specified energy efficient products include, or have

---

[56] *See* EIG-00006860 (April 2022 MIH LLC Management Presentation) at slides 16–17; *see also* MCEN-PE_0001281 (Program Agreement 2017-0915, with Altair Lighting and Costco), MCEN-PE_0001452 (Program Agreement 2016-0203, with GE Lighting and Sam's Club), MCEN-PE_0001466 (Attachment A to Program Agreement 2018-0125, with L'Image and Dollar General), *and* ME-AMEFF00021723 (Program Agreement 2017-0601, with GE Lighting and Ahold U.S.A.).

18

included, lighting products (ranging from individual bulbs to large, wired lighting fixtures), caulking, door sweeps, window treatments, showerheads, ceiling fans, and major and minor appliances (including clothes washers, refrigerators, water heaters, dehumidifiers, and air purifiers).[57]

American Efficient pays its Program partners fees for market data and calculates those fees based on the amount of money that American Efficient believes it can obtain in the capacity markets from the underlying products.[58] The fees per unit sold are small and do not correspond to the retail price, the potential to incent customer behavior, or the size or total energy consumption of the product. For example, American Efficient pays The Home Depot 15 cents to 40 cents for each clothes washer (average of 19 cents per model), 5 cents to 30 cents for each refrigerator (average of 12 cents per model), and 5 cents per upright freezer.[59] Those numbers are roughly equivalent to the average fees American Efficient pays to The Home Depot for less expensive products, such as each lighting product (12 cents), each envelope sealant product (*i.e.*, caulk; 12 cents), and each showerhead (15 cents).[60] American Efficient has referred, both externally and internally, to the fees as "micropayments."[61]

Consistent with American Efficient's payment levels to The Home Depot, staff's internal analysis indicates that overall, American Efficient pays its Program partners 9 cents per product (18 cents per stock keeping unit or "SKU") and 15 cents per appliance on average.[62] By comparison, traditional utilities in PJM participating in energy

---

[57] *See* June 2022 Submission at 9–10.

[58] *See* Tr. 82:12–84:14 (Head of Origination); Tr. 160:9–19 (Chief Markets Officer).

[59] ME-AMEFF00040481 (Attachment B to Program Agreement Number 2017-1001) (effective August 3, 2023).

[60] ME-AMEFF00040481 (Attachment B.1, B.2, and B.5 to Program Agreement Number 2017-1001).

[61] Tr. 76:19–77:6 (Head of Origination).

[62] Staff estimated the average fee payment to partners using the total items and SKUs sold (from ME-AMEFF00040325–ME-AMEFF00040478) and dividing those total values by the payments made to Program partners (from ME-AMEFF00040479 & ME-AMEFF00040480). Staff relied on Attachment B in Program partner contracts to estimate the average fee paid per appliance.

19

efficiency programs offer customers direct discounts of between $20 and $100 per appliance.[63]  In terms of energy savings, staff's analysis indicates that American Efficient pays roughly $0.001/kWh for the energy savings it calculates, a rate that is approximately 1 percent of the average amount the utilities pay for the savings resulting from their customers' energy efficiency projects.[64]

Staff estimates that between August 2015 and April 2024 (the most recent data that staff received from the Company), American Efficient paid its Program partners approximately $63.8 million for data on product sales occurring in the PJM footprint, and approximately $13.4 million for data on product sales occurring in the MISO footprint before MISO disqualified the Company.[65]  The combined figure of $77.2 million is approximately 15 percent of the roughly $516 million that the Company received from

---

[63] Staff obtained residential energy efficiency rebate information from the publicly available Database of State Incentives for Renewables & Efficiency (DSIRE): https://www.dsireusa.org/.

[64] DSIRE  also provides information on custom incentive payments for new commercial projects for every kWh saved, ranging from $0.06/kWh by a Pennsylvania utility to $0.28/kWh by a Maryland utility.  Staff calculated the payment of $0.001/kWh for American Efficient by dividing total partner payments (ME-AMEFF00040479 & ME-AMEFF00040480) by the cleared capacity MW converted to kWh at a 100% load factor.  Staff also calculated a payment of $0.001/kWh by dividing total partner payments by the total tradeable watts (ME-AMEFF00040325–ME-AMEFF00040478).

[65] Staff's estimate is based on ME-AMEFF00052473, which provides a complete list of the Company's payments to Program partners, and ME-AMEFF00052474, which provides a breakdown of those payments between ISO/RTOs.

Despite its partial disqualification in ISO-NE and complete disqualification in MISO, American Efficient continued to purchase environmental attributes for and data associated with energy efficient product sales within those ISO/RTOs through March 2024.  The Head of Origination testified that the Company was still doing so because the Company did not want to decrease the Program value for partners and because "[a]t some point in the future, perhaps there's a possibility that those assets may have some value." Tr. 201:1–17 (Head of Origination).  Indeed, American Efficient has explored the idea of expanding its Program into NYISO, CAISO, and ERCOT as well. Tr. 124:23–25 (Chief Markets Officer).

20

the MISO capacity market, that it has cleared in the PJM capacity market, and that it has received in PJM capacity bonus payments.[66]

Program partners have discretion to do whatever they want with the payments they receive from American Efficient and are not obligated to advertise or otherwise promote sales of energy efficient products or pass the payments on to consumers through lower retail prices, rebates, or any other mechanism. American Efficient acknowledges that "[t]he terms and conditions of American Efficient's Program Agreements with Program Partners . . . do not specify or direct how Program Partners may use payments they receive from American Efficient."[67]

In addition to collecting market data through the Program Agreements, American Efficient also purports to own the "environmental attributes" associated with the products covered by that data. The Company has defined that term differently in different agreements, but those definitions generally include the "characteristics" of the product that enables it to "produce, consume, or avoid consuming" energy in a way that qualifies the product for incentives or payments.[68] The Program Agreements discuss the defined

---

[66] Most of the $516 million has already been paid to American Efficient and its investor, the Investment Bank Affiliate. American Efficient is scheduled to receive the remainder paid out at regular intervals through the end of the 2025/26 PJM Delivery Year (May 2026).

[67] American Efficient's October 28, 2022 Response to staff's September 26, 2022 Data Request 1 ("October 28, 2022 Response").

[68] All agreements include a definition of "Environmental Attributes" that generally includes "all characteristics that enable the energy that Products produce, consume, or avoid consuming to qualify for incentives or payments, and includes all the Products' benefits to the environment, including but not limited to, avoided emissions or other impacts to air, water, or soil that may occur through the Products displacement of nonrenewable and less environmentally friendly energy sources." *See, e.g.*, ME-AMEFF00021954 (Program Agreement 2014-1201). More recent agreements include express references to capacity payments or "grid company" payments, *see* ME-AMEFF00004480, or references to "all rights to claim or receive any incentives or payments" offered by ISO/RTOs or "grid companies." *See, e.g.*, ME-AMEFF00013784 (Program Agreement 2020-0415). Earlier (2014–2018) Program Agreements contained no mention of "energy efficiency resources" or of any category of attributes that would clearly include the rights to capacity market revenues. *See, e.g.*, ME-AMEFF00021954 (Program Agreement 2014-1201).

21

attributes in connection with the characteristics of the physical products themselves, not the use of those products by end-use customers.

The Program Agreements purport to transfer title to a product's environmental attributes from the Program partner to American Efficient by virtue of American Efficient's payment for sales data regarding that product. Agreements typically provide that "[r]etailer hereby transfers to Sponsor, free and clear of all encumbrances, the exclusive rights to all Environmental Attributes (and all rights and interests associated therewith) of Retailer relating to such Party's Products for which Sponsor has made Payments hereunder."[69]

After American Efficient obtains sales results from a Program partner, it "ingests" the "sales data" into a database.[70] Using various methodologies and assumptions, the Company's R&D division then converts the sales data into an estimate of the number of MWs of peak energy consumption that would be saved if end-use customers used the products as assumed in a future delivery year. The Company then allocates those MWs to different capacity zones based on the retailer's zip code (which is not necessarily the zip code where the customer will use the product).[71]

---

[69] ME-AMEFF00018705 (Agreement Number 2021-0514 between Walmart Inc. and American Efficient Origination LLC) at paragraph 4(b). The term "environmental attributes" does not appear anywhere in the PJM or MISO Tariffs, nor do EERs under either Tariff depend on the environmental attributes of the capacity resource that the EERs displace. This theory of using environmental attributes in the capacity context is one that American Efficient came up with on its own. Staff recognizes that Program Agreement definitions of "environmental attributes" could be read to transfer customer rights to other payments and incentives, including state rebates, tax credits, and utility incentives, and that the retailers' transfer of such customer rights without customer notice or consent could violate state consumer protection laws. This Staff Report does not analyze such potential violations because they are beyond the scope of the Commission's jurisdiction.

[70] *See* EIG-00010670 at 4 ("[T]he American Efficient team has executed a handful of new partnerships [*sic*] agreements (MaxLite, HD Pro, 1000 Bulbs and Ace Hardware) and ingested more sales data."); EIG-00017663 ("large surplus in DY19-20 due to ingest of data from new Lowe's contract and PIMV report").

[71] *See, e.g.*, ME-AFFIRMED-00000180, at 9 (Affirmed's April 15, 2021 Measurement & Verification Plan - Energy Efficiency Resources for the 2022/23 Base Residual Auction).

22

The R&D division's calculation of MWs to bid into the ISO/RTOs' annual auctions is not based only on products sold in a single year. Because the ISO/RTOs allow EER providers to receive payments for multiple years for a single project (typically for up to four years from the date of installation),[72] the Company includes the calculated energy savings for a given individual product across multiple capacity delivery years. American Efficient also has offered and cleared capacity based on product sales that occurred even *before* it had a Program Agreement with the relevant manufacturer, distributor, or retailer.[73] American Efficient refers to these sales as "historicals."[74]

After the Company's R&D division performs its analysis, American Efficient's Energy Market Participation division begins the process of offering the calculated MWs into the relevant capacity markets as an EER. To do so, the Company prepares M&V plans for submission to the RTOs. The purpose of an M&V plan is to identify the number of MWs that the EER nominates as capacity and the methods and techniques that it will use to measure and verify the savings resulting from its project(s). MISO requires EER providers to submit an initial M&V plan 30 days prior to the annual PRA in which the resource is to be initially offered[75] and an updated M&V plan for the EER "by February 1 prior to the next PRA in which the EE Resource is to be subsequently offered."[76] PJM similarly requires EER providers to submit initial M&V plans describing the proposed project 30 days before the first Reliability Pricing Model ("RPM") Auction they participate in and 30 days before each subsequent RPM Auction.[77]

---

[72] PJM Manual 18B, at section 1.1; MISO Manual 11, at section 4.2.8.

[73] *See, e.g.*, ME-AMEFF00024665 ("Glad to hear you guys are open to 'mining' past sales for Environmental Attributes to assign to us—we find it's a great exercise to make sure the reporting side of a program works and obviously has the benefit of creating immediate revenue.").

[74] Tr. 49:2–13 (Chief Markets Officer).

[75] *See* MISO Tariff, Attachment UU (Energy Efficiency Resources Measurement & Verification Procedures).

[76] MISO Manual 11, at section 4.2.8.

[77] *See* PJM Manual 18B, at sections 5.1.1 & 5.1.2. RPM refers to the PJM capacity market, which resources participate in through both BRAs and incremental auctions.

Once the ISO/RTOs approve the calculations and statistical assumptions in American Efficient's M&V plans, the Company bids the EERs into the capacity auctions. The Company's Energy Market Participation division then prepares and submits Post-Installation Measurement ("PIMV") reports for all EERs that cleared a capacity auction. MISO requires resources to submit an annual PIMV report "by March 1 prior to the first Planning Year that the Energy Efficiency Resource is committed to PRA"[78] and updated PIMV reports "by March 1 prior to each subsequent Planning Year that the resource is committed."[79] PJM's BRAs typically occur three years before the delivery year, and PJM requires EERs to submit PIMV reports documenting the completed project 15 business days before the start of the relevant capacity delivery year.[80]

According to PJM, the purpose of PIMV submissions is "to ensure that proper equipment/systems were installed, are operating correctly, and have the potential to generate the Nominated EE Value and Capacity Performance value of the EE Resource."[81] In its PIMV reports, American Efficient also typically updates the nominated MW values of the EERs it cleared in the capacity market. American Efficient receives capacity payments from the ISO/RTOs for the cleared capacity in the delivery year for which the Company's offers cleared. The payment amounts from the ISO/RTOs are based on the auction clearing price and the MW quantities included in the M&V plans.

**B.     History of American Efficient's Participation in PJM, MISO, and ISO-NE**

**1.     American Efficient's Participation in PJM's Capacity Auctions**

American Efficient began participating in PJM through its subsidiary Wylan (Affirmed's predecessor) in 2014. On March 13, 2014, one of the founders of Modern Energy Group sent an M&V plan to PJM for the 2016/2017 delivery year. The accompanying cover letter explained that the plan, dated April 12, 2013, "was originally submitted by a group called American Efficient" and that "[i]n the intervening period, Wylan Energy has acquired the assets of American Efficient's business pertaining to this

---

[78] MISO Manual 11, at section 4.2.8.

[79] *Id.*

[80] PJM Manual 18B, at section 5.1.3.

[81] *Id.* at section 4.1.

24

M&V plan, and as a Member of PJM, would like to continue pursuing the Resource Generation therein outlined."[82]

The April 2013 M&V plan Wylan purchased and re-submitted to PJM explained the EER as follows:

> Planned Energy Efficiency Installations (EE installations) will consist of one (1) product segment: compact fluorescent lighting (CFL) to be installed in small/medium sized commercial properties and residences. CFL bulbs will be distributed to program participants through online marketplaces and offline distribution partners. We will be able to target small/medium sized commercial properties and residences within specific [Locational Delivery Areas] through our relationships with our location-specific distribution partners. *The cost of CFL bulbs will be offset via either rebate coupons or markdowns.*[83]

Less than a month later, on April 11, 2014, American Efficient submitted a new M&V plan to PJM for the 2017/2018 Delivery Year.[84] This new plan differed from the 2016/2017 M&V plan that American Efficient had originally purchased, but the new plan referred to offering "subsid[ies]," and the earlier plan was referenced in, and included as an attachment to, the updated plan.

---

[82] ME-AMEFF00046967. The "American Efficient" entity from which Wylan purchased the M&V plan is separate and distinct from American Efficient LLC. The original entity is not affiliated with Modern Energy Group, other than from having sold the M&V plan to Wylan.

[83] ME-AMEFF00044753 at 5 (Updated Measurement & Verification Plan for Energy Efficiency Resources to be offered into the 2016/2017 Base Residual Auction) (emphasis added).

[84] ME-AMEFF00045536 (Updated Measurement & Verification Plan - Energy Efficiency Resources for the 2017/18 Base Residual Auction). The M&V plan also claimed that the referenced Program would "ensure that participants who are replacing retiring [compact fluorescent lightbulbs] do not revert back to incandescent or halogen bulbs of lumen equivalence."

One month later, in May 2014, American Efficient cleared 9.2 MW of EE capacity in the 2017/2018 BRA. Since then, American Efficient has participated in all but one of PJM's BRAs and has participated in every incremental auction. Table 2 below sets forth the results of American Efficient's EE Capacity participation in PJM.

**Table 2 – American Efficient's Participation in PJM's Base Residual and Incremental Auctions**[85]

| Delivery Year | AmEff Cleared Capacity in PJM (MW) | Total EE Capacity Cleared in PJM (MW) | AmEff Share of Cleared EE Capacity | AmEff Capacity Revenue in PJM |
|---|---|---|---|---|
| 2015/16 | 45 | 1,190 | 4% | $2,764,109 |
| 2016/17 | 49 | 1,723 | 3% | $1,744,472 |
| 2017/18 | 274 | 1,922 | 14% | $5,961,093 |
| 2018/19 | 714 | 2,296 | 31% | $10,565,632 |
| 2019/20 | 750 | 2,529 | 30% | $13,683,040 |
| 2020/21 | 1,764 | 3,570 | 49% | $25,519,577 |
| 2021/22 | 2,767 | 4,806 | 58% | $92,534,414 |
| 2022/23 | 4,258 | 5,735 | 74% | $100,623,559 |
| 2023/24 | 4,108 | 5,896 | 70% | $62,739,092 |
| 2024/25 | 5,454 | 7,716 | 71% | $96,774,825 |
| 2025/26[86] | 568 | N/A | N/A | $60,757,945 |
| **Total** | **20,751** | **37,383** | **54%** | **$473,667,758** |

[85] Although the 2017/2018 BRA was the first BRA American Efficient cleared, it later cleared incremental auctions for the 2015/2016 and 2016/2017 Delivery Years.

[86] As discussed in note 3, *supra*, the number of MWs American Efficient could offer in the 2025/26 BRA was capped by agreement between it and PJM. Had the Company offered the same number of MWs it offered in the 2024/25 BRA (5,454), staff calculates that the company would have cleared at least $542 million in the recently completed auction. To calculate that number, staff multiplied the extra MWs the Company would have cleared (5,454 – 568) x $269.92/MW-day (the lowest clearing price in the recent auction) x 365. Staff then added that number to the $60,757,945 the Company cleared.

The number of MWs American Efficient offered in PJM's auctions has consistently increased year-over-year. As Table 2 reflects, for the past three delivery years for which PJM has conducted auctions where there were no limits on American Efficient's ability to participate (2022/2023, 2023/2024, and 2024/2025), American Efficient has, on average, offered and cleared 4,607 MW of EE capacity per delivery year with average delivery year revenues of $86.7 million.[87] Over those three recent delivery years, American Efficient represented nearly three-quarters of the EER MWs cleared in PJM's auctions. In total, American Efficient has cleared 20,751 MW of EE capacity and $473,667,758 in capacity payments since entering PJM's capacity market in 2014.

Continued aggressive growth in PJM has been a core part of the Company's business strategy. In a presentation American Efficient sent to one of Modern Energy Group's institutional investors, Investment Company, in April 2022, American Efficient highlighted its Program's 76 percent compound annual growth rate in PJM[88] and that its "contracted revenues" grew from around $17 million at the start of its relationship with Investment Company in June 2020 to approximately $122 million in November 2021.[89] Most significantly, documents American Efficient sent Investment Company show that American Efficient planned to dramatically increase its PJM capacity revenues. In April 2022, shortly before the 2023/2024 BRA, American Efficient reported to Investment Company that it anticipated receiving between $806 million and $1.344 billion in capacity payments from PJM through the next five BRAs.[90]

---

[87] For context, 4,607 MW of cleared "capacity" is greater than the summer capacity of every power plant in the United States except one. *See* U.S. Energy Info. Admin., "Electricity Explained - Electricity generation, capacity, and sales in the United States," *available at* https://www.eia.gov/energyexplained/electricity/electricity-in-the-us-top-10.php (last updated Oct. 26, 2023). It is also greater than the nameplate capacity of the newly expanded Vogtle Electric Generating plant (4,530 MW), the nation's largest nuclear power plant. *See* U.S. Energy Info. Admin., "How many nuclear power plants are in the United States, and where are they located?" *available at* https://www.eia.gov/tools/faqs/faq.php?id=207&t=2 (last updated May 8, 2024).

[88] EIG-00006860 at 15 (MIH, LLC Management Presentation – April 2022).

[89] EIG-00010468 (Email from Modern Energy to Investment Company (Nov. 5, 2021)).

[90] EIG-00006860 at 23 (MIH, LLC Management Presentation – April 2022). Despite projecting such sharp increases in capacity revenues, the Company projected that its total expenditures would remain flat. Specifically, the Company identified its current

27

Beyond the $473.7 million in capacity that American Efficient cleared in PJM, as reflected in Table 2, American Efficient also was awarded $26.8 million for "overperformance" during Winter Storm Elliott.[91] Under PJM's rules, an EER's entitlement to a Performance Payment during a Performance Assessment Interval ("PAI") is based on a comparison of (i) the EER's committed MWs based on its M&V plan and (ii) the updated MW number set forth in the EER's PIMV report.[92] If the updated MW number set forth in the PIMV report is greater than the committed MW, then the EER is deemed to have "overperformed" during each and every PAI occurring within the given delivery year. Thus, American Efficient's $26.8 million in capacity bonus payments for Winter Storm Elliott was based on its PIMV reports listing more MWs than its M&V plans for the 2022/2023 delivery year.

## 2. American Efficient's Participation in MISO's Capacity Auctions

American Efficient began participating in MISO through its affiliate Midcontinent in 2017. American Efficient cleared the 2017 Planning Resource Auction (PRA), and thus first obtained a capacity commitment for the 2017/2018 Planning Year. American Efficient then bid and cleared in the next three MISO PRAs, for the 2018/2019, 2019/2020, and 2020/2021 Planning Years. Table 3 below sets forth the results of American Efficient's participation in MISO.

---

"total asset acquisition cash spend by Delivery Year" in the then-current 21/22 Delivery Year as $37 million and projected future annual "asset acquisition" expenditures of $37 million (22/23 DY), $35 million (23/24 DY), $33 million (24/25 DY), and $34 million (25/26 DY). *Id*. at 15.

[91] PJM Market Settlements Reporting System (through April 2024).

[92] *See* PJM Reliability Assurance Agreement, Schedule 6, section L.6; *see also* PJM, *Proposed Enhancements to PJM's Capacity Market Rules*, Docket No. ER24-98-000, at 53 (Oct. 13, 2023) ("[U]nder the existing rules, Energy Efficiency Resources actual performance is based on a comparison of their post-installation and measurement report, which is submitted 15 days before the Delivery Year even starts, and the committed MW quantity of the Energy Efficiency Resource.").

28

**Table 3 – American Efficient's participation in MISO's Planning Resource Auctions**

| Delivery Year | AmEff Cleared Capacity in MISO (MW) | AmEff Capacity Revenue in MISO |
|---|---|---|
| 2017/18 | 98 | $53,600 |
| 2018/19 | 173 | $566,006 |
| 2019/20 | 312 | $891,522 |
| 2020/21 | 650 | $16,796,341 |
| **Total** | **1,233** | **$18,307,469** |

For the three PRAs from 2017–2019, American Efficient offered capacity based solely on sales data regarding residential and commercial lighting sales.[93] Beginning with the 2020 PRA, however, American Efficient began to include sales data for additional products in its bids and American Efficient intensified its efforts to sign up additional Program partners (and to seek data from past sales by those partners).[94] As a result, the number of MWs American Efficient cleared in the 2020 PRA increased sharply from past years. Specifically, in the first three PRAs in which it bid, American Efficient cleared between 98 and 312 MW. Once American Efficient expanded the scope of its data collection, American Efficient cleared 650 MW in the 2020 PRA. American Efficient says that this steep upward trajectory would have continued if it had participated in the 2021 PRA; however, MISO disqualified American Efficient from its market before the 2021 PRA.[95]

American Efficient received approximately $15.5 million in capacity payments from MISO. Although the Company cleared $18.3 million in MISO's PRAs, as reflected in Table 3, MISO disqualified the Company before the conclusion of the last delivery year for which it cleared.

---

[93] *See, e.g.*, GS-FERC-00001373 (Program Agreement 2014-1201).

[94] *See, e.g.*, ME-AMEFF00001135 (Notification of Program Change for Program Agreement 2017-1001, effective July 1, 2020).

[95] American Efficient asserts that it would have cleared over 1,300 MW had MISO let it participate in the 2021/2022 PRA. June 2022 Submission at 11.

29

3. **American Efficient's Submission of M&V Plans and PIMV Reports to PJM and MISO**

American Efficient submitted M&V and PIMV reports to PJM and MISO.[96] The M&V plans that it submitted to PJM were similar to the ones that it submitted to MISO, and those plans generally were similar from year-to-year. The plans included an overview of the Program, a summary of the methodology used to convert sales statistics to MWs, an estimate of the capacity (in MWs) that American Efficient nominated for the year, and a timeline for product sales. American Efficient attached a list of covered products, a sample Program Agreement, a detailed list of claimed MWs by capacity zone and time period, and a sample of the data American Efficient used in its Program.

The M&V plans initially described the Program, in part, as "facilitat[ing] energy demand reduction . . . through *incentive programs* for energy efficient products."[97] Early versions of the plans further represented that the Program "encourages consumers to adopt energy efficient lighting technologies or prevents them from reverting to less efficient products."[98] The Company also represented in its submissions that the Program worked by "reducing retail prices to consumers."[99] Following staff's notification in February 2019 that the ISO-NE market monitor had made a referral regarding the

---

[96] American Efficient also occasionally submitted revisions to its M&V plans on, or even after, its PIMV reports.

[97] *See, e.g.*, ME-AFFIRMED-00000778, at 4; MISO_DRMCEN_NCS0005226 (emphasis added). *See also* Maple Energy, Critical Path Schedule (Jun. 22, 2018) ("Maple's Program is a combination of 'upstream' and 'midstream' programs, meaning that Maple has made contractual arrangements with manufacturers and/or distributors to provide incentives for the sale of EEPs, thereby reducing the retail price to the consumer, or otherwise incentivizing the manufacturers and/or distributors to encourage energy efficient product purchases.").

[98] ME-AFFIRMED-00000778, at 5; MISO_DRMCEN_NCS0005226.

[99] *See, e.g.*, PJM000003340; ME-MCEN-00001290.

30

Program,[100] American Efficient changed the language in later PJM and MISO plans and reports.[101]

The PIMV reports that American Efficient submitted to MISO included a shorter summary of the Program, a listing of claimed capacity MWs by zone and time period, and attestations regarding compliance with certain tariff requirements. American Efficient attested in the MISO M&V plans and PIMV reports "that the energy efficiency installations meet the definition of an Energy Efficiency Resource, as provided in Attachment UU of the Tariff," and in the PIMV reports that American Efficient "affirms and acknowledges that it has the legal authority to claim the reduction associated with the EE installation(s) that constitute the Energy Efficiency Resource for the [relevant] Planning Year."[102]

American Efficient made similar attestations in PJM. For example, American Efficient attested in both M&V plans and PIMV reports "that the energy efficiency installations meet the definition of an Energy Efficiency Resource, as provided in Section 1.1 of PJM Manual 18B," and in PIMV reports American Efficient also "affirm[ed] and acknowledge[d] that it has the legal authority to claim the demand reductions associated with the EE installation(s) that constitute the Energy Efficiency Resource for the 2020/21 Delivery Year."[103] PJM's "EE Post-Installation Measurement & Verification Report Template" ("PIMV template") indicated that PJM generally will not require an EER provider to provide proof that it has acquired the necessary rights to the resource. More specifically, the PIMV template stated that "PJM intends to rely solely on the sworn statement or affirmation of the EE Resource Provider," and that "PJM presumes that the EE Resource Provider would obtain such legal rights and authority by entering into contracts with end-use customers providing the EE Resource Provider with the right to offer the EE installation into the PJM capacity market" or have obtained "a written statement" from the end-use customer that the customer "does not have an agreement with another EE Resource Provider to offer the EE installation into the PJM capacity

---

[100] *See supra* note 5.

[101] For further detail regarding the Company's reaction to learning of the ISO-NE referral, and consequent wording changes in the Company's submissions to PJM and MISO, see section IV.E.4 below.

[102] MCEN-PE_0001079.

[103] *E.g.*, ME-AFFIRMED-00015945.

31

market."[104]  In other words, PJM relied on the honesty of EER providers in self-certifying that they had the required contract rights.

American Efficient met with PJM and MISO staff to discuss the technical aspects of those M&V plans and PIMV reports, and it hired influential individuals, like the former General Counsel of PJM, to represent it at several of those meetings.[105]  The main PJM reviewer, however, focused his review and approval on the technical aspects (*e.g.*, calculation of MWs saved by the end-use customers and the types of products included) rather than whether the Program met applicable tariff definitions.[106]

### 4.    MISO's Disqualification of American Efficient

In February 2021, MISO's Independent Market Monitor—Potomac Economics— initiated an audit of American Efficient's participation in MISO's 2021 PRA.[107]  Potomac Economics reviewed the Program Agreements and detailed data regarding the basis for American Efficient's bids.  Potomac Economics also spoke at length with American Efficient and its counsel multiple times about the details of the Program.[108]  In those conversations, the Company argued that the Program complied with the relevant provisions of the MISO Tariff.  After completing its audit, Potomac Economics identified the following potential violations of MISO's Tariff:

---

[104] EE Post-Installation Measurement & Verification Report Template. https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/post-installation-measurement-and-verification.ashx.

[105] Memorandum to File from J. Cleaver, Attorney, OE DOI, summarizing December 5, 2023 conversation with a former PJM employee (Jan.5, 2024) ("Staff Interview Memo").

[106] *Id.*; *see also* ME-MCEN-00001775 (counsel requesting a meeting with MISO); ME-MCEN-00001975 (reflecting counsel's participation in discussions with MISO staff).  For further discussion of American Efficient's interactions with PJM and MISO staff, see section VII.B below.

[107] ME-MCEN  00000025 Memorandum from David Patton to MISO re: "Audit of EE Resources Supplied by Midcontinent Energy" (Mar. 25,2021).

[108] The first call occurred on February 12, 2021, and lasted approximately 35 minutes.  The second call took place on March 22, 2021, and lasted approximately 1 hour and 47 minutes.

- American Efficient does not own the energy efficiency rights that it is selling in MISO's capacity market.
- The Program does not satisfy the Tariff definition of EERs, which must "achieve a permanent reduction in electric energy usage."
- The Program does not comply with the M&V requirements in Attachment UU of the Tariff.
- American Efficient nominated energy savings based on sales that occurred in periods prior to American Efficient's agreements with some of the retailers.
- American Efficient claims energy savings associated with products that are not energy efficient or that meet only the minimum energy efficiency standards.[109]

Shortly before Potomac Economics issued its audit findings, MISO issued a notice rejecting American Efficient's EER registrations and disqualifying American Efficient from participating in the 2021 PRA.[110] MISO cited numerous bases for disqualifying American Efficient, including inadequate documentation of contractual rights and inadequate post-installation verification activities.[111]

After Potomac Economics issued its audit findings, MISO added an addendum to its disqualification notice, adopting several of the audit findings in addition to its own initial findings.[112] Neither American Efficient nor any of its subsidiaries has participated or attempted to participate in MISO's capacity market since the MCEN disqualification.

### 5. ISO-NE's Rejection of American Efficient's Efforts to Expand Its Program

American Efficient also participates as an EER in ISO-NE's capacity market through its affiliate Maple, though at a much lesser degree than it has participated in the PJM and MISO markets. Maple's conduct is not the subject of this proceeding, but American Efficient's interactions with ISO-NE are relevant to staff's findings as to American Efficient's participation in PJM and MISO's markets. PJM modeled its tariff

---

[109] ME-MCEN 00000025 at 2.

[110] *See* ME-MCEN-00000857 (March 25, 2021 "MISO Energy Efficiency (EE) Resource Registration Notification to Midcontinent Energy LLC" and Addendum).

[111] *Id*.

[112] Chief Markets Officer Test. Ex. 24

33

language for EERs on ISO-NE's tariff,[113] and American Efficient's business model and capacity market participation model in ISO-NE is the same as that which it employs in PJM and MISO.[114] Accordingly, ISO-NE's critiques of the Program put American Efficient on notice of its Program's failings and illustrate some of the violations that staff has identified during this investigation.

In ISO-NE's FCA 13 (covering the Delivery Year 2022/2023), American Efficient sought to dramatically increase its existing 10.6 MWs of capacity to 199.6, as it had done in other ISO/RTOs. In response, ISO-NE asked the company to provide additional information about its operations and spent a significant portion of 2019 working with American Efficient to better understand the business model and the details of the Program. In August 2019, following an extended exchange of letters and memoranda, ISO-NE explained why it was disqualifying American Efficient as an EER in further capacity auctions: American Efficient had not been able to provide information on "the mechanism by which its incentive payments encourage the purchase of efficient products."[115] ISO-NE also expressly stated that its initial decision to qualify American Efficient as an EER had "relied on Maple's statements that its program was substantially similar to state energy efficiency programs," and that, had it known more accurately what American Efficient's business model was, ISO-NE "would not have qualified Maple's resources" for capacity auctions in prior years.[116]

In its correspondence with the Company, ISO-NE also noted that American Efficient had repeatedly refused to divulge to ISO-NE the dollar amounts of the payments made to Program partners, "something that other energy efficiency providers readily share with the ISO."[117] ISO-NE also: (1) disputed American Efficient's description of its payments to its partners as "incentive" payments of the sort that are utilized in midstream

---

[113] In fact, the Commission order directing PJM to incorporate energy efficiency into PJM's capacity market expressly directed PJM to consider modeling its energy efficiency participation on ISO-NE. *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,318, at P 203 (2007). PJM's EER manual also cites the corresponding ISO-NE manuals as a "reference material" for PJM. PJM Manual 18B, at 8.

[114] Tr. 81:7–24 (Chief Markets Officer).

[115] Chief Markets Officer Test. Ex. 9 (Aug. 16, 2019 Letter from ISO-NE to Chief Markets Officer).

[116] *Id.*

[117] *Id.*

34

energy efficiency programs;[118] (2) noted the dramatic differences in what utilities spent per MW of energy efficiency and what American Efficient spent ($4 million/MW v. $35,000/MW);[119] (3) provided statistics suggesting that American Efficient was overcounting MWs;[120] (4) found that American Efficient's Program obligated New England consumers to not only pay American Efficient for providing no discernable benefit but, in fact, pay twice for the same capacity—once when they purchase the product and once again in the capacity market;[121] and (5) disagreed with American Efficient's description of itself as an "aggregator" because, unlike American Efficient, "aggregators can demonstrate the changes in energy use that result from direct consumer participation in their EE program activities."[122]  ISO-NE also refuted American Efficient's claim that it was providing an ancillary benefit to New England consumers by allowing the capacity market "to avoid procuring more expensive capacity resources."[123] As ISO-NE explained:

> In New England, energy efficiency resources that clear in the Forward Capacity Auction are 'added back' to the load forecast that informs the FCA procurement target.  As a result, when Maple claims energy savings in the capacity market and enters those savings into the ISO's database, it forces an upward adjustment to the annual long-term load forecast used to calculate the Installed Capacity Requirement, which requires consumers *to pay for additional resources to meet the higher capacity requirement.*[124]

After the Company repeatedly failed to respond to ISO-NE and IMM requests to respond to these critiques and to justify how the Program conformed with tariff

---

[118] Chief Markets Officer Test. Ex. 10 (Sept. 6, 2019 Letter from ISO-NE to Chief Markets Officer).

[119] Chief Markets Officer Test. Ex. 7.

[120] *Id.*

[121] Chief Markets Officer Test. Ex. 9.

[122] *Id.*

[123] *Id.*

[124] *Id.* (emphasis in original).

35

requirements,[125] ISO-NE partially disqualified American Efficient from its capacity markets, writing: "As the ISO has explained in its memoranda to Maple, dated July 24, August 16, August 28, and September 6, 2019, the resource has failed to provide sufficient documentation to demonstrate its claimed demand reduction value."[126]

## C. American Efficient's Finance Partners

American Efficient entered into agreements with institutional investors to fuel the expansion of its Program, and those agreements have been the avenue through which millions of dollars have flowed from the capacity markets to the Company's investors. Accordingly, understanding the full scope of American Efficient's exploitation of those markets requires some background on some of its financial partner agreements.

### 1. Investment Bank and Investment Bank Affiliate

American Efficient approached Investment Bank in late 2016 with a proposal to monetize the Company's energy efficiency positions in the capacity markets.[127] The basic structure of the proposal was for American Efficient to monetize $14 million of cleared capacity awards in PJM using an auction-specific megawatt transaction: in other words, sell the rights to cleared capacity revenue in advance to Investment Bank in exchange for cash.[128] As Investment Bank explored the specifics of the proposal and evaluated the risks associated with a potential investment, executives from American Efficient—mostly the Company's then-Chief Investment Officer and future CEO—provided further details in response to Investment Bank's questions.[129] Ultimately, Investment Bank agreed to two forms of financing: (1) bilateral capacity transactions and

---

[125] *See* Chief Markets Officer Test. Ex. 7.

[126] Memorandum to Maple Energy LLC from ISO-NE's Director of Resource Adequacy (Sept. 27, 2019).

[127] GS-FERC-00026571 (Emails exchanged between American Efficient's Chief Investment Officer and personnel at Investment Bank in September 2016).

[128] GS-FERC-00023447 (Dec. 20, 2016 email summarizing the proposed transaction, circulated among Investment Bank personnel).

[129] *See, e.g.*, GS-FERC-00023274 (January 2017 email exchanges among American Efficient's Chief Investment Officer and Investment Bank personnel).

36

(2) a "collateral facility"—essentially a line of credit—to loan American Efficient the collateral needed to expand its participation in PJM's capacity auctions.

American Efficient executed a Master Power Purchase and Sale Agreement with Investment Bank Affiliate on April 28, 2017.[130]  Under the agreement, Investment Bank Affiliate purchased the rights to approximately $15.3 million in future capacity payments from PJM in exchange for a present payment of $13.3 million to American Efficient. Investment Bank Affiliate's performance under the agreement was backed by an unconditional guaranty issued by Investment Bank.[131]  Investment Bank's internal profit-and-loss analysis estimated Investment Bank would recognize approximately $1.5 million in profit—a return on average equity greater than 50 percent.[132]  Investment Bank Affiliate ultimately made a total of six bilateral capacity transactions with American Efficient under the 2017 master agreement,[133] paying American Efficient $133 million in total and receiving $152 million in capacity payments from PJM.[134]  This agreement provided American Efficient operating cash during the multi-year period between clearing capacity in PJM's capacity auctions and receiving capacity payments.

In 2018, American Efficient approached Investment Bank again to build on the prior capacity transactions and open a line of credit.  The goal of the line of credit was to allow American Efficient to post higher amounts of collateral to participate in PJM's annual BRA—which requires higher collateral amounts than the incremental auctions—and to participate in all PJM capacity auctions (both annual and incremental) at higher MW offerings.[135]  As of January 2021, the Company had a $250 million line of credit

---

[130] GS-FERC-00006099 (Executed Agreement).

[131] GS-FERC-00000113.

[132] GS-FERC-00006062.  The precise amount paid to American Efficient ended up being slightly lower than the $13.3 million figure used in the profit-and-loss calculation. GS-FERC-00005942 (reflecting a "final $ value" to Wylan of $11,438,817).  Investment Bank's return on average equity was approximately 70%.  GS-FERC-00005106.

[133] ME-AMEFF00039881 through ME-AMEFF00039968 (trade confirmations for individual bilateral capacity transactions pursuant to the Master Purchase and Sale Agreement).

[134] ME-AMEFF00052470 and ME-AMEFF00052471.

[135] GS-FERC-00003233 (term sheet for Collateral Posting facility).

37

with Investment Bank covering auctions through the PJM Delivery Year 2025–2026 BRA.[136]

## 2. Investment Company

In November 2019, Modern Energy Group approached Investment Company—a private investment fund specializing in energy investments, and an entity with which Modern Energy Group had relationships for its other portfolio companies—to attract further investment in Modern Energy Group's portfolio companies, and especially American Efficient.[137]

Investment Company engaged in due diligence through the early months of 2020.[138] This due diligence included reviewing American Efficient's April 2020 forecast model, which showed capacity market pre-tax earnings across PJM, MISO, and ISO-NE increasing from $3 million per Delivery Year in 2020/2021 to $173.4 million per Delivery Year in 2025/2026.[139] As part of its due diligence, Investment Company also inquired into "regulatory limits" in ISO-NE that American Efficient had identified as "restrict[ing]" the Company's revenue forecast.[140]

Through a note purchase agreement dated June 30, 2020, Investment Company entities purchased $50 million in notes due June 2029, with a commitment to an

---

[136] ME-AMEFF00040066 (January 2021 Amended and Restated Financing Agreement).

[137] *See* EIG-00017379 (Dec. 2019 email from American Efficient's Chief Investment Officer providing a proposed term sheet for a preferred equity transaction and a "cash flow forecast" for Modern Energy Group).

[138] *See, e.g.*, EIG-00010871.

[139] *See* EIG-00017863 (Modern Energy, American Efficient Forecast, 2019–2026, Version as of 4/21/2020).

[140] EIG-00017863 (April 2020 spreadsheet identifying MWs obtained and projected capacity revenues across PJM, MISO, and ISO-NE). American Efficient's response to Investment Company's request for an explanation of the "ISO-NE regulatory concerns" the Company had identified was simply that ISO-NE had not—"[a]t the moment"—approved the Company's latest M&V plan; there was no mention of the concerns ISO-NE had identified with the core business model. EIG-00011321.

38

additional $50 million in "delayed draw" notes.[141]  Beginning in July 2020, American Efficient began drawing on the funds available to Modern Energy Group through the agreement with Investment Company.[142]  American Efficient relied on regular monthly intercompany transfers within Modern Energy Group, funded by Investment Company's investment in American Efficient's immediate corporate parent, MIH LLC.[143]

In April 2021, American Efficient provided Investment Company with a detailed update on the Company's status in PJM and MISO, following MISO's disqualification of Midcontinent Energy.[144]  The update included a timeline of the MISO IMM's audit, MISO's disqualification of American Efficient, and American Efficient's knowledge of the IMMs' referrals to Enforcement.  The update stated the Company's disagreement with MISO's disqualification decision, but also stated that the Company was "being thoughtful about whether and how to communicate with PJM's staff" regarding the disqualification, as the Company was "unsure about [PJM staff's] level of awareness of the IMM's referral to FERC."[145]

### D.  American Efficient Used False and Misleading Information to Gain Entry to and Participate in the Capacity Markets

American Efficient's Program lacked many of the requirements needed under the PJM and MISO tariffs to be a valid EER.  As such, the Company should never have been able to participate in the capacity markets.  But American Efficient deceived the "watchful gatekeepers" of those markets[146] by purporting to sell something—capacity—that it knew it could not provide.  It falsely represented that its Program offered product

---

[141] ME-AMEFF00040184 (Note Purchase Agreement, June 30, 2020).

[142] ME-AMEFF00039599 (MIH LLC – American Efficient LLC – Revolving Intercompany Note Schedule) (showing advances with "MIH ([Investment Company])" designated as the "Source").

[143] See, e.g., ME-AMEFF00052390 ("weekly update" from American Efficient's then-CEO reflecting a meeting with Modern "to plan next capital infusion from Investment Company (regular cadence monthly)"); Tr. 30:18–31:24 (Head of Origination).

[144] EIG-00017101.

[145] Id.

[146] Preliminary Findings Response at 2.

discounts, just like the utility rebate programs already in the market, and falsely represented that its Program had key features that it, in fact, did not. When the gatekeepers began to peer more closely into the Program, American Efficient intentionally withheld material information about the Program's shortcomings. These misrepresentations and omissions painted the Program in a false light, allowing the Company to continue expanding its illegitimate participation in the capacity markets of PJM and MISO.

### 1. American Efficient Passed Off a Market Research Program as Capacity

Each M&V plan and PIMV report that American Efficient submitted to PJM and MISO attested that American Efficient was providing capacity. In PJM, the Company attested that the installations it was submitting complied with "the definition of an Energy Efficiency Resource, as provided in Section 1.1 of PJM Manual 18B;"[147] in MISO, the attestation affirmed the Company's compliance with Attachment UU of the MISO Tariff.[148] Both Section 1.1 of PJM Manual 18B and Attachment UU of the MISO Tariff require that an EER "must achieve a permanent, continuous reduction in electric energy consumption."[149] As PJM and the Commission noted when introducing EERs to the PJM market, the entire purpose of including EERs in the capacity markets is to compensate "the party providing an EE resource [for] the benefit of that investment's reduction in the PJM region's capacity needs."[150]

But American Efficient and Modern Energy Group knew that American Efficient's Program was not providing capacity. As the Former Policy Director explained, American Efficient "was not causing energy efficiency to occur;" rather, "it was calculating what was already occurring."[151] When ISO-NE and MISO eventually questioned why American Efficient should be allowed to continue participating in their respective capacity markets, American Efficient responded not by claiming that the Company was providing capacity, but by claiming that it was providing "ancillary

---

[147] *See, e.g.*, ME-AFFIRMED-00000180.

[148] *See, e.g.*, MCEN-PE_0001116.

[149] PJM Manual 18B; MISO Tariff, Attachment UU.

[150] *PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,275 at P 122.

[151] Tr. 91:1–92:15 (Former Policy Director).

40

benefits" to the capacity markets in the form of market research and market data[152]—a claim that ISO-NE soundly rejected upon disqualifying the Company from expanding its participation there.[153]  The Program was not providing capacity to the markets because that was not what it was designed to do: it was designed to acquire and monetize the "environmental attributes" of energy efficient products.[154]

### 2.    American Efficient Misled PJM and MISO Regarding the Fundamental Design of Its Program

Unlike many EERs that participate in PJM and MISO, American Efficient's Program does not provide product rebates or discounts to end-use customers.  But American Efficient wanted to participate in the capacity markets, so American Efficient misleadingly portrayed its Program as a rebate or discount program.

In American Efficient's earliest submissions to PJM, the Company described the projects it would offer as EERs as installation of lighting products that exceeded federal

---

[152] *See* July 31, 2019 Letter from the Company's Chief Markets Officer to ISO-NE (telling ISO-NE that American Efficient's Program "ensured that ISO-NE's Forward Capacity Market receives critical information on energy efficient products that are being installed across the ISO's territories"); MISO_DRMCEN_NCS0004698 (responding to MISO's disqualification letter by stating that the Program "represents the exclusive means" to "capture[] and introduce[] into the MISO capacity market" the energy savings from installation of energy efficient products that were occurring in MISO's territory). American Efficient has presented much the same argument to staff during this investigation, asserting that its benefit to the capacity markets is not providing capacity but instead "internaliz[ing] previously externalized benefits and provid[ing] more efficient market signals."  June 2022 Submission at 1.  The Company made these claims of providing "ancillary benefits" to the capacity markets after ISO-NE, MISO, and staff began to take action against the Company's violations; American Efficient did not describe the Program this way in its M&V plans or PIMV reports.

[153] *See* Chief Markets Officer Test. Ex. 9 (rejecting the Company's assertions as "unfounded").  MISO also effectively rebuffed this argument by the Company, adopting the "conceptual concerns" raised by the MISO IMM about American Efficient's Program, which included noting that the Company's rationale of participating in the capacity market by tracking energy efficiency caused by others was "unsupportable and in conflict with the plain language of the Tariff."  MISO_DRMCEN_NCS0002085 (MISO IMM's audit report); MISO_DRMCEN_NCS0002109, at 10 (addendum to MISO's initial disqualification, agreeing with the IMM's "conceptual concerns").

[154] Tr. 19:2–7, 32:5–10, 33:1–7, and 34:3–37:5 (Head of Origination).

efficiency standards, with the cost of the more-efficient bulbs being "offset via either rebate coupons or markdowns."[155]  Later in 2014, the Company told PJM its lighting program was an "'upstream' program," with "contractual arrangements with lighting manufacturers to buy-down the price of lighting products to retailers, thereby reducing the retail price to the consumer."[156]  Modern Energy Group's Former Policy Director testified about conversations she had with Modern Energy Group's Co-Founder and CEO in which the Co-Founder explained that early versions of the business model had considered offering small price reductions to consumers.[157]

When the Company provided a sample Program Agreement to PJM staff in April 2016 to "provide [RTO staff] with a deeper understanding of [American Efficient's] program,"[158] the agreement defined the "Program Mechanics" as operating in one of two ways: the Company would pay its partner either "an amount equal to the positive difference between the Retail Price and the Mark Down Price ('Discount') for Products sold through the Retail Outlets," or "such other amount as the Parties agree from time to time."[159]

Throughout 2016, American Efficient submitted M&V plans and PIMV reports that expressly stated its Program worked by reducing retail prices for end-use customers. American Efficient's initial PIMV report for the 2016/2017 delivery year—submitted to PJM in April 2016—echoed the description that the Company had used in 2014: that the Program was "a combination of 'upstream' and 'midstream' programs," and defined "upstream and midstream programs" to mean that the Company had "made contractual arrangements with lighting manufacturers and distributors to buy-down the price of lighting products to retailers, thereby reducing the retail price to the consumer, or otherwise incentivizing the lighting distributors to encourage adoption of energy

---

[155] PJM000000707 at 5 (Updated Measurement & Verification Plan for Energy Efficiency Resource/s to be Offered into the 2016/2017 Base Residual Auction (April 12, 2013)).

[156] PJM000003918 at 3.

[157] Tr. 55:10–56:20, 105:17–106:15 (Former Policy Director).

[158] ME-AFFIRMED-00000124 (April 29, 2016 email from Modern Energy Group's co-founder to PJM staff).

[159] ME-AFFIRMED-0000125 (Agreement Number 2016-0201).

42

efficiency purchases."[160]  American Efficient removed the phrase "buy-down" from subsequent submissions through 2016, but continued to tell PJM that the Program functioned by "reducing the retail price to the consumer" in three additional plans and reports submitted in 2016.[161]  The Company used similar language in a PIMV report submitted to MISO in March 2017.[162]

Even after removing the language "reducing the retail price to the consumer" from its submissions by the end of 2016, American Efficient adopted the substantive descriptions of the Program from one M&V plan to the next, referring ISO/RTO staff back to prior submissions to understand how the Program works.[163]  The Company's submissions continued to use the phrase "combination of 'upstream' and 'midstream' programs"—which it had defined in its 2016 filings as buy-down programs reducing retail prices to consumers—through January 2021 in both PJM and MISO.[164]  As a result of American Efficient's submitted plans, submitted sample Program Agreements, and discussions with PJM staff, PJM staff understood, for a time at least, that American

---

[160] PJM000003308 at 12.

[161] PJM000003340 at 12 (revised PIMV for 2016/2017 delivery year, submitted May 3, 2016); PJM000001102 at 7 (M&V plan for 2017/2018 second incremental auction, submitted June 10, 2016); PJM000001192 at 8 (M&V plan for 2018/2019 first incremental auction, submitted August 10, 2016).

[162] ME-MCEN-00001290 at 8 ("Midcontinent's lighting program is a combination of 'upstream' and 'midstream' programs, meaning that Midcontinent has made contractual arrangements with lighting manufacturers and distributors to provide incentives for the sale of EEPs, thereby reducing the retail price to the consumer, or otherwise incentivizing the lighting distributors to encourage adoption of energy efficiency purchases.").

[163] *See, e.g.*, PJM000001320 ("This Plan is similar in form to a Commercial Lighting Plan submitted to PJM on January 29, 2016, and a Residential Lighting Plan submitted to PJM on January 26, 2016, both of which were approved on February 19, 2016 as submitted."); PJM000001812 (stating that the submitted plan was similar "[i]n content, form, and structure" to plans submitted previously).

[164] *See, e.g.*, MISO_DRMCEN_NCS0002119 at 7 (PIMV report for planning year 2021/2022, submitted to MISO February 1, 2021); PJM000003091 at 9 (PIMV report for delivery year 2021/2022, submitted to PJM January 29, 2021).

Efficient's Program entailed retail partners discounting the sales price of the relevant products.[165]

But that is not how the Program worked. The Company's Head of Origination testified that, although the Program Agreements allowed the Company to set the fees equal to a set per-unit fee or the amount that a partner discounted the products, in his time at American Efficient—which began in December 2016—not a single Program partner has been compensated to give discounts.[166] As discussed above, all of the per-unit fees were calculated based on "the value of the environmental attribute"—*i.e.*, how much money the Company could get out of the capacity markets for the product—and without regard to discounting products to affect consumer behavior.[167] Nothing in the language of the Program Agreements required manufacturers to reduce the wholesale price of products to retailers, or for retailers to reduce the retail price of products to consumers.[168] American Efficient continued using the word "discount" to define the Program payments in sample agreements it submitted to PJM, even after the Program Agreements no longer contemplated basing the payments off a difference in price.[169] No later than 2017, American Efficient understood that the Company's use of the word "discount" to describe its Program payments to partners led to confusion and misunderstanding about the nature of the Program—indeed, American Efficient acknowledges that Program partners "assum[ed] the program had to be a markdown" or "rebate" program based on the use of the word "discount."[170] It changed the language in its Program Agreements to avoid misleading Program partners. But even after it recognized that the reference to "discount" was misleading, the Company never offered a clarification to PJM or MISO.[171]

---

[165] *See, e.g.*, PJM000004541 (July 20, 2017 email among PJM staff discussing the "Wylan business model").

[166] Tr. 120:17–121:6 (Head of Origination).

[167] *Id.* at 81:22–84:14.

[168] *Id.* at 74:25–79:16; 98:15–18.

[169] *Id.* at 134:16–136:13.

[170] *Id.* at 152:7–153:1.

[171] *See* Tr. 55:16–24 (Former Policy Director).

44

### 3. American Efficient Misrepresented Key Elements of Its Programs to PJM and MISO

In addition to misrepresenting the fundamental character of its Program, American Efficient has mischaracterized numerous elements of the Program in submissions to PJM and MISO and has claimed that its Program caused changes in consumer behavior without having evidence to support those claims.

American Efficient's submissions to PJM and MISO have included misleading statements about the character of the payments that its Program provides Program partners under the Program Agreements. Specifically, its M&V plans have described the Program as "facilitat[ing] energy demand reduction . . . through incentive programs for energy efficient products."[172] American Efficient was familiar with utility programs and their use of direct and indirect customer incentives to change customer behavior.[173] But—again—that is not how American Efficient's Program worked. The Program Agreements have never required Program partners to provide incentives to the end-use customers responsible for the reductions in peak energy consumption.[174] Rather, what American Efficient referred to as "incentives" really were fees paid to Program partners to purchase market data and environmental attributes.[175] Program partners were free to use those payments for whatever purpose they wished.[176] Nor were the Program payments designed to incentivize conduct by Program partners that would increase sales of energy efficient products: any such conduct would have been undertaken by the Program partner wholly at the partner's discretion, without any contractual obligation to American Efficient, and American Efficient never analyzed whether its Program payments in any way affected sales of energy efficient products.[177] Testimony from the Company's Former CEO confirmed that in 2019 American Efficient replaced the word

---

[172] ME-AFFIRMED-00000871; MISO_DRMCEN_NCS0005226.

[173] Tr. 112:3–17; 203:8–25 (Head of Origination); Tr. 85:3–87:21 (Chief Markets Officer); Chief Markets Officer Test. Ex. 7 at 4–6.

[174] Tr. 74:25–79:16; 86:17–87:5; 98:15–18 (Head of Origination).

[175] *Id.* at 49:24–50:17; Tr. 56:12–20 (Former Policy Director) (agreeing that it would be inaccurate "to call the payments to program partners incentives" once the Program simply paid partners "a straight per product cost").

[176] Tr. 70:22–71:4 (Head of Origination).

[177] *Id.* at 61:1–62:2; 208:19–209:3.

"incentives" in its M&V plans and PIMV reports with the word "payments" because "payments" was a more accurate description of the money American Efficient was providing to its Program partners.[178]  There is no evidence that American Efficient ever tried to correct misperceptions at either MISO or PJM created by this inaccuracy.[179]

American Efficient's PIMV reports to PJM were also misleading in their implication that American Efficient had obtained contractual rights to the relevant capacity rights from end-use customers.  PJM's PIMV template states that PJM "presumes" an Energy Efficiency Resource has either (i) entered into contracts with end-use customers, or (ii) obtained a written statement from the end-use customer that no one else has the rights to claim the reductions.[180]  The PIMV template further explains that PJM will not require proof of such end-use customer agreements absent a reason to doubt the resource's legal authority.  The PIMV template explains that PJM instead requires an affirmation that the resource provider "has the legal authority to claim the demand reduction associated with the EE installation(s) that constitute the Energy Efficiency Resource."  In an April 2017 email exchange, PJM reiterated the requirements set forth in the PIMV template and stated that "it is the responsibility of the EE provider to ensure that this claim [that the EER provider has legal authority to claim the demand reduction] is valid, and upon request by PJM, provide evidence to support this claim."[181]

In its PIMV reports to PJM, American Efficient includes the verbatim affirmation language found in the PIMV template.  While the affirmation does not itself expressly reference agreements with end-use customers, the only rights discussed in the PIMV template are end-use customer rights, and thus the "legal authority" to which the

---

[178] Former CEO Interview at 1:22:51–1:23:35; 1:28:26–1:29:35.

[179] Indeed, it appears that PJM was misled about the program, at least when American Efficient was getting itself established in that ISO/RTO.  PJM000004541 (July 2017 email among PJM personnel, discussing what PJM had heard from American Efficient at a meeting "regarding how the Wylan business model works," and including "[r]etail store discounts sale of light bulb" in understanding of program mechanics).

[180] EE Post-Installation Measurement & Verification Report Template, *available at* https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/post-installation-measurement-and-verification.ashx.

[181] Chief Markets Officer Test. Ex. 19 (April 6, 2017 email from PJM to American Efficient).

affirmation refers is the acquisition of rights from end-use customers.[182]  By including the affirmation in its PIMV reports, American Efficient implies that it has obtained those rights, when in fact it has not.[183]

These misrepresentations furthered the implication American Efficient pushed on ISO/RTO  staff regarding the fundamental design of its Program: that the Program operated similarly to utility-rebate programs by providing money to manufacturers, distributors, and retailers to buy down, discount, or otherwise reduce retail prices of covered products to end-use customers.

Beyond misrepresenting how the Program worked, American Efficient misrepresented its knowledge and beliefs of the Program's effect on consumer behavior. American Efficient repeatedly claimed in its M&V plans and PIMV reports that its Program reduced energy demand in one of two ways: by "encourag[ing] consumers to adopt energy efficient lighting technologies," or by "prevent[ing] them from reverting to less efficient products."[184]  American Efficient's submissions stated affirmatively that "[i]n doing so," (*i.e.*, by encouraging adoption of EE products or preventing reversion to less efficient products) American Efficient "reduces energy demand during EE Performance Hours, as defined in PJM Manual 18 Section 4.4 and 4.4.1."[185]  The M&V

---

[182] In the *Advanced Energy Economy* Order, the Commission cited the PIMV template as support for its statement that PJM requires "EER providers to demonstrate that they have the legal authority to claim the demand associated with the EER." *Advanced Energy Economy*, 161 FERC ¶ 61,245 at P 64 & n. 129.

[183] American Efficient emailed PJM on August 15, 2016, and, while not stating explicitly that it did not contract with end-use customers, explained that it believed it obtained title to "EE Resource rights" from contracts that provided for "transferr[ing] full title" of the EE Resource rights to American Efficient "prior to the first sale of specified EE Resource [sic] to end-use customers."  PJM000000023.  PJM responded that it "cannot comment as to [the] nature of" the Program Agreements because it has never had cause to review them.  ME-AFFIRMED-00000112.  PJM also reiterated that "[i]t is the responsibility of the EE provider to ensure that [the affirmation regarding legal rights the PIMV template requires] is valid."  *Id*.  There is no evidence that American Efficient pursued the matter further to clear up PJM's misunderstanding.

[184] ME-AFFIRMED-00000871.

[185] *Id*.

Case 1:25-cv-00068-TDS-JEP    Document 19-1    Filed 03/03/25    Page 59 of 175

plans that American Efficient submitted to MISO contained similar misrepresentations.[186] These assertions first appeared in American Efficient's submissions to PJM in January 2016, with an M&V plan for a commercial lighting program,[187] and continued through February 2019.[188] The phrases were removed from submissions beginning in May 2019.[189]

But American Efficient had no evidence to support either assertion. Counsel for the Company has acknowledged the Company still has no evidence that its Program encourages adoption of energy efficient technology beyond the choices consumers already make.[190] Testimony from Company personnel confirmed that American Efficient never attempted to analyze or quantify the effect its Program had on sales of energy efficient products.[191] And testimony from Company personnel offered no feature of the Program that even conceivably could prevent a consumer from "reverting to less efficient

[186] *See, e.g.,* ME-MCEN-00000061.

[187] ME-AFFIRMED-00004379 (Initial Measurement & Verification Plan for Commercial & Industrial Lighting Energy Efficiency Resources for the 2016/17 Third Incremental Auction (Jan. 29, 2016)) ("The program will encourage customers using less efficient lighting products including incandescent, linear fluorescent, or halogen bulbs of higher wattage to purchase more efficient bulbs, and will encourage customers already using efficient bulbs not to revert back to less efficient lighting products including incandescent, linear fluorescent, or halogen bulbs of equivalent lumens.").

[188] ME-AFFIRMED-00003075 (Updated Measurement & Verification Plan - Energy Efficiency Resources for the 2019/20 Third Incremental Auction (Feb. 12, 2019)). American Efficient made a similar claim—albeit phrased differently—in the earliest M&V plans it submitted to PJM in 2014. *See* ME-AMEFF00045536 (stating that the Program would "ensure that participants who are replacing retiring [compact fluorescent lightbulbs] do not revert back to incandescent or halogen bulbs of lumen equivalence").

[189] Tr. 175:8–177:24 (Chief Markets Officer). American Efficient's Chief Markets Officer testified that she had no recollection of these edits, did not know why they were made, and did not remember any internal discussions of such edits. *Id.* at 172:18–175:7.

[190] *See* October 21, 2022 letter from D. Applebaum to T. Hettenbach and J. Cleaver ("American Efficient has not performed any analyses or studies as to whether its Project 'result[s] in greater sales of energy efficient products than would otherwise be the case.'").

[191] Tr. 208:19–209:3 (Head of Origination).

48

products"—much less any analysis of how the Program actually does prevent such an action.[192]

It is not surprising that the Company does not have any such evidence; its Program was aimed at acquiring data and environmental attributes, not changing customer behavior. American Efficient's Program does not interface with consumers in any way,[193] and it was not designed to encourage end-use customers to take certain actions or prevent them from taking others. Instead, the Program was designed to monetize purchase decisions that end-use customers already had made, and it was misleading at best for American Efficient to suggest that the Program encouraged or prevented any end-use customer actions.

### 4. American Efficient Intentionally Withheld Material Information Regarding Its Program from PJM and MISO

As early as December 2018, ISO-NE began voicing concerns to American Efficient regarding Maple, the American Efficient subsidiary operating in ISO-NE under the same business model that American Efficient used in PJM and MISO.[194] When ISO-NE crystallized its concerns and rejected an expansion of American Efficient's participation in ISO-NE in September 2019, the evidence shows that American Efficient consciously chose to withhold that information from other ISOs/RTOs, especially PJM, because the Company feared closer scrutiny in its largest money-making capacity market.

ISO-NE began an internal inquiry into American Efficient's business model in September 2018, following an expansion of the capacity American Efficient was claiming in ISO-NE's forward capacity market. The review noted that American Efficient's "business model varies significantly from utility programs," both because the utility program incentives are far larger than American Efficient's Program payments, and because the utility-program incentives actually reach the end-use customer.[195] ISO-

---

[192] Tr. 164:12–166:5 (Chief Markets Officer) (claiming at first that this assertion is accurate because "the shelves at Home Depot aren't infinitely long" before admitting that nothing about the Program can prevent a consumer from reverting to less efficient products).

[193] *See, e.g.*, Tr. 164:7–11 (Chief Markets Officer).

[194] Tr. 81:7–82:2 (Chief Markets Officer).

[195] Chief Markets Officer Test. Ex. 7, at 1 (December 14, 2018 Memorandum from ISO-NE to Internal Market Monitor).

49

NE's review also raised concerns with American Efficient's Program possibly "double-counting" energy savings from sales of lightbulbs that were already included in utility-rebate programs, and with American Efficient potentially claiming savings from lightbulbs without sufficient time in use (*e.g.*, party bulbs and other specialty lighting).[196] As discussed in section IV.B.5 above, ISO-NE explained in detail exactly how the Program violated its Tariff and stated that it never would have qualified any of the Company's capacity if it had understood from the beginning how the Program really worked.

According to the Chief Markets Officer, the strong rebuke of the American Efficient business model by ISO-NE "did not lead [American Efficient] to believing there were real issues" with the Program,[197] and the Company did not revise any submissions that it had made or was planning to make to other ISOs/RTOs as a result.[198] But the Chief Markets Officer also testified that the Company had disclosed the ISO-NE partial disqualification in written submissions to PJM.[199] She rebuffed any suggestion that American Efficient had withheld this information, confidently identifying the specific PJM submissions and time periods in which it supposedly had informed PJM of the partial disqualification. But then, days later, through counsel, the Chief Markets Officer recanted all of it. After six weeks of searching to find any evidence that the Company ever had informed PJM about the partial disqualification, counsel finally admitted, in an errata sheet, that the Chief Markets Officer's testimony had been in error and the Company could not find any evidence to support the Chief Markets Officer's original testimony.[200]

The Former Policy Director's testimony reveals a very different reaction within the Company to ISO-NE's disqualification of Maple from the Forward Capacity Auctions. Contrary to the Chief Markets Officer's assertions, the Former Policy Director testified that Company executives, including the Chief Markets Officer and the then-

---

[196] *Id.*

[197] Tr. 123:5–13 (Chief Markets Officer). Rather, the Chief Markets Officer testified that the interactions with ISO-NE led the Company to believe there were "definitely issues in [ISO-NE's] interpretation of a tariff and how it applied to us." Tr. 123:11–13 (Chief Markets Officer).

[198] *Id.* at 120:16–20.

[199] *Id.* at 120:21–122:8.

[200] Tr., Errata Sheet at 2–3 (Chief Markets Officer).

CEO, took seriously ISO-NE's criticism of American Efficient comparing itself to state utility programs or suggesting the Program reduced the retail price to consumers; in fact, she testified that they agreed to revise submissions to other ISOs/RTOs to strike similar language.[201]

But more important is what American Efficient chose not to do. The Former Policy Director testified that specific conversations occurred regarding whether to tell PJM about the disqualification from ISO-NE, and that a specific and affirmative Company decision was taken not to inform PJM.[202] According to the Former Policy Director, American Efficient was concerned that raising ISO-NE's concerns to PJM would "poke the bear," and that raising ISO-NE's concerns to PJM would lead to similar concerns on the part of PJM.[203] PJM was "the biggest and most important market" American Efficient was operating in at the time,[204] but PJM had approved a version of

---

[201] Tr. 48:16–50:21; 52:1–53:7 (Former Policy Director). The Former Policy Director's testimony is corroborated by wording changes in American Efficient's submissions to PJM: the final submission to PJM that claimed the Program operated through "incentives," claimed that the Program affected consumer behavior, and described the Program as "a combination of 'upstream' and 'midstream' programs" was dated February 12, 2019. *Compare* ME-AFFIRMED-00003075 (M&V plan for 19/20 Third Incremental Auction), *with* ME-AFFIRMED-00001267 (PIMV report for the 2019/20 delivery year, submitted in May 2019). This change in wording—which was not accompanied by any substantive changes to the Program—occurred only shortly after American Efficient had received a data preservation directive from staff related to ISO-NE's referral of Maple on February 1, 2019. However, later submissions continued to describe the Program as a "combination of 'upstream' and 'midstream' programs," even through 2021 in both PJM and MISO. *See, e.g.*, MISO_DRMCEN_NCS0002119 at 7 (PIMV report for planning year 2021–22, submitted to MISO February 1, 2021); PJM000003091 at 9 (PIMV report for delivery year 2021–22, submitted to PJM January 29, 2021).

[202] Tr. 77:20–78:23 (Former Policy Director).

[203] *Id.* at 82:1–15.

[204] *Id.* at 81:15–25. At the time ISO-NE disqualified American Efficient from expanding its participation in the FCA in August 2019, American Efficient had cleared more than $136 million in capacity revenue—and more than 4,200 MW of "capacity"— in PJM. In other words, as of August 2019, American Efficient's cleared capacity revenues in PJM were already more than 7.5 times greater than the sum total of the capacity revenues American Efficient cleared during its entire time participating in MISO before being disqualified in 2021.

51

American Efficient's Program that did not exist: a version in which Program payments reduced the retail price for consumers, the version described in the Company's earliest submissions to PJM, and the version of the Program that the Company had never highlighted its move away from as it ramped up its participation in PJM.[205]

The Former Policy Director testified clearly and bluntly that, following ISO-NE's disqualification of the Program from its markets, American Efficient's leadership "was concerned that if they explained their existing business model extremely clearly to PJM, that that would cause PJM to question the participation" of American Efficient in the PJM capacity market.[206]

Despite American Efficient's decision not to share ISO-NE's concerns with other ISO/RTOs, MISO's IMM began its own audit in 2021 of American Efficient's participation in MISO's capacity markets. The audit led MISO to disqualify American Efficient from MISO's capacity markets. Like with ISO-NE's disqualification, the Chief Markets Officer testified that American Efficient informed PJM and described at some length written submissions that American Efficient made to PJM disclosing and explaining the MISO decision.[207] The Chief Markets Officer likewise recanted that testimony through counsel, and no documentary evidence supports it.[208]

Again, the Former Policy Director provided testimony contrary to the testimony the Chief Markets Officer recanted: the Former Policy Director testified that American Efficient did not tell PJM about the MISO disqualification because of the same general decision that drove the decision not to tell PJM about the ISO-NE disqualification.[209] The Former Policy Director's testimony is corroborated by communications between Modern Energy Group and one of its funding entities—Investment Company—in which Modern Energy explained that MISO had disqualified American Efficient and that MISO's IMM had referred the matter to Enforcement, but that American Efficient was "being thoughtful about whether and how to communicate with PJM's staff [about the MISO disqualification and staff's investigation] in advance of the [upcoming capacity

---

[205] *Id.* at 83:14–85:19.

[206] *Id.* at 85:23–86:10.

[207] Tr. 226:2–228:2 (Chief Markets Officer).

[208] Tr., Errata Sheet at 2–3 (Chief Markets Officer).

[209] Tr. 98:13–100:10 (Former Policy Director).

52

auctions]," as the Company was "unsure about [PJM staff's] level of awareness of the [MISO] IMM's referral to FERC."[210]

In addition to its past failure to disclose disqualifications by ISO-NE and MISO, American Efficient continued actively misleading PJM about its status in other markets. In July 2023, PJM informed American Efficient that PJM would not return the collateral American Efficient had posted for PJM's base residual auction, citing "external inquiries" into American Efficient's Program as a Material Adverse Change under the credit provisions of PJM's tariff. American Efficient responded with a letter attempting to convince PJM that staff's investigation was not a Material Adverse Change justifying surrender of American Efficient's posted collateral. In that letter, American Efficient misled PJM as to its continued participation in MISO, stating that its subsidiary "operates similarly"—present tense—"in MISO's capacity market," despite the subsidiary having been disqualified from the MISO capacity market more than two years prior.[211]

## V. VIOLATIONS

### A. American Efficient Has Violated the PJM and MISO Tariffs

American Efficient received hundreds of millions of dollars from PJM and MISO based on the Company's repeated affirmations that its Program satisfied the tariff obligations to qualify as an EER. But the Program does not satisfy those obligations. American Efficient's Program fails to meet the relevant tariff requirements at least because it: (1) is not designed to achieve—and does not cause—reductions in electricity consumption, (2) lacks the required nexus to end-use customer projects, and (3) does not include the required ownership or contractual rights in end-use customer projects. By offering and getting paid for EER capacity that did not meet the tariff definitions of "Energy Efficiency Resource" and the tariff-defined process for offering EER capacity into the PJM and MISO markets, American Efficient violated the PJM and MISO Tariffs.

#### 1. American Efficient Has Violated the Tariff Requirements that an EER Be Designed to Achieve Reductions in Energy Consumption

American Efficient's Program is not designed to achieve reductions in energy consumption, nor does it cause such reductions. As such, American Efficient's Program

---

[210] EIG-00017101 (April 27, 2021 email to Investment Company).

[211] Letter sent from Affirmed Energy to PJM Interconnection, "Affirmed Energy – PJM Interconnection Letter – Credit – Follow-up to Conversation" at 2 (July 24, 2023).

fails to meet the requirements under the PJM and MISO Tariffs that EERs be "designed to achieve" such reductions and fails to meet the additional MISO Tariff requirement that EER projects "result[] in" installed measures on retail customer facilities that "achieve" a reduction in energy consumption.

Section 69A.3.2 of the MISO Tariff defines "Energy Efficiency Resource," in pertinent part, as a project "designed to achieve a continuous reduction in electric energy consumption during On Peak daylight hours . . . ."  Attachment UU of the MISO Tariff further clarifies that EERs are "specific projects *resulting in* installed measures on retail customer facilities *that achieve* a permanent reduction in electric energy usage while maintaining a comparable quality of service."[212]  Attachment UU also requires that M&V plans include "project-specific M&V methods and techniques that will be used to determine and verify the expected Coincident Peak Demand reduction (*i.e.*, the demand reduction) *resulting from* an EE Resource."[213]

Likewise, Article 1 of the PJM RAA defines, in relevant part, "Energy Efficiency Resource" as "a project . . . designed to achieve a continuous . . . reduction in electric energy consumption . . . ."[214]

This plain language requiring that EERs be "designed to achieve" and, in the case of MISO's Tariff, "result[] in" installed measures that "achieve" reduced energy consumption establishes a requirement that EERs cause reductions in energy consumption at end-use customer sites or on retail customer facilities.  Such a requirement also reflects common sense, given that an EER's ability to cause reductions in energy use is what makes them valuable as capacity resources.  If they do not reduce

---

[212] Emphasis added.

[213] Emphasis added.

[214] RAA, Article 1, Definitions.

54

demand, they contribute nothing to resource adequacy,[215] forcing ratepayers to pay higher bills for no benefit.[216]

The causation requirement is reinforced by the PJM and MISO manuals. MISO's Resource Adequacy Manual provides that "[t]he reduction in electric energy consumption due to existing EE programs that is reflected in the [Coincident Peak Demand] forecast cannot qualify as an EE Resource."[217] In other words, an EER must cause new energy savings, not just claim credit for existing energy efficiency that already is in the load forecast. Similarly, PJM Manual 18B expressly states that the EER "must achieve" a reduction in energy consumption,[218] and that the M&V plan "will be used to determine and verify the Nominated EE Value . . . and Capacity Performance value . . . *resulting from* an EE Resource."[219]

The causation requirement is further reinforced by binding standards for energy efficiency drafted by the North American Energy Standards Board ("NAESB"), which the Commission has incorporated by reference into its regulations, and PJM and MISO have incorporated into their respective tariffs.[220] These binding standards provide interpretative guidance for the EER-specific tariff provisions. NAESB standard WEQ-021-3.1.1, for example, states that "[a]n Energy Efficiency Resource may participate in wholesale markets where there is a verified permanent load reduction *behind the distribution meter resulting from* installation of Energy Efficiency equipment, processes,

---

[215] Recognizing that American Efficient's Program did not cause any reductions in energy use, the Former Policy Director came to believe that the Program was a simple "wealth transfer" from ratepayers to the Company. Tr. 113:25–114:2 (Former Policy Director).

[216] Ironically, a consumer who replaces old incandescent lightbulbs with energy efficient ones that are included in American Efficient's program to save money has to pay higher electric bills to cover American Efficient's capacity payment, even though American Efficient did not help to pay for that bulb and had nothing to do with the consumer's purchasing decision.

[217] MISO Manual 11, at section 4.2.8.

[218] PJM Manual 18B, at section 1.1 (Overview of Energy Efficiency).

[219] PJM Manual 18B, at section 2.1 (Description of M&V Plan) (emphasis added).

[220] *See* 18 C.F.R. § 38.1(b) (2024); PJM Tariff, § 4.2; MISO Tariff, Attachment Q, NAESB WEQ Business Practice Standards Reference, 34.0.

55

or systems."[221]  NAESB standards WEQ-021-1.1 and WEQ-000 collectively require ISO/RTOs to establish M&V methodologies that "determin[e] reductions in usage and/or demand *resulting from* Demand Response or Energy Efficiency."[222]  Likewise, NAESB standard WEQ-021-3.2.9 requires EER providers to submit M&V plans that "include a detailed description of calculations used to establish Energy Efficiency Baseline and actual Demand Reduction Value."[223]  NAESB defines "Energy Efficiency Baseline" as "[e]nergy usage that would have occurred without implementation of the subject measure or project."[224]

When the Commission incorporated the NAESB standards for energy efficiency into the Commission's regulations, the Commission's order confirmed that EERs must cause the energy reductions for which they are taking credit and getting paid.  The Commission found that the NAESB standards "provide the means for demonstrating consistent and reliable evidence of reductions in electricity usage *attributable to* energy efficiency resources that qualify to participate in organized wholesale electricity markets."[225]  Likewise, the Commission observed that the NAESB standards tied payments from the capacity markets to actual performance by the EERs participating in those markets.[226]  Multiple ISO/RTOs have also confirmed—in direct response to

---

[221] NAESB, WEQ-021-3.1.1, Measurement and Verification of Energy Efficiency Products (WEQ Version 003.3, Mar. 30, 2020) (emphasis added).

[222] NAESB, WEQ-021-1.1, Measurement and Verification of Energy Efficiency Products (WEQ Version 003.3, Mar. 30, 2020) (emphasis added); NAESB, WEQ-000, Standards and Models Relating to Abbreviations, Acronyms, and Definition of Terms (Mar. 30, 2020).  The quoted definitions have been in effect through the entire period relevant to this investigation.

[223] NAESB, WEQ-021-3.2, Measurement and Verification of Energy Efficiency Products (WEQ Version 003.3, Mar. 30, 2020).

[224] NAESB, WEQ-000, NAESB Abbreviations, Acronyms, and Definition of Terms (WEQ Version 003.3, Mar. 30, 2020).

[225] *Standards for Business Practices and Communication Protocols for Public Utilities*, 139 FERC ¶ 61,041, at P 23 (2012) (emphasis added).

[226] *Id.* ("The NAESB standards are intended to provide for proper measurement and verification of energy efficiency resources so that the resources may be compensated in accordance with how well they perform, and how performance continues as equipment or systems age.").

56

American Efficient's arguments to the contrary—that their tariffs require EERs to cause the reductions in energy usage offered as capacity.[227]

### a. The Program Is Not Designed to Achieve Reductions in Energy Consumption

American Efficient's Program is designed to obtain market data and environmental attributes of energy efficient products that its retail partners had sold, with the ultimate goal of getting capacity payments based on those data and environmental attributes. It is not designed to achieve a reduction in electricity consumption at end-use customer sites, nor does it actually achieve such a reduction. This is not just staff's conclusion: Company witnesses readily admitted as much during testimony. American Efficient's Head of Origination testified that "[o]ur programs are contracts with supply chain partners, and the purpose of those programs is to—for American Efficient to secure title to environmental attributes."[228] The Head of Origination further indicated that the purpose of the Program is "identifying and monetizing the environmental attributes in [American Efficient's] partner's [sic] supply chain via wholesale energy markets."[229] This understanding was not just one the Head of Origination reached on his own: he testified that when he started with the Company, the Company's founders and Chief Investment Officer (who would later become American Efficient's CEO) explained the purpose of the Program as "the contractual mechanism for [American Efficient] to provide consideration to secure title to environmental attributes" from Program

---

[227] When ISO-NE refused to qualify additional megawatts offered by American Efficient, it informed American Efficient that "the basis for the utility savings that are qualified" in their capacity markets is "that their incentives are causal in the purchase decision by the end-user." Chief Markets Officer Test. Ex. 7. Additionally, after MISO disqualified American Efficient in 2021, and American Efficient asserted that the MISO tariff did not require causation, an internal draft of MISO's "formal response" to that argument spelled out in detail how the "resulting in" language in MISO's Attachment UU inescapably establishes a causation requirement. MISO_DRMCEN_NCS0003401 (setting out the logical structure of the tariff language ("A 'resulting in' B, where A consists of the 'specific projects,' and B consists of the 'installed measures'"), providing multiple dictionary definitions tying "resulting in" to equal causation, and observing that American Efficient's position "exalts semantics over substance").

[228] Tr. 31:25–32:10 (Head of Origination).

[229] *Id.* at 18:24–19:7.

partners.[230]  Others at the Company agreed.  American Efficient's Former CEO "did not believe that the Program was designed to cause energy efficiency."[231]  Modern Energy Group's Former Policy Director testified that the Program was designed to "track[] energy efficiency that is expected to occur on an energy system" and then submit the capacity value "expected from the installation of [] energy-efficient items into capacity markets."[232]  Finally, the Company admitted in its 1b.19 Response that "[t]he transfer of *exclusive* rights to environmental attributes is the primary purpose of American Efficient's Program Agreements."[233]

Beyond these admissions, the details of the Program confirm that it is not designed to achieve reductions in electricity use.  At no point throughout the lifecycle of its process—acquiring historic sales data, repackaging that data, and submitting it to the ISO/RTOs  for payment—does American Efficient interact with the end-use customers or take actions designed to influence customer behavior.  Indeed, while recruiting a potential Program partner, the Company's Head of Origination confirmed that the Program does not seek to change customer behavior, writing, "[W]e do not need to prove additionality; these are sales that are already occurring but for which [the potential partner] is capturing $0."[234]  The Head of Origination was more direct with a supplier while strategizing how to sign up another retailer, writing, "I hate that the decision was made before me to call the Costco program 'marketing.'  We are only paying people for Environmental Attributes."[235]

Nor does American Efficient's Program require Program partners to use the payments they receive from American Efficient to achieve energy reductions at customer sites.  For example, there is no requirement that Program partners pass all, or even some,

---

[230] *Id.* at 33:1–23 (adding that this description of the Program's purpose was consistent with how others at the Company understood it at the time, and with how the Head of Origination would explain it to someone else today).

[231] Tr. 92:5–15 (Former Policy Director).

[232] Tr. 36:9–22 (Former Policy Director).

[233] 1b.19 Response at 16.  *See also id.* at 16 & n. 43 (quoting the language transferring environmental attributes and stating that "[t]he remainder of the Program Agreement is in service of this transfer").

[234] ME-AMEFF00024681.

[235] ME-AMEFF00023086.

58

of the payments they receive from American Efficient to customers. Nor is there any requirement that Program partners use the payments to influence customer behavior through some other means or even show that they somehow are increasing sales of energy efficient products. American Efficient has acknowledged that "[t]he terms and conditions of American Efficient's Program Agreements with Program partners . . . do not specify or direct how Program Partners may use payments they receive from American Efficient."[236] The Company's Head of Origination admitted that the Program partners can use the Program fees to increase sales of inefficient products if they want to do so.[237] And American Efficient used the absence of any requirement to use the money to support energy efficiency as a selling point in trying to recruit new partners. For example, in one such solicitation, the Company's Head of Origination highlighted that the revenue the partner would receive from American Efficient would be "'true', *i.e.*, discretionary."[238]

Moreover, the per-product payment amounts were not designed to influence customer behavior. Rather, as the Chief Markets Officer testified, the per-product payment amounts American Efficient makes to its partners are determined in response to the question of "[h]ow much is this valued in the capacity market?" and the payment amounts "are accurate numbers on what could be generated off of capacity revenues."[239] In short, the payment amount component of the Program design bears no relation to causing energy use reductions at customer sites. Rather, it is based on American Efficient's capacity market profit margins.

Company witnesses conveyed that the Program's impacts on the Company's partners and on customers is either uncertain or merely aspirational. For example, the Head of Origination testified "it is *our hope* that the funding that all of our Program partners use from our programs is used to incentivize, promote, support, the sale of efficient products."[240] "Hope" is not a design meeting the applicable tariff requirements for EERs.

---

[236] October 28, 2022 Response.

[237] Tr. 73:6–13 (Head of Origination).

[238] October 28, 2022 Response.

[239] Tr. 105:3–106:12 (Chief Markets Officer).

[240] Tr. 129:5–10 (Head of Origination) (emphasis added).

59

### b. American Efficient's Program Does Not Cause Reductions in Energy Consumption

The PJM and MISO Tariffs require that EER projects be designed to achieve reductions in energy consumption at end-use customer sites and, as discussed above, American Efficient's Program violates those tariffs because it is not designed to do so. Staff notes, however, that setting aside the Program's design, there is no evidence American Efficient's Program causes any reductions, whether it was designed to do so or not, and that makes the tariff violation even more glaring.

The Company claims capacity credit for MWs associated with data from two types of energy efficient product sales: products that Program partners sold before they signed a Program Agreement for those products (so-called "historical sales" or "historicals") and products that Program partners sold after they signed relevant Program Agreements. It is logically impossible that American Efficient's project caused the historical sales, and some at the Company are willing to admit as much.[241] As the Head of Origination conceded, "I don't wish to make the case that the payments we would make for historical sales data would cause sales to occur at some prior period of time."[242]

Nor is there any basis to claim that American Efficient's project has caused sales occurring after a product was covered by a Program agreement. Staff repeatedly requested evidence demonstrating that the retailers have changed sales practices or customer behavior in response to the Program, and American Efficient was not able to provide anything beyond unsupported anecdotes. In fact, the Company admitted to staff that it has conducted no studies or analyses as to whether its Project "result[s] in greater sales of energy efficient products than would otherwise be the case" and has no documents suggesting that it does result in such greater sales.[243] Nor does American Efficient gather data that could be used to undertake such a study. In his testimony, the Head of Origination acknowledged, "I have never asked a Program partner to produce or show me any data that would be used to make a causal claim as it relates to our programs."[244] And in response to a staff data request seeking "copies of all documents

---

[241] The Chief Markets Officer refused to admit this point, stating that she did not personally take a position on that and that she did not think American Efficient took a position on it either. Tr. 49:2–54:13 (Chief Markets Officer).

[242] Tr. 141:6–21 (Head of Origination).

[243] *See* Letter from D. Applebaum to T. Hettenbach, at 1–2 (Oct. 21, 2022).

[244] Tr. 188:18–21 (Head of Origination).

60

related to how Program [p]artners have used project revenues," American Efficient noted that partners have discretion as to how to use the fees, noted that tracking how Program partners use the fees could "discourage participation," and stated that "the company does not regularly solicit or maintain such information."[245]

Aside from formal studies or data, the Former CEO confirmed in his interview that whether and the extent to which American Efficient was influencing customer purchases and installations was not something that was discussed internally at American Efficient. The Former CEO told staff that he did not recall any internal discussions that included any quantification of the impact the Program was having on customer actions. Most significantly, the Former CEO offered that, while it is "conceivable" that American Efficient's payments to Program partners caused customers to purchase and install energy efficient products, he did not recall anyone at American Efficient ever making such a claim "definitively," and that he "certainly" never claimed that the Program caused consumers to reduce energy use.[246]  This is consistent with the Former Policy Director's recollection of the Former CEO "saying that he did not believe that the Program was designed to cause energy efficiency or that it did,"[247] and with the Former Policy Director's testimony that the Former CEO believed that such studies would show that the Program *did not* cause such reductions.[248]

---

[245] October 28, 2022 Response.

[246] Former CEO Interview at 1:12:50–1:21:57.

[247] Tr. at 92:5–15 (Former Policy Director).

[248] *Id.* at 73:16–74:7. American Efficient's witnesses were inconsistent on the issue of whether the per-unit fees the Company paid to its partners (on the order of nine cents) were likely to change customer behavior.  *Compare* Schatzki Declaration at P 23 (a price reduction of that size would "be expected to change consumer behavior to some degree") *with* Former CEO Interview (testifying that customer rebates or buy downs of much greater magnitude, *e.g.*, $1 for a box of lightbulbs or $100 for an appliance, would *not* influence a customer's purchasing decision); Tr. at 106:13–107:7 (Chief Markets Officer) (testifying "I don't know" when asked whether a buy down or rebate of five cents would make a difference to an individual customer's decision as to whether or not to buy that item).  Regardless, as discussed further below in Section V.B.3, the Former CEO's statement that he certainly never claimed the Program caused customers to reduce energy usage is directly contradicted by the program materials sent to PJM and MISO, which claimed that the program did cause such reductions.

61

2. **American Efficient Has Violated the Tariff Requirement That EERs Must Have a Nexus to End-Use Customers, their Facilities, or their Sites**

As the preceding discussion also establishes, American Efficient's purported EER project (its Program) has no connection to end-use customers, their facilities, or their sites. It is limited to the collection of data and environmental attributes from manufacturers, distributors, and retailers and qualification of capacity by ISO/RTOs. But, to qualify as a capacity resource under the PJM and MISO Tariffs, EERs must include some nexus with an end-use customer project. The MISO Tariff defines, in key part, an EER as a resource in which the market participant possesses rights "from an end-use customer project,"[249] and defines EERs as "specific projects resulting in installed measures on retail customer facilities."[250] The PJM RAA defines an EER as "a project . . . designed to achieve a continuous . . . reduction in electric energy consumption at the End-Use Customer's retail site,"[251] and the Commission has held that EERs in PJM are "by definition, composed of retail customer actions that reduce load."[252] PJM itself has gone even further, stating in a Commission filing that "PJM's Commission-approved Tariff provision explicitly recognizes that EERs are sourced by End-Use Customers who are retail customers."[253] Collectively, these provisions establish that EER projects must cause an effect (the reduction in energy consumption) at an end-use customer location or retail customer facility, not in the middle of a supply chain with no nexus to end-use customers. In other words, the causation requirement is not some amorphous and attenuated obligation to generally support additional energy efficiency; it is a specific requirement to cause increases in energy efficiency in connection with end-use customers.

The PJM and MISO manuals confirm the required nexus with end-use customer projects. MISO Manual 11 requires a Market Participant registering an EER to provide the Local Resource Zone, Local Balancing Area, and CP Node where the EER is

---

[249] MISO Tariff, Module M, section 69A.3.2.

[250] MISO Tariff, Attachment UU.

[251] RAA, Schedule 6, section L.1.

[252] *Advanced Energy Economy*, 161 FERC ¶ 61,245 at P 59.

[253] PJM Interconnection, L.L.C., Limited Answer, Docket No. ER18-17-000, at P 3 (filed Nov. 6, 2017).

62

located,[254] confirming that EERs are specific projects at customer sites and not a generalized program to claim credit for broad-based energy reduction based on generic product purchases. Similarly, PJM requires EER providers to identify the "location of EE Resource (Transmission zone or sub-zonal LDA)" and to model a separate EER "for each Transmission Zone or sub-zonal LDA in which the installation is located."[255]

American Efficient's Program has no connection to end-use customers, their projects, their facilities, or their retail sites.[256] The Program does not result in any changes to end-use customer facilities. American Efficient simply pays fees for data and environmental attributes to Program partners. The nexus of that activity is to manufacturers, distributors, and retailers, but not to end-use customers.

The Chief Markets Officer admitted that American Efficient "does not have a relationship with end-use customers"[257] and that American Efficient's Program partners do not contract with end-use customers for environmental attributes that the Company offers into capacity markets.[258] American Efficient and its Program partners contract with one another, to the exclusion (and detriment) of customers. American Efficient does not even notify customers that it is taking those attributes away from the products that the customers buy. And while certain Program Agreements required retailers to provide such notification,[259] American Efficient has never enforced these provisions or reviewed or

---

[254] MISO Manual 11, at Appendix C.

[255] PJM Manual 18B, at sections 1.3 and 3.1.2.

[256] Tr. 164:7–11 (Chief Markets Officer) ("Affirmed does not have a relationship with end-use customers.").

[257] *Id.*

[258] *Id.* at 268:13–17.

[259] *See, e.g.*, ME-AMEFF00001413 (Program Agreement 2018-0125, Attachment D) (requiring a partner to notify customers that they were participating in a "rebate program," through which the customers were giving American Efficient ownership over the "environmental or energy efficiency attributes associated with the product"); *see also* ME-AMEFF00021382 (Program Agreement 2016-0201 (requiring a partner to provide notice that the end-use customers were losing "Environmental Attributes" but without any obligation to define for the customers what those attributes are). *But see* GS-FERC-00001373 (Program Agreement with The Home Depot, omitting any requirement for the retailer to provide notice to customers).

verified its Program partners' compliance with them.[260]  In fact, American Efficient expressly told potential Program partners that there was "no requirement to do customer notice,"[261] and American Efficient's counsel explained to the MISO IMM that the Company did not enforce the notice provisions because the "retailer had no desire and we had no desire also to do that, so as a result we hadn't been notifying the end-use customers."[262]

The Company did not offer rebates to consumers, nor did it require its partners to reduce the price of energy efficient products installed at end-use customer locations.  The lack of any nexus with end-use customer projects thus violates the definition of "Energy Efficiency Resource" in the PJM and MISO Tariffs.

### 3.    American Efficient Has Violated the Tariff Requirements That an EER Possess Contractual Rights from End-Use Customer Projects

Section 69A.3.2 of the MISO Tariff requires that a market participant selling capacity from an EER must "possess[] ownership or equivalent contractual rights[] from an end-use customer project."  Section 5.5 of the PJM Tariff requires capacity sellers to possess similar ownership or contractual rights.  American Efficient does not itself own a qualifying end-use customer project.  Instead, it argues that its ownership of environmental attributes of energy efficient products gives it the necessary contract

---

[260] Tr. 130:4–132:20 (Head of Origination) (testifying that he had never been involved in enforcing the notice provisions, and had no knowledge of anyone from the Company enforcing them or investigating compliance with them); *see also* ME-AMEFF00023147 (Head of Origination telling a potential retail partner "I have never enforced [point-of-purchase] clauses on any program, and do not intend to start").  In addition, the MISO IMM did not receive a single notice about environmental attributes being sold to American Efficient while buying products from multiple Program partners.  *See* ME-MCEN 00000025, at 4 (Memorandum from David Patton to MISO re: "Audit of EE Resources Supplied by Midcontinent Energy" (March 25, 2021)).

[261] ME-AMEFF00024681.  The Company's Head of Origination testified that he did not know why the notice requirements were in some Program Agreements, but he could "imagine a business reason where it might be helpful to have a contract clause that might be needed at some future point in time for a compliance reason of some nature."  Tr. 133:8–11 (Head of Origination).

[262] Potomac Economics and American Efficient recorded call at 1:01:22 (Mar. 22, 2021).

rights. That argument fails as a matter of tariff interpretation, contract law, and basic policy.

Regardless of whether American Efficient validly acquired any contract rights to environmental attributes through its Program Agreements, any rights that it acquired are not the ones required by the PJM and MISO Tariffs. The PJM and MISO Tariffs require contract rights to end-use customer projects, not the right to certain attributes of products. Any rights that American Efficient might have acquired through the Program were limited to the energy efficient products themselves and not in the projects for which end-use customers may have used those products. The distinction between products and projects is significant.

The plain text of the PJM and MISO Tariffs confirms that the end-use customer *action* ("projects") is what matters. MISO's Tariff states that EERs are "specific projects resulting in installed measures on retail customer facilities." Both the PJM and MISO Tariffs state that "projects" include the "*installation* of more efficient devices or equipment or *implementation* of more efficient processes or systems." The Tariffs define EERs as projects and projects as actions. The products are merely the objects of those actions. This concept also is reflected in Commission orders, like the *Advanced Energy Economy* Order, in which the Commission expressly rejected the proposition that EERs lack "a nexus or connection with retail electric service," noting that EERs in PJM are "by definition, composed of retail customer actions that reduce load."[263] Also, in the Final Rule on Wholesale Competition in Regions with Organized Electric Markets, the Commission's discussion of energy efficiency reflected the fact that efficiency gains require customer actions, *i.e.*, projects:

> Energy efficiency uses less energy by *employing* products, technologies, and systems to use less energy to do the same or better job than by conventional means. . . . Energy efficiency can include *switching* to energy-saving appliances (such as Energy Star® certified products) and advanced lighting (compact fluorescent or LED lighting); *improving* building design and construction (better insulation and windows, tighter ductwork, *use* of high-efficiency heating, ventilation, and air conditioning); and *redesigning* manufacturing processes

---

[263] *Advanced Energy Economy*, 161 FERC ¶ 61,245 at P 59.

(advanced electric motor drives, heat recovery systems) to use less energy, thus reducing use of electricity and natural gas.[264]

All these examples are projects, defined by the action taken by the end-use customer ("employing," "switching," "improving," "use of," "redesigning") for which the products are mere objects of the verbs in the sentence.

The Program Agreements purported to transfer environmental attributes of energy efficient products, not end-user projects. American Efficient defined those attributes to include the "characteristics" of the products that enables them to "produce, consume, or avoid consuming" energy in a way that qualifies the product to incentives or payments. The environmental attributes are intrinsic to the products themselves. Such an environmental attribute could be the ability of a lightbulb to qualify for a program that gives incentives for products that generate 1600 lumens of light with 17.5 watts of electricity (rather than the 100 watts required by incandescent bulbs).[265] To the degree that the Program Agreements properly transferred ownership of the environmental attributes for the products included in the Program,[266] American Efficient would own the rights to that characteristic of those products, but it would not own the rights to whatever the end-use customer does with that product.

To offer another example: caulk is one of the energy efficient products that American Efficient includes in its Program. Homeowners seal cracks with caulk to save money on their electric bill. Accordingly, the environmental attribute associated with caulk might be the chemical composition giving it the ability to seal cracks up to a certain size. But that attribute is separate from the energy savings associated with the actions (project) undertaken by an end-use customer who makes use of the caulk. Such a project can involve considerable work by the end-use customer. Not only would such a project entail applying the new caulk, but could also entail numerous other tasks, including evaluating energy usage and drafts to identify leaks, planning out the sealing project,

---

[264] *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 125 FERC ¶ 61,071 n. 277 (2008) (citing Federal Energy Regulatory Commission, Assessment of Demand Response & Advance Metering: Staff Report at A-4 (September 2007)) (emphasis added).

[265] *See, e.g.*, ME-AFFIRMED-00000253.

[266] As discussed in section VII.D below, staff concludes that these environmental attributes do not convey the rights required by the PJM and MISO Tariffs; therefore, staff does not need to opine as to whether the purported transfer of attributes from Program partners was lawful and effective.

66

going to the store(s) to gather supplies, removing old caulk, preparing the application surface through sanding and cleaning, painting, and clean-up. All those customer actions, considered together, constitute the end-use customer project. That is what the PJM and MISO Tariffs provide capacity payments for, not simply for the chemical composition or characteristics of the caulk.

The requisite contractual rights are specified in the PJM and MISO Tariffs. Generic rights to attributes of a device are not enough; rather, the MISO Tariff specifies that the market participant must possess ownership or equivalent contractual rights "from an end-use customer project."[267] The PJM Tariff similarly requires that a seller "own or ha[ve] contractual authority to control the output or load reduction capability of [an EER]."[268] In either case, the market participant must possess ownership or contractual rights in the project. And the project for which a market participant must possess contractual rights contains specific definitional elements including, among other things, the installation of devices or equipment or implementation of processes or systems that are designed to achieve a continuous reduction in electric energy consumption. The possession of contractual rights to one attribute of one product that may be one part of such a "project" (the possession of environmental attributes from a product) does not satisfy the tariff obligation that a market participant possesses ownership or equivalent contractual rights to a project that meets the specific definition of an EER.

The Program Agreements do not purport to transfer any rights to those customer actions that make up the end-use customer project, and American Efficient does not argue that they do. Nor could it, given the lack of any customer consent, privity of contract, consideration, or even notice. American Efficient has no contracts with end-users of energy efficient products,[269] has no basis for taking rights away from those end-users, and has no claim to the fruits of those end-users' work. The mere fact that a customer chose to buy caulk at The Home Depot does not give The Home Depot rights to the projects that the customer undertakes with that caulk. That would be like Staples claiming copyrights based on authors' pen purchases or a sporting goods store claiming part of a

---

[267] MISO Tariff, Module E-1, section 69A.3.2.

[268] PJM Tariff, Attachment DD, Schedule 5.5.

[269] *See, e.g.*, Tr. 182:13–25 (Chief Markets Officer) (testifying that contracting with end-use customers would be "an immense administrative burden"); June 2022 Submission at 32 ("[T]he claim that American Efficient must directly obtain the contractual rights to the load capacity reductions from the end-use customer misunderstands the nature of the forward capacity market.").

67

professional athlete's salary based on a sock purchase. And the retailers cannot sell to American Efficient rights that they themselves do not own.

If American Efficient could claim, through retailers like Walmart and Costco, the energy savings resulting from end-users' projects, then American Efficient (and the retailer who sold those rights) potentially could claim endless ownership rights based on the sales of a multitude of products without providing notice to the end-users.[270] Moreover, if American Efficient can claim capacity rights based on ownership of environmental attributes purchased from a retailer, then that retailer would have been able to claim the payments itself before it transferred those rights. And so could the distributor who sold the caulk to the retailer, and so could the upstream manufacturer of the caulk who sold it to the distributor, and so could the chemical company that processed the caulk's component ingredients. Such an interpretation has no limiting principle and would effectively turn the capacity market into a direct subsidy for the unchecked production of caulk with no regard for its use in EER projects that are designed to achieve a reduction in energy usage.[271]

#### 4. American Efficient Has Violated the PJM and MISO Tariffs by Claiming Capacity Without a Valid "Energy Efficiency Resource"

Based on staff's conclusion that American Efficient participated in the PJM and MISO capacity markets without meeting the tariff definitions of "Energy Efficiency Resource," staff concludes that American Efficient also violated tariff provisions governing the participation of EERs and other capacity resources in the PJM and MISO capacity markets.

In MISO, Market Participants bid Zonal Resource Credits ("ZRC") into the Planning Resource Auction ("PRA"), and a ZRC is a MW unit of a Planning Resource. The Tariff defines "Planning Resource" as a "Capacity Resource, Energy Efficiency Resource, or Load Modifying Resource."[272] The Tariff further provides that a Market Participant "that owns or possesses equivalent contractual rights to a qualified

---

[270] For example, such an interpretation could result in a retailer claiming ownership over the increased home values of a customer upgrading to granite countertops sold by the retailer.

[271] For further discussion of claims to ownership of capacity rights based on the theory of environmental attributes, see the discussion in section VII.D below.

[272] MISO Tariff, Module A, section 1.P.

Planning Resource" can convert the resource's MW to ZRCs "in order to offer such ZRCs into a PRA,"[273] and that all Market Participants that have converted MWs to ZRCs "will have an option to . . . submit offers into the PRA for such ZRCs."[274]

American Efficient's Program does not meet the definition of "Energy Efficiency Resource" and, therefore, the Program is not a Planning Resource. Accordingly, American Efficient was not eligible to offer ZRCs into MISO's PRA, which as the above terms indicate, is limited to Planning Resources. Therefore, American Efficient's PRA offers violated the MISO Tariff.

American Efficient violated similar provisions of the PJM Tariff and RAA. PJM authorizes "Annual Energy Efficiency Resources" and "Summer-Period Energy Efficiency Resources" to submit Sell Offers, and previously permitted "Base Capacity Energy Efficiency Resources" to submit Sell Offers.[275] As discussed above, however, the Program does not satisfy the definition of EER. As such, the Company was not eligible to submit Sell Offers for capacity resources, yet it has and continues to do so in violation of these Tariff provisions.

American Efficient lacked authority to participate in either capacity market because its Program was not an EER. By participating notwithstanding its lack of eligibility, American Efficient violated provisions of each Tariff governing capacity market participation.

## B.     American Efficient Has Engaged in Market Manipulation

American Efficient extracted hundreds of millions of dollars from markets in which it was not legitimately eligible to participate. For several years, American Efficient knowingly or recklessly misled the ISO/RTOs to capture payments for capacity that the Company could not deliver. It was a course of business, propped up on a

---

[273] MISO Tariff, Module E-1, section 69A.4.5.

[274] MISO Tariff, Module E-1, section 69A.7.1

[275] Under the PJM Tariff, "Annual Energy Efficiency Resources" may submit Sell Offers for Capacity Performance Resources, Attachment.DD.5.5A(a), "Summer-Period Energy Efficiency Resources" may submit Sell Offers for Summer-Period Capacity Performance Resources, Attachment.DD.5.5A(e)(i), and "Base Capacity Energy Efficiency Resources" were authorized to submit Sell Offers for Base Capacity Resources for the 2018/2019 and 2019/2020 Delivery Years, Attachment.DD.5.5A(d). The substantive definition for each type of EER is nearly identical, aside from the differences in the seasonal performance periods.

foundation of false statements and misrepresentations, that defrauded the capacity markets and impaired their proper operation. For the reasons set forth below, Enforcement concludes that American Efficient has violated, and continues to violate, section 222 of the FPA and the Commission's Anti-Manipulation Rule.

## 1. Legal framework of market manipulation

The elements of the Commission's Anti-Manipulation Rule, are, in relevant part: (1) using a fraudulent device, scheme or artifice, or making a material misrepresentation, or engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase or sale of electric energy subject to the jurisdiction of the Commission.[276]

### a. Fraudulent scheme, conduct, and/or course of business

When the Commission adopted the Anti-Manipulation Rule, it explained that "[f]raud is a question of fact that is to be determined by all the circumstances of a case," and that fraud is defined "generally" to include "any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market."[277] The Commission's use of the term "well-functioning market" when defining fraud "is not limited just to consideration of price or economically efficient outcomes in a market."[278] Rather, the term broadly includes consideration of any "terms[] and conditions of service in a [Commission-jurisdictional] market,"[279] including the Commission-approved capacity markets. The Commission has also clarified that "[a]n entity need not violate a tariff, rule or regulation to commit fraud."[280] Gaming, or "behavior that circumvents or takes unfair advantage of market rules or conditions in a deceptive manner that harms the proper functioning of the market and potentially other market participants or

---

[276] 18 C.F.R. § 1c.2 (2024); *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at P 49 (2006), *reh'g denied*, 114 FERC ¶ 61,300 (2006).

[277] Order No. 670, 114 FERC ¶ 61,047 at P 50.

[278] *GreenHat Energy, LLC*, 177 FERC ¶ 61,073, at P 67 (2021) ("*GreenHat*").

[279] *Houlian Chen*, 151 FERC ¶ 61,179, at P 49 (2015) ("*Houlian Chen*"); *see also GreenHat*, 177 FERC ¶ 61,073 at P 67.

[280] *GreenHat*, 177 FERC ¶ 61,073 at P 68 (quotations omitted); *see also Houlian Chen*, 151 FERC ¶ 61,179 at P 5 (citing *Competitive Energy Svcs., LLC*, 144 FERC ¶ 61,163, at P 50 (2013)).

70

consumers,"[281] also violates the Anti-Manipulation Rule, even if the deceptive conduct complied with the letter of the tariff or market rules.[282]

The term "for the purpose of impairing, obstructing, or defeating" is a well-used term of art, and courts have used that term in myriad cases of fraud. In *Dennis v. United States*, which the Commission cited in Order 670 establishing the Anti-Manipulation Rule,[283] the Supreme Court of the United States used that term to refer to conduct "not confined to fraud as that term has been defined in the common law."[284] Accordingly, the Commission and the courts have found that a wide range of different types of schemes "impair[], obstruct[] or defeat[] a well-functioning market," including cross-market schemes, economic withholding schemes,[285] schemes in which market participants traded ISO/RTO market products inconsistent with the market design purpose of the trades in

---

[281] Staff White Paper on Anti-Market Manipulation Enforcement Efforts Ten Years After EPAct 2005, FERC, at 23 (Nov. 2016).

[282] *See* Order No. 670, 114 FERC ¶ 61,047 at PP 58–59 (incorporating prior prohibitions on gaming into the Anti-Manipulation Rule); *see also JP Morgan*, 144 FERC ¶ 61,068, at PP 69–84 (2013).

[283] Order No. 670, 114 FERC ¶ 61,047 at P 50 n.103.

[284] 384 U.S. 855, 861 (1966). For further federal court decisions applying *Dennis* to many different species of fraud, see, *e.g.*, *U.S. v. Arch Trading Co.*, 987 F.2d 1087 (4th Cir. 1993) (finding that backdated documents used to contravene export controls, without causing financial loss to the federal government, would have supported a conviction for fraud against the government); *U.S. v. Vogt*, 910 F.2d 1184, 1202–03 (4th Cir. 1990) (upholding a conviction for conspiring to defraud the United States where the defendant hid bribery proceeds from the IRS); *U.S. v. Shoup*, 608 F.2d 950, 959 (3d Cir. 1979) (finding fraud, regardless of "technical accuracy" where a consultant modified the tone of a report to defraud the government).

[285] *See Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1199 (D.C. Cir. 2021) ("[E]conomic withholding seems to fit within the regulatory definition of market manipulation as including any scheme . . . to defraud, where 'fraud' includes any action . . . for the purpose of impairing, obstructing or defeating a well-functioning market." (internal quotations and citations omitted)).

71

order to target certain payments,[286] and schemes in which market participants planned not to comply with their obligations to an ISO/RTO.[287]

The Anti-Manipulation Rule prohibits misleading conduct even if a market participant has not made any false or misleading statements.[288]  Moreover, a finding of fraud does not "require advance notice specifically prohibiting the conduct concerned. . . . The Commission need not imagine and specifically proscribe in advance every example of fraudulent behavior."[289]  Indeed, "the difference between legitimate open-market transactions and illegal open-market transactions may be nothing more than a trader's manipulative purpose for executing such transactions."[290]

The Anti-Manipulation Rule was modeled on SEC Rule 10b-5, and the Commission clarified that it would be guided, on a case-by-case basis, "by analogous securities law precedent that is appropriate under the facts, circumstances, and situations presented in the energy industry."[291]  In interpreting Rule 10b-5, the Supreme Court has refused to read the statute "narrowly" and has noted that it "must be read flexibly, not technically and restrictively."[292]  Rule 10b-5 "was designed as a catch-all clause to prevent a wide variety of fraudulent practices . . . both garden variety frauds and novel

---

[286] *FERC v. Coaltrain Energy, L.P.*, No. 2:16-CV-732, 2018 WL 7892222, at *15 (S.D. Ohio Mar. 30, 2018) ("*Coaltrain*") ("It is not hard to see how trading only for the benefit of MLSA credits subverts a well-functioning market.").

[287] *GreenHat*, 177 FERC ¶ 61,073 at P 160.

[288] *Coaltrain*, 2018 WL 7892222 at *12 ("This means that Section 222 proscribes deception not only in the form of misleading statements but also in the form of misleading conduct itself." (internal quotations and alterations omitted)).  *See also FERC v. City Power Mktg., LLC*, 199 F. Supp. 3d 218, 234–35 (D.D.C. 2016) ("Importantly, deception need not take the form of 'a specific oral or written statement,' for '[c]onduct itself can be deceptive.'") (quoting *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 158 (2008)).

[289] *Competitive Energy Servs., LLC*, 144 FERC ¶ 61,163, at P 50 (2013).

[290] *GreenHat*, 177 FERC ¶ 61,073 at P 68 (quotations omitted).

[291] Order No. 670, 114 FERC ¶ 61,047 at P 45.

[292] *S.E.C. v. Zandford*, 535 U.S. 813, 819–20 (2002) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963))).

72

frauds."[293] Even subsequent prohibitions on specific conduct were "meant to cover additional kinds of illegalities—not to narrow the reach of" Rule 10b-5.[294] The aggregation of fraudulent acts or behavior can constitute a "course of business" that operates as a fraud or deceit on an individual, entity, or market.[295]

### b. Material misrepresentations

A misrepresentation is material within the context of the Anti-Manipulation Rule if it creates "a substantial likelihood that a reasonable market participant would consider it in making its decision to transact because the material fact significantly altered the total mix of information available."[296] However, it is not necessary to show any person or entity's actual reliance on a material misrepresentation.[297]

### c. Scienter

The scienter element of a fraud claim is satisfied upon a showing of knowing, intentional, or reckless conduct.[298] Factors indicating scienter include contemporaneous communications, the pattern and evolution of specific conduct, and deliberate actions to expand and increase profits from a scheme.[299] Proof of scienter under the Anti-

---

[293] *FERC v. Vitol, Inc.*, 2021 WL 6004339, at *17 (E.D. Cal. Dec. 20, 2021) (applying Rule 10b-5 precedent in the context of the Anti-Manipulation Rule, quoting *Chiarella v. United States*, 445 U.S. 222, 226 (1980), and *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981), and citing the Supreme Court's "flexible approach" to interpreting Rule 10b-5 in *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008)) (internal quotations omitted).

[294] *Lorenzo v. S.E.C.*, 587 U.S. 71, 80 (2019) (quoting *United States v. Naftalin*, 441 U.S. 768, 774 (1979)).

[295] *See, e.g.*, *Zandford*, 535 U.S. at 819–20 (determining that multiple actions under a common scheme, when viewed "[i]n the aggregate," constituted "a course of business that operated as a fraud or deceit" (internal quotations omitted)).

[296] Order No. 670, 114 FERC ¶ 61,047 at P 51.

[297] *Id.* P 48 n.102 (determining that "reliance, loss causation and damages are not necessary for a violation" of the Anti-Manipulation Rule).

[298] *Maxim Power Corp.*, 151 FERC ¶ 61,094, at P 83 (2015) (citing Order No. 670, 114 FERC ¶ 61,047 at PP 52–53).

[299] *Houlian Chen*, 151 FERC ¶ 61,179 at P 128.

73

Manipulation Rule does not require direct evidence, but instead can be "established by legitimate inferences from circumstantial evidence. These inferences are based on the common knowledge of the motives and intentions of [people] in like circumstances."[300]

When analyzing recklessness in the context of Rule 10b-5, courts have emphasized that the focus is on the danger of the listener being misled: recklessness can be found in "highly unreasonable act[s]" marking "an extreme departure from the standard of ordinary care" where the danger of misleading the listener is "either known to the defendant or so obvious that the defendant must have been aware of it."[301] Recklessness can be shown by "an egregious refusal to see the obvious, or to investigate the doubtful."[302] Circumstances in which federal courts have made a finding of recklessness in the context of securities fraud include a corporate executive implying the existence of positive events without any factual basis for the implication, even if the executive subjectively held an opinion that the events might be forthcoming;[303] omitting negative facts from regulatory filings that obviously would have been relevant for consideration by regulators or shareholders;[304] or selectively disclosing some unfavorable facts while withholding others.[305]

### 2. American Efficient's Fraudulent and Deceitful Course of Business Impaired and Obstructed the PJM and MISO Capacity Markets

American Efficient's business model, by its very operation and design, obstructed the proper functioning of the PJM and MISO capacity markets.

---

[300] *Barclays Bank PLC*, 144 FERC ¶ 61,041, at P 75 (2013).

[301] *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999).

[302] *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1426 (9th Cir. 1994) (internal quotations and citation omitted).

[303] *S.E.C. v. GenAudio, Inc.*, 32 F.4th 902, 922–24, 934–35 (10th Cir. 2022).

[304] *S.E.C. v. Blackburn*, 15 F.4th 676, 680–81 (5th Cir. 2021).

[305] *S.E.C. v. Johnston*, 986 F.3d 63, 74–76 (1st Cir. 2021).

74

### a. American Efficient fraudulently passed off a market research scheme as a capacity resource

For years, American Efficient deceived every ISO/RTO in which it operated by telling them that its Program "reduces energy demand."[306]  After all, reducing energy demand is the whole reason why Energy Efficiency Resources are included in the capacity markets.[307]  American Efficient has participated in more than two dozen different capacity market auctions in PJM and MISO since 2014; for each and every one, American Efficient attested that its Program of paying retailers, manufacturers, and distributors of energy efficient products achieved reductions in energy usage.[308]  Over the past decade, American Efficient has sought and received nearly half a billion dollars in payments meant to award companies that provide capacity.

But the Company did not reduce energy demand.  It did not provide capacity.  It did nothing to ensure resource adequacy.  All it did was report market data to ISO/RTOs and take money out of the capacity markets.  Accordingly, American Efficient's business model, by its very operation and design, obstructed the proper functioning of the PJM and MISO capacity markets.  That outcome—collecting payments from the capacity markets

---

[306] *See, e.g.*, PJM000001192 (M&V for 2018–19 1st Incremental Auction in PJM); ME-MCEN-00000108 (M&V for 2017–18 PRA in MISO); July 31, 2019 letter from Chief Markets Officer to ISO-NE (quoting the ISO's quotation of Maple's submissions).

[307] The Commission has held that the "core objective" of capacity markets is "maintaining resource adequacy," *Calpine Corp. v. PJM Interconnection, L.L.C.*, 169 FERC ¶ 61,239 (2019), *order on reh'g*, 171 FERC ¶ 61,035, at P 139 (2020), and the Commission allows energy efficiency to participate in the capacity markets to compensate providers for their efforts to ensure resource adequacy by reducing energy consumption.  *See, e.g.*, *Standards for Business Practices and Communication Protocols for Public Utilities*, 139 FERC ¶ 61,041, at P 23 (2012) (finding that the NAESB standards "provide the means for demonstrating consistent and reliable evidence of *reductions in electricity usage attributable to* energy efficiency resources," and that the standards "are intended to provide for proper measurement and verification of energy efficiency resources *so that the resources may be compensated in accordance with how they perform*" (emphasis added)); *see also* Chief Markets Officer Test. Ex. 7 (ISO-NE Dec. 2018 letter to Maple) (stating that "the basis for the utility savings that are qualified" in ISO-NE's capacity markets is "that their incentives are causal in the purchase decision by the end-user").

[308] *See, e.g.*, ME-MCEN-00000108 (attesting to compliance with Attachment UU of the MISO Tariff); ME-AFFIRMED-00000180 (attesting to compliance with PJM Manual 18B).

without delivering any actual capacity—impairs the functioning of the capacity markets.[309]

### b. American Efficient acted with the requisite scienter

The evidence demonstrates that Company leadership—both at American Efficient and at its corporate parent, Modern Energy Group—knew that the market data it was injecting into the markets and passing off as capacity was not real capacity and that the Program was not advancing the capacity markets' core objective of ensuring resource adequacy. The Former Policy Director testified that "American Efficient did not believe it was causing energy efficiency to occur, but [instead] was calculating what was already occurring."[310] She further testified that American Efficient's CEO "did not believe that the Program was designed to cause energy efficiency or that it did."[311] Separately, ISO-NE told executives at American Efficient that allowing its Program to participate in the ISO-NE capacity market "would obligate New England consumers to pay [the Company] for providing no discernible benefit—neither an increase in demand reduction nor an increase in reliability."[312] The Former Policy Director reached the same conclusion upon learning about the add-back mechanism in PJM, which meant the Company's Program amounted to little more than "a wealth transfer between rate payers and Modern Energy."[313] The Former Policy Director ultimately left the Company because she believed that American Efficient's continued participation in the capacity markets was "at best unethical."[314]

Other executives at the Company were less concerned that American Efficient was getting paid hundreds of millions of dollars for capacity it was not providing, and the Company's culture did not foster consideration of such concerns. Even on subsidiary

---

[309] Relatedly, American Efficient accepted $26.8 million in Winter Storm Elliott bonus payments that might otherwise have gone to the capacity resources that provided actual energy or load reductions to the grid during the emergency conditions.

[310] Tr. 91:1–5 (Former Policy Director).

[311] *Id.* at 92:5–15.

[312] Chief Markets Officer Test. Ex. 9 (Aug. 16, 2019 letter from ISO-NE to Maple).

[313] Tr. 113:17–114:2 (Former Policy Director).

[314] *Id.* at 110:6–17.

issues, for example, like when the Former Policy Director told Modern Energy Group's Executive Chairman that her reading of the PJM Tariff suggested that the Program was not actually lowering capacity prices and was not displacing less environmentally sustainable generation sources (as some in the Company previously had thought), the Executive Chairman attempted to dissuade her from pursuing her concerns further. He asserted there was "a different set of rules [from the ones she had identified] . . . that meant that the market was implemented differently."[315] But the Former Policy Director came to believe the Executive Chairman's position was just "wishful thinking"[316]—a belief that was buttressed by the Chief Markets Officer's comments that the Executive Chairman "had not really seen another set of rules that would counteract the add-back."[317] Nevertheless, the Executive Chairman stifled the Former Policy Director's concerns, content to continue accepting millions of dollars without investigating warnings that the Program was not producing the anticipated benefits.[318] This type of reckless disregard for the truth demonstrates the reckless culture that ultimately led the Company to pass off a market data program as capacity.

According to the Former Policy Director, the Chief Markets Officer agreed with the conclusion that American Efficient was not providing any benefits to the capacity markets, but the Chief Markets Officer believed it was perfectly fine for American Efficient to extract money from the markets and get paid for capacity the Company did not provide.[319] The Former Policy Director testified that Company executives expressed the view that "the tariff doesn't say that we cannot do that" and that "it's not our responsibility to make the market rules right."[320] If doing so resulted in the Company reaping benefits without providing any in return—as they knew to be the case—the Chief

---

[315] *Id.* at 61:19–62:3.

[316] *Id.* at 63:21–64:4.

[317] *Id.* at 69:19–70:11.

[318] To the contrary, the Company's interest was in higher capacity prices. When the Chief Markets Officer notified other Company executives that the MISO 2017/2018 PRA clearing prices were unexpectedly low, she stated "[u]nfortunately I do not have good news," and described herself as "Bummed but Undeterred." ME-MCEN-00001319 (Apr. 17, 2017 email from Chief Markets Officer).

[319] Tr. 71:5–23 (Former Policy Director).

[320] *Id.* at 67:6–68:3.

Markets Officer and other leaders within the Company believed the onus was on the ISO/RTOs or FERC to change the tariffs.[321]

The Company's considered refusal to change its Program despite being told—both externally by ISO-NE and MISO, and internally by its director of policy—that the Program was not delivering capacity or benefits to the capacity market further shows American Efficient's intent to deceive. After ISO-NE rebuffed American Efficient's position that it was providing market signals or other important benefits, the Company changed the wording of some of its submissions to PJM and MISO, but did not undertake any effort to change the substance of the Program to address ISO-NE's concerns.[322] To make matters worse, upon learning of ISO-NE's view of its Program after ISO-NE had learned about the Program in greater detail, American Efficient did not even conduct an internal review or otherwise examine elements of the Program that ISO-NE had criticized.[323] Likewise, once the Former Policy Director raised the same issues internally, the Company contemplated changing the Program so it would actually provide capacity—but chose not to because it would be too expensive.[324] Even a third rebuke, via MISO's complete disqualification of the Company's participation in MISO's capacity market, did not spur American Efficient or Modern Energy Group to make the Program a legitimate capacity program. American Efficient's conscious disregard of these warnings from multiple, expert sources was at least reckless if not wholly intentional.

c. **American Efficient's scheme resembles others that the Commission has found to be market manipulation**

In collecting payments for capacity that it had no intention to cause and no ability to provide, American Efficient's Program mirrors other schemes that the Commission has found manipulative. For example, in three separate orders addressing baseline inflation schemes arising out of ISO-NE's Day-Ahead Load Response Program (DALRP), the Commission found manipulation on the basis that the subjects "devised and implemented" schemes under which they would be paid for demand response that they

---

[321] *Id.* at 67:6–68:3; 71:5–23. In addition to showing knowledge that the Company's scheme was extracting payments without providing benefits, this is an example of gaming manipulation. *See supra* notes 281-83 and accompanying text.

[322] Tr. 120:4–15 (Chief Markets Officer).

[323] Tr. 120:4–11 (Chief Markets Officer).

[324] Tr. 65:10–69:9 (Former Policy Director).

78

"*never intended to provide or actually provided*."[325]  Just like American Efficient, the subjects of the DALRP cases represented that they were making demand reductions without actually reducing their load, and the Commission concluded that such a scheme was manipulative.

Similarly, in its Order approving Enforcement's settlement with JP Morgan Ventures Energy Corporation ("JPMVEC") regarding a scheme involving inflated energy offers for the purpose of increasing uplift payments, the Commission noted that "Enforcement determined that JPMVEC knew that the ISOs received no benefit from making inflated payments to JPMVEC, and thus defrauded the ISOs by *obtaining payments for benefits* (beyond the routine provision of energy) *that JPMVEC did not deliver*."[326]  Just as in the JPMVEC matter, here neither MISO nor PJM received any benefit from American Efficient's Program, but both have made significant payments in the many millions of dollars to American Efficient for undelivered benefits.

Like the manipulative schemes previously before the Commission, American Efficient's Program imposes unnecessary and unjust costs on customers.  These cases all involve a scheme whereby a resource "extracts" payments from ISO/RTOs and customers with no intention of providing the benefits the payments were intended to obtain.

### 3.  American Efficient made knowingly false, and knowingly or recklessly misleading, material misrepresentations in furtherance of its fraudulent scheme and course of business

American Efficient made numerous misrepresentations and outright false statements in connection with the Company's fraudulent business model, beginning at the very earliest of American Efficient's interactions with PJM and MISO.[327]

---

[325] *Competitive Energy Servs., LLC*, 144 FERC ¶ 61,163, at P 43 (2013); *Richard Silkman*, 144 FERC ¶ 61,164, at P 43 (2013); *Lincoln Paper & Tissue, LLC*, 144 FERC ¶ 61,162, at P 30 (2013) (emphasis added).

[326] *In Re Make-Whole Payments and Related Bidding Strategies*, 144 FERC ¶ 61,068, at P 79 (2013) (Order Approving Stipulation and Consent Agreement) (emphasis added).

[327] The Company's litany of false and misleading statements, with the requisite scienter, is sufficient on its own to establish a violation of the Anti-Manipulation Rule. However, the statements are also further evidence of the Company's scienter in carrying

### a. American Efficient's false and misleading statements

Through the Program materials American Efficient submitted to PJM and MISO, the Company told ISO/RTO staff that American Efficient's Program was a rebate or discount program, and it never corrected that mischaracterization.[328]  Sample Program Agreements the Company provided to PJM and MISO described elements of the Program that the Company never implemented, such as providing point-of-purchase materials to educate consumers and requiring retail partners to provide notices to end-use customers that the products were being sold stripped of their environmental attributes.[329]  The Company misleadingly claimed that the payments it made to Program partners were incentives[330] and that it had obtained contractual rights to the energy reductions resulting from end-use customers' independent actions.[331]  The program that American Efficient asked PJM to approve—the program for which American Efficient has collected hundreds of millions of dollars—was a program that never existed.

Additionally, American Efficient claimed that the Program caused reductions in energy usage by influencing consumer behavior, despite the Company having no factual evidence to support the claims.  As detailed above, when the Company told PJM and MISO that its Programs "encouraged" consumers to adopt energy efficient products, or "prevented" consumers from reverting to less-efficient products, and in so doing the Program "reduces energy demand," it had no evidence supporting any of those three assertions.[332]  Statements of affirmative fact, made without contemporaneous knowledge or evidence to support them, are fraudulent misrepresentations.[333]

---

out its fraudulent scheme: lying to and/or misleading PJM and MISO in order to secure American Efficient's participation in the PJM and MISO capacity markets is evidence that the Company knew its Program was not a legitimate capacity program.

[328] Tr. 55:16–24 (Former Policy Director); *see also supra* section IV.E.2.

[329] Tr. 125:5–126:1 (Head of Origination).

[330] *See supra* notes 173–80 and accompanying text.

[331] *See supra* notes 181–84 and accompanying text.

[332] *See supra* notes 185–94 and accompanying text.

[333] *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 10 (2020) ("A misrepresentation may result in liability only if . . . the maker of it knowingly states or implies a basis for the representation that does not exist."); Restatement (Second) of Torts

American Efficient's business model extracted payments from the capacity markets in exchange for benefits American Efficient had no ability to provide. American Efficient went to great lengths to obscure this basic truth about its Program. It cloaked its Program in legitimacy by claiming to cause changes in consumer behavior while having no evidence to support those claims. This course of business defeated the functioning of the PJM and MISO capacity markets.

### b.    American Efficient acted with the requisite scienter

The evidence demonstrates that American Efficient made material statements to PJM and MISO that it knew were false, or at least knew were misleading. In addition, American Efficient disregarded known risks that statements it made to ISO/RTO staff might be false, or that such statements were likely to deceive ISO/RTO staff, showing the statements were made recklessly. The Company's culture of withholding material information and stifling internal criticisms—as well as its lack of candor during staff's investigation—further demonstrate that American Efficient acted knowingly or recklessly.

### i.    Knowingly false or misleading statements

A number of American Efficient's material false statements—including ones that it made repeatedly, in multiple submissions over multiple years—were knowingly false. The Company's claims in the plans and reports it submitted both to PJM and MISO from 2016 to 2018 that its Program "reduc[ed] the retail price to the consumer" of covered products were false, and the Company knew it. American Efficient's Head of Origination testified that not a single Program partner was paid based on reducing retail prices to consumers.[334] Emails that the Head of Origination sent to potential partners

---

§ 526 (1977) ("A misrepresentation is fraudulent if the maker . . . knows that he does not have the basis for his representation that he states or implies."). Federal courts routinely apply these principles in securities cases. *See, e.g.*, *Gebhart v. S.E.C.*, 595 F.3d 1034, 1040–44 (9th Cir. 2010) (discussing scienter, citing to the Restatement (Second), and finding sufficient evidence of scienter where the defendants "conducted no meaningful independent investigation to confirm the truth of their representations"); *Bergeron v. Ridgewood Securities Corp.*, 610 F. Supp. 2d 113, 143 (D. Mass. 2009) (discussing scienter, citing to the Restatement (Second), and finding that a reasonable jury could have concluded that the defendants acted with requisite scienter by making representations "despite knowing that no feasibility study had been conducted" regarding the underlying claim and by continuing to assert the claim after being informed it was not feasible).

[334] Tr. 120:17–121:6 (Head of Origination).

contemporaneously with those submissions used the "completely discretionary" nature of the Program payments as a selling point to induce new partners to join the Program.[335] Other emails the Head of Origination sent during the same time period to existing or potential partners emphasized that the Program payments were for "marketing," and there was no requirement that they be used for product discounts.[336]

American Efficient argues that the "better evidence" to focus on is what it "actually—and regularly—communicated to PJM" in its M&V Plans and PIMV Reports.[337] But the false claim that the Program reduced retail prices to consumers was repeated "actually[ ]and regularly" in the M&V Plans and PIMV Reports the Company submitted to PJM. What's more, that evidence also demonstrates that American Efficient repeatedly claimed that its Program could "prevent[ customers] from reverting to less efficient products."[338] But in its 1b.19 Response, American Efficient contradicts this statement[339] and acknowledges that the Program did not interact with end-use customers in any way.[340]

American Efficient also focuses on the fact that its M&V and PIMV Reports and Program partner agreements indicate that it uses an "upstream" or "midstream" program

---

[335] ME-AMEFF00022608 (July 2017 email to Ace Hardware).

[336] *See, e.g.*, ME-AMEFF00022835 (March 2017 email to GE, stating that "Wylan Energy is neither a utility or our marketing funds 'rebates'"); ME-AMEFF00022828 (February 2017 emails with The Home Depot, stating that American Efficient's "position is these are marketing dollars").

[337] 1b.19 Response at 34.

[338] This claim appeared in submissions to both PJM and MISO as late as 2019. *See infra* Appendix A-3.

[339] *See* 1b.19 Response at 30 ("Altering the availability of product choices does not mean, of course, that American Efficient is literally 'preventing' consumers from choosing to buy other products.").

[340] *See* 1b.19 Response at 32 ("But years of documentation, in the form of thousands of pages of program documents and partner contracts, submitted regularly to PJM offer no shred of a suggestion that the Company provided discounts or payments to end users rather than payments directly to manufacturers and retailers."); *see also* Tr. 164:7–11 (Chief Markets Officer).

to incentivize the sale of EE products.[341]  However, when pressed on the utility of the incentives, the Head of Origination admitted that nothing about the Program could stop a retail partner from using Program payments to stock, promote, or even discount less efficient products.[342]  Even the Chief Markets Officer's best defense of this assertion—that "the shelves at Home Depot are not infinitely long"—crumbled once pressed for specifics.[343]  No element of American Efficient's Program reasonably could be believed to stop a customer from walking into a retail store and selecting a less efficient product than one that was covered under the Company's Program—but American Efficient kept claiming that its Program could.

American Efficient further asserts that the issue of incentives is a "criticism that sweeps more broadly to cover any energy efficiency provider that contracts with retailers and manufacturers."[344]  That simply is not true.  Other providers may provide rebates and other payments that actually do incentivize behavioral changes that result in decreased electricity consumption at end-use customer sites.  Staff's findings that American Efficient violated tariffs and defrauded ISO/RTOs do not mean that others did as well.  Nor do the ISO/RTOs' approvals of the Company's M&V Plans and PIMV Reports show that those entities were not defrauded.[345]

In addition to the false statements discussed above, American Efficient and its representatives made knowingly misleading statements to PJM in order to obtain approval of the Company's Program in that market.  When PJM raised questions about

---

[341] 1b.19 Response at 33.

[342] Tr. 73:6–13 (Head of Origination).

[343] Tr. 164:12–166:5 (Chief Markets Officer) (Q: "[W]hen you walk into a Home Depot, you can still buy a light bulb that's not energy-efficient, yes?" – A: "Yes.") (Q: "[T]here was no prevention of a customer reverting to a less efficient product, right?" – A: "In my opinion, it's been made less likely or you'll have less choices to do so." – Q: "So you would say that it makes it less likely, but it doesn't prevent it?" – A: "It doesn't completely prevent them from reverting.").

[344] 1b.19 Response at 36.

[345] Similarly, American Efficient's citation to a 2010 report prepared for the Department of Energy and the Environmental Protection Agency noting that incentives can be directed at consumers or to retailers and distributors does not suggest that it was proper for American Efficient to characterize as "incentives" the micropayments that it made for data and environmental attributes.  *See* 1b.19 Response at 37.

83

whether customers purchasing products covered by the Company's Program were aware that the products were being sold without their environmental attributes, American Efficient's counsel pointed to language in the Program Agreements and told PJM that the contracts required notice to consumers.[346]  But those words in those contracts were provisions that American Efficient never enforced.  The Head of Origination testified that American Efficient never investigated or enforced those obligations in their contracts.[347]  And when MISO's market monitor raised the same question in 2021, American Efficient's counsel said that the customer notification clauses were not enforced because the "retailer had no desire and we had no desire also to do that, so as a result we hadn't been notifying the end-use customers."[348]  While it may not have been outright false to say that the contracts provided for giving notice to consumers, it was knowingly misleading for American Efficient to claim that contract language it never enforced—and never intended to enforce—was sufficient to satisfy a requirement of PJM's tariff.

### ii.      Recklessly false or misleading statements

Other material false statements and misrepresentations the Company made were at least reckless, because despite knowing the danger of misleading PJM and MISO, American Efficient engaged in a series of actions showing a conscious disregard of that danger.

American Efficient knew there was a danger that ISO/RTO staff would be misled by false statements or misrepresentations in the Company's submissions because ISO/RTO staff had told American Efficient they would rely on the Company's representations and affirmations.  When the Company asked PJM about the viability of its contractual arrangements, PJM responded by telling the Company to submit an affirmation of contractual rights to claim demand reductions—and emphasized that "it is the responsibility of the EE provider to ensure that this claim is valid."[349]  PJM also told American Efficient that PJM had not reviewed the underlying contracts with the Company's Program partners.[350]  American Efficient knew that PJM's approach of

---

[346] Staff Interview Memo at 1.

[347] Tr. 130:4–132:20 (Head of Origination).

[348] Potomac Economics and American Efficient, March 22, 2021 recorded call at 1:01:22.

[349] ME-AFFIRMED-00000112.

[350] *Id.*

84

ensuring requisite contractual rights did not involve specific review of American Efficient's contractual arrangements. Rather, PJM's PIMV template that American Efficient quoted verbatim (to attest to contractual rights American Efficient did not possess) stated expressly that "PJM intends to rely solely on the sworn statement or affirmation of the EE Resource Provider unless it is advised or has reason to believe that the EE Resource Provider does not have the legal rights and authority to commit the demand reduction into the PJM capacity market."[351] By reiterating that PJM would rely on affirmations from the Company and that the Company bore the responsibility for the accuracy of those affirmations, PJM put American Efficient on notice of the danger that deceptive statements in the Company's M&V plans or PIMV reports would mislead ISO/RTO staff.

But even knowing this danger, American Efficient provided information to PJM and MISO that was grossly misleading or that the Company did not have any evidence to support.

For example, American Efficient knew that PJM makes a presumption when it reviews EER submissions—namely, that it "presumes that the EE Resource Provider would obtain such legal rights and authority by entering into contracts with end-use customers providing the EE Resource Provider with the right to offer the EE installation into the PJM capacity market" or have obtained "a written statement" from the end-use customer that the customer "does not have an agreement with another EE Resource Provider to offer the EE installation into the PJM capacity market."[352] American Efficient knew, or should have known, that PJM makes this assumption—in fact, PJM's stated assumption is located in the PIMV template directly below the attestation statement that an EER provider is instructed to use to demonstrate that it has the requisite legal authority to claim the demand reduction. American Efficient recklessly included the attestation statement in its PIMV reports—which claims that the Company has the legal authority to claim the demand reduction associated with the EERs—while the Company knew that such attestation carries with it a presumption from PJM that an EER provider is either entering into contracts with end-use customers and/or obtaining the above-referenced written statement from the end-use customer. But American Efficient never entered into such contracts with end-use customers, nor did it obtain such written statements. By making that attestation, knowing that it would be interpreted in

---

[351] PIMV Template at 2.

[352] *Id.*

85

accordance with PJM's presumptions, the Company showed a conscious disregard of the danger of misleading PJM with respect to the requisite contractual rights.

Additionally, American Efficient realized no later than 2017 that the word "discount" was misleading and confusing in the Program Agreements the Company submitted with its M&V plans and PIMV reports; in fact, one of its biggest Program partners (The Home Depot) told the Head of Origination as much in writing in February 2017.[353] As a result of those communications, the Company changed the wording of its contracts to clear up the confusion for Program partners,[354] but it continued submitting sample agreements to PJM with the language the Company knew was misleading for more than a year and a half afterward.[355]

American Efficient's other misrepresentations about how its Program worked were reckless as well. American Efficient repeatedly described its Program payments as "incentives"—a word that, under any normal dictionary understanding, implies a causal relationship to some action[356]—despite knowing that Program partners could use the payments for any purpose and that the payments were merely cash consideration being

_____

[353] ME-AMEFF00022828 (February 2017 emails exchanged with The Home Depot) (pointing out to the Head of Origination that "nothing [in the Program Mechanics section of the Program Agreement] is referenced for manufacturer to pay retailer outside of a 'Discount,'" and speculating "[t]hat might be the hiccup is, indicating they can only pay [The Home Depot] when a markdown is in place").

[354] Tr. 152:7–153:1 (Head of Origination).

[355] *See* ME-AFFIRMED-00000757 (sample agreement submitted to PJM in March 2018); ME-AFFIRMED-00002693 (sample agreement submitted to PJM in August 2018).

[356] "Incentive," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/incentive ("something that incites or has a tendency to incite to determination or action"); *see also*, U.S. Dept. of Energy, Designing Incentives Toolkit, Better Buildings Residential Network, https://www.energy.gov/eere/better-buildings-residential-network/articles/voluntary-initiative-designing-incentives ("Incentives provide motivation to potential customers to take a certain action by lowering the risk, decreasing the cost, or offering additional benefits beyond those resulting directly from the home energy upgrades. Many residential energy efficiency programs have found incentives to be an effective way to overcome market barriers, attract customer and contractor attention, and encourage homeowners to invest in home energy assessments and upgrades.").

86

exchanged for sales data and a claim to environmental attributes. The Company also continued to affirm in writing that its Program complied with all aspects of the PJM and MISO Tariffs, even after ISO-NE had provided a detailed explanation of how the Program fell short of similar requirements in ISO-NE's Tariff.[357]

Beyond misleading PJM and MISO about how the Program worked, American Efficient recklessly misrepresented the Company's previous knowledge of or beliefs in the Program's effects. Like with the knowingly false claim that the Program could prevent customers from reverting to less efficient technologies, American Efficient repeatedly claimed that its Program "encourage[d] consumers to adopt energy efficient" products. But the Company knew its Program partners were under no obligation to use Program payments to encourage or incentivize any type of consumer behavior. In addition, even if the partners were under such an obligation, American Efficient had done nothing to investigate or quantify whether such encouragement was actually taking place.[358] American Efficient continued to trumpet this empty claim nonetheless.

---

[357] For further discussion of the Company's failure to act in the wake of ISO-NE's criticisms—including the Company's affirmative decision to withhold from PJM and MISO information regarding ISO-NE's criticisms and disqualification of the Company's expanded participation in the FCA—see section IV.E.4 above.

[358] What's more, the theory of causation that American Efficient espouses now— of incentivizing consumer behavior indirectly through upstream "micropayments"—is one that Company executives previously disclaimed. Tr. 77:24–78:14 (Head of Origination) (discussing the Head of Origination's characterization of Program payments as "micro-payments"). The Former Policy Director testified that Company executives resisted adopting such a theory of causation on the grounds that it was "unlikely anyone in the industry would accept that argument without some significant studies." Tr. 71:24– 73:2 (Former Policy Director). The Company never conducted such studies because "most of the team"—including American Efficient's then-CEO—"did not believe that argument and did not believe that those payments were causing initial energy efficiency to occur." *Id.* at 73:16–74:7 (adding that the theory was viewed "mostly as a defensive track that [Modern Energy Group's former executive chairman] would go down"). The former CEO himself confirmed as much, as he stated that he did not believe that even direct incentives to retail customers would necessarily influence those customers' purchasing choices unless the incentives were a significant fraction of the normal retail price (such as half the cost of a large appliance). Former CEO Interview at 1:12:00– 1:22:00. For further discussion of the shortcomings of the economic argument American Efficient asserted during the investigation, see section VII.D below.

### iii.    Corporate culture as further evidence of scienter

American Efficient's false and misleading statements were all motivated by the same desire: to prevent anyone from becoming suspicious of the Company and looking too closely at exactly what American Efficient was doing.  The Company's reactions when that scrutiny nonetheless arrived show more of the same, with executives making the conscious decision to withhold from PJM and MISO information regarding ISO-NE's disqualification of American Efficient's additional assets and to withhold from PJM the fact of the Company's complete disqualification in MISO.  The Company knew that each ISO/RTO  might consider American Efficient's activity in other ISO/RTOs when evaluating the Company's eligibility and participation because American Efficient had used the Company's participation in some ISO/RTOs to gain access to others.[359]  But American Efficient took a different tack with its investors than it did with PJM or MISO: the Company disclosed the disqualifications to Investment Company but took a far more reticent approach when it came to PJM.[360]  It did so out of fear that scrutiny of American Efficient's business model would lead to disqualification of the Company's Program in its biggest and most important market.  The Commission and courts have held that an entity's efforts to conceal its behavior is evidence of a manipulative intent.[361]  The Company making such consequential decisions because of its fear of scrutiny belies any argument that the Company honestly believed it was complying with the relevant tariffs.

---

[359] *See, e.g.*, ME-MCEN-00001775 (Email from outside counsel for the Company to MISO  staff (June 9, 2016)) ("Although Wylan has historically operated in PJM's capacity markets, Wylan is interested in learning whether it might be feasible to also participate in MISO's capacity markets with EE Resources, pursuant to MISO's current tariff.").

[360] *Contrast* EIG-00017101 (disclosing to Investment Company the disqualification by MISO and the referrals to Enforcement by the MISO and PJM IMMs, and telling Investment Company the Company was "being thoughtful about whether and how to communicate with PJM's staff in advance of the BRAs, as we are unsure about their level of awareness of the IMM's referral to FERC"), *with supra* section IV.E.4(discussing the Company's decision to withhold from PJM information regarding the Company being disqualified in ISO-NE and MISO).

[361] *See, e.g.*, *City Power Mktg., LLC*, 152 FERC ¶ 61,012, at P 187 (2015) ("These attempts to conceal the nature of their trades are additional evidence of Respondents' manipulative intent."); *SEC v. Svoboda*, 409 F. Supp. 2d 331, 341 (S.D.N.Y. 2006) (holding that defendants in securities fraud case "acted with a high degree of scienter," based, in part, on its finding that they took "numerous steps . . . to conceal their illegal activity").

It also shows that American Efficient knew its business model operated as a course of business that impairs and obstructs the capacity markets in PJM and MISO by extracting hundreds of millions of dollars in capacity payments that American Efficient is not eligible to receive.

The Company's lack of meaningful action in the wake of ISO-NE's criticisms of the American Efficient business model also shows the Company's refusal to "investigate the doubtful."[362] ISO-NE informed American Efficient that the Company's comparison of its business to utility rebate programs was not well made, that its submissions failed to demonstrate a causal link between the Program and the efficiency benefits the Company was claiming in the capacity markets, and—most importantly—that ISO-NE "would not have qualified [American Efficient's] requested capacity" had it known more details about "the specific features of [American Efficient's] program."[363] And yet the Company did nothing to address the concerns raised by ISO-NE. American Efficient never commissioned any sort of study or quantitative analysis to determine if its Program was causing energy efficiency. The Company did not change the amounts it was paying Program partners, require Program partners to use Program payments in ways that might affect consumer behavior, or revise its Program in any way.[364] The Company did not undertake any compliance reviews of whether its Program complied with tariffs in ISO-NE, PJM, or MISO.[365] Nor did the Company seek clarity from the Commission through its No-Action Letter process or re-engage with the ISO/RTOs with the type of open, detailed, and transparent communications about the Program's mechanics that American Efficient claims it was doing all along.[366] The Company persisted in this dogged inaction

---

[362] *In re Worlds of Wonder Securities Litigation*, 35 F.3d at 1426.

[363] Chief Markets Officer Test. Ex. 10.

[364] Tr. 120:12–15 (Chief Markets Officer).

[365] *Id.* at 120:4–11.

[366] American Efficient has referred to ISO/RTO staff "uniquely function[ing] as watchful gatekeepers" of EER participation in the capacity markets, and has argued that it was entitled to rely on their "approvals" of the Company's Program. Preliminary Findings Response at 2. But when one of those "watchful gatekeepers" told American Efficient that its Program did not qualify as an EER, the Company disregarded those concerns and refused to investigate. Tr. 123:5–13 (Chief Markets Officer). There is no reason to speculate about whether American Efficient should have known its Program might be non-compliant: the very experts whose conclusions the Company now tries to use as a shield told them so.

even in the wake of ISO-NE's disqualification of American Efficient's expansion in that market and following MISO's complete disqualification of Midcontinent's participation.

American Efficient's leadership took the same approach in response to internal criticisms. When the Former Policy Director went to Modern Energy Group's Executive Chairman with her concerns about American Efficient's benefits to the capacity markets after learning about the PJM add-back, the Executive Chairman's response was to shut her down and argue that she must be wrong.[367] Even after the Former Policy Director—who had worked on market design issues at FERC and who held leadership position on a number of policy issues within PJM—and the Company's Chief Markets Officer both researched the issue and confirmed the Former Policy Director's concerns, the Executive Chairman continued to denigrate the Former Policy Director's assertion that the Company's Program was providing no benefit to the market.[368] Just like the Company's refusal to investigate the doubtful following ISO-NE's criticisms, the Executive Chairman demonstrated the Company's egregious refusal to see the obvious.

American Efficient cannot reasonably claim that it was a naïve, inexperienced company that inadvertently mis-spoke or ran afoul of rules after looking to the ISO/RTOs for guidance. In the context of Rule 10b-5 and SEC enforcement cases, federal courts have recognized that corporate officers' experience and sophistication in the particular line of business at issue can support a finding of scienter.[369] The Company's executive leadership team is experienced and sophisticated in the energy markets,[370] and its advisory board included multiple advisors who each held decades of experience in energy

---

[367] Tr. 60:12–61:18 (Former Policy Director).

[368] *Id.* at 63:1–64:3 (recalling the former executive chairman saying in effect "how could you [the Former Policy Director] be smart enough to be the only one that figured this out," which the Former Policy Director interpreted as a "patronizing or sarcastic comment," and describing the executive chairman's view that American Efficient was still providing benefits to the capacity markets as "wishful thinking").

[369] *See, e.g.*, *S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 357–58 (S.D.N.Y. 2016); *S.E.C. v. Garber*, 959 F. Supp. 2d 374, 379–80 (S.D.N.Y. 2013).

[370] *See, e.g.*, GS-FERC-00003042 (touting the credentials of Company co-founders having "each worked in the renewable energy and energy efficiency industry since 2007"); Tr. 19:16–27:21 (Former Policy Director) (discussing the Former Policy Director's background and experience in various aspects of capacity markets including PJM); Former CEO Interview at 40:45–53:05 (discussing the former CEO's experience at another energy efficiency company prior to joining American Efficient).

90

law and policy.[371]  Another advisor is the former General Counsel for PJM and a legal advisor to MISO leadership.  These experienced insiders chose to ignore both internal warnings from their expert staff—such as the Former Policy Director—and external warnings from ISO-NE.

### iv.        Lack of candor as evidence of scienter

This evidence of scienter is further buttressed by the Company's lack of candor toward staff and the Commissioners regarding this investigation, reflecting a pattern by Modern Energy Group and its leadership.  For example, in the Company's June 2022 Submission, American Efficient insisted that its participation in the capacity markets "enable[s] the grid to avoid over-procurement of more expensive generation resources," thereby "lower[ing] cost[s] to ratepayers."[372]  But the Company was well aware of the add-back mechanism in PJM—by far the largest market in which American Efficient participated—and the fact that the add-back mechanism meant EERs would neither displace generation resources nor lower costs for ratepayers.[373]  According to the Former Policy Director, Company leadership held approximately 15 separate meetings to discuss the add-back and its effect on American Efficient's role in the capacity markets.[374]

---

[371] *See, e.g.*, GS-FERC-00003116 (highlighting the credentials of Modern Energy Group's advisory board, including a former CEO of Duke Energy and a former general counsel of PJM who had helped write the market rules in MISO).

[372] June 2022 Submission at 10.

[373] Tr. 256:3–257:5 (Chief Markets Officer); Tr. 57:6–61:18 (Former Policy Director); *see also* ME-AFFIRMED-00016721 (April 2017 email from the Company's Chief Investment Officer to Investment Bank, explaining the add-back).  In its 1b.19 Response, the Company argued that its statement was not specific to PJM, and therefore its inconsistency with the PJM add-back does not show a lack of candor.  1b.19 Response at 39.  However, based on MWs cleared, PJM represents over 92% of the total capacity the Company has cleared over its history.  Thus, any general claims about the Company's Program that are not true with respect to its effect in PJM are simply not credible.

[374] Tr. 64:6–20 (Former Policy Director).  In its 1b.19 Response, the Company also argued that the conflict between its assertion in its June 2022 Submission and the add-back mechanism cannot be a basis to find a lack of candor because the add-back "is a public rule that everyone participating in the market knows about; it is not a secret that can be hidden."  1b.19 Response at 39.  The fact that the Company's own untrue statement can be disproven easily does not make it true.  That the add-back mechanism was, or could be, known to all does not change the fact that the Company made the assertion while fully knowing that its activities had no impact on the price at all.

91

Proposed solutions included returning to the initial business model in which American Efficient would provide discounted energy efficient products or investing the Company's profits into "something that creates energy efficiency."[375] Company executives decided against either proposal because they would be expensive.[376]

The June 2022 Submission further claimed that the Company's Program was "standard practice for EERs in the wholesale capacity markets and for the energy efficiency industry generally,"[377] but ISO-NE had told them in no uncertain terms three years earlier that American Efficient's claims to operate like a utility program were inaccurate. When American Efficient responded to staff's Preliminary Findings, the Company's written response selectively omitted key portions of the ISO/RTO staff's responses to communications from the Company.[378] Aside from what the Company told staff, American Efficient also continued suggesting to PJM that it continues to operate in MISO.[379]

Company representatives also revealed themselves not to be credible in their dealings with staff, including during sworn testimony and an investigative interview. Assessments of witness credibility are frequently "intertwined" with "a determination of

---

[375]*Id.* at 65:10–68:3.

[376] *Id.* at 68:18–69:13.

[377] June 2022 Submission at 51.

[378] *Contrast* Preliminary Findings Response at 15 (citing to "an April 6, 2017 email" from PJM supposedly expressing that "PJM understood Wylan's EER programs and did not advise Wylan that any changes were required"), *with* ME-AFFIRMED-00000112 ("*PJM does not review or endorse the internal business processes*, quality or compliance controls of EE Providers who participate in the PJM Capacity Market. As such, *PJM's responses to the following questions should not be interpreted as, or be provided to third parties as, implying any endorsement of those practices.*" (emphasis added)).

[379] Affirmed Energy LLC, July 24, 2023 Letter to PJM, at page 2 (stating that "[a]nother subsidiary of American Efficient, Midcontinent Energy LLC ('Midcontinent'), *operates* similarly in MISO's capacity market," despite the subsidiary having been disqualified from MISO years earlier (emphasis added)).

whether a party acted with scienter;"[380] indeed, "if a finder of fact were to conclude that the [witness] was not being completely truthful," that can support a finding of scienter.[381]

The Chief Markets Officer testified erroneously that American Efficient had in fact disclosed the ISO-NE and MISO disqualifications to PJM before correcting those assertions later.[382] But apart from those errors, the Chief Markets Officer also repeatedly staked out untenable and inherently noncredible positions. For instance, she tried to defend the Company's repeated assertions that its Program somehow "prevents" consumers from reverting to less energy efficient products before eventually admitting it could not do so.[383] She also insisted that the Company's Program could be credited for causing a sale of an energy efficient product that occurred before American Efficient ever entered into a Program Agreement with the product manufacturer or with the retailer from whom the product was bought[384]—a position that her colleague, the Head of Origination, expressly disclaimed during his testimony.[385]

The Chief Markets Officer also incorrectly claimed that certain utility rebate programs were "like ours" when asked whether she was aware of any other energy efficiency programs that were "materially identical" to American Efficient's Program,[386] despite ISO-NE's rejection—in a letter addressed specifically to her—of this very same claim.[387] Even a cursory review of publicly available filings for the specific programs

---

[380] *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 668 (3d Cir. 2002).

[381] *Cohen v. Bowen*, 837 F.2d 582, 586–87 (2d Cir. 1988).

[382] *See* Tr., Errata Sheet at 2–3 (Chief Markets Officer).

[383] Tr. 164:12–166:5 (Chief Markets Officer).

[384] *Id.* at 49:2–54:13.

[385] Tr. 141:6–21 (Head of Origination).

[386] Tr. 117:2–118:3 (Chief Markets Officer) (naming three utility programs—two in New Jersey, and one in Pennsylvania—as "materially identical" to American Efficient's Program).

[387] *See* Chief Markets Officer Test. Ex. 9 (August 16, 2019 letter from ISO-NE) (stating that ISO-NE previously "relied on [the Company's] statements that its program was substantially similar to state energy efficiency programs," but that if ISO-NE had had an accurate understanding of the Company's business model, it would not have qualified the Company's earlier submissions). In its 1b.19 Response, American Efficient argued

93

she cited reveals significant, material differences of exactly the sort ISO-NE pointed out to the Chief Markets Officer in 2019.[388] No one would expect the Chief Markets Officer to have an encyclopedic knowledge of the precise program details of every utility that operates in PJM, but the Chief Markets Officer chose to draw the comparison, under oath, when ISO-NE had already disagreed with that comparison and publicly available documents showed the comparison was inaccurate.

Similarly, American Efficient provided misleading information to Chairman Phillips in a letter dated October 6, 2023, and in a second letter to Commissioner Clements dated October 26, 2023. The letters claimed that "PJM and MISO carefully reviewed and repeatedly approved American Efficient's measurement and verification plans and reports on 50 separate occasions related to 31 separate capacity auctions over

---

that the Chief Markets Officer's testimony is consistent with statements the PJM IMM made in its Complaint, discussed in note 2, *supra*, and that this makes the Chief Markets Officer's testimony "far from 'untenable' or 'inherently incredible.'" 1b.19 Response at 29–30. This conclusion is unfounded. While the IMM's complaint identifies flaws that the IMM believes are applicable to numerous EER providers in PJM, there is no suggestion in the complaint that American Efficient's Program is materially similar or identical to any other EER provider's program.

[388] *See, e.g.*, "Quarterly Progress Report of [New Jersey Utility 1] – 2nd Quarter Program Year 2023" at *4, Docket Nos. QO1901040, QO19060748 & QO17091004 (N.J. Bd. of Pub. Utils., March 1, 2023) ("Customers purchased and *received instant discounts* on over 150,000 packages of high-efficient lighting in retail locations throughout the Company's service territory during the second quarter of PY23. The Company *visited retail locations* in our service territory and *continues to provide lighting demonstrations and education for customers*." (emphasis added)); "Annual Report for the Period June 1, 2022 through May 31, 2023, Program Year Fourteen (14), of [Pennsylvania Utility's] Act 129 Plan" at *H-2, Docket No. M-2020-3020824 (Pa. Pub. Util. Comm'n, Sept. 29, 2023) ("The Efficient Lighting component has encouraged residential customers to purchase and install specialty LED bulbs *by lowering the price of component-qualified ENERGY STAR® LEDs.* The component provided upstream incentives to participating manufacturers *to discount the prices of a variety of specialty bulbs sold at local retail stores.*" (emphasis added)); "Verified Petition of [New Jersey Utility 2]" at Att. 1, Schedule KR-CEF-EE II-2, pp. 12–15, Docket No. QO23120874 (N.J. Bd. of Pub. Utils., Dec. 1, 2023) (describing New Jersey Utility 2's residential Energy Efficient Products Program, which includes rebates to consumers at multiple levels—after purchase, at the point of sale, or upstream through retail partners—but also an online marketplace; appliance recycling; provision of "efficient product kits;" and promotions through "trade allies" like electricians, plumbers, and contractors).

94

nearly a decade," arguing that this "clearly indicates that the RTOs themselves have not recognized or followed Enforcement's novel tariff interpretation."[389] But the letters excluded the significant fact that both the MISO IMM and MISO itself had sent American Efficient multi-page letters explaining in detail why the Program violated multiple provisions of the MISO Tariff,[390] and that both MISO and ISO-NE had disqualified the Program, in whole or in part, from their capacity markets. These material omissions are part of a pattern of misleading behavior, further supporting a finding of scienter.

### 4. American Efficient's capacity bids were subject to the Commission's jurisdiction

American Efficient's capacity market activity included transactions in markets operated by a Commission-approved ISO and a Commission-approved RTO under Commission-approved tariffs.[391] As such, the Commission has jurisdiction over American Efficient's capacity market participation.[392]

## VI. LIABILITY OF MODERN ENERGY GROUP FOR AMERICAN EFFICIENT'S CONDUCT

As described below, the law and facts support holding Modern Energy Group liable both for its own conduct and for the conduct of its subsidiaries in order to ensure that the harmed parties can be made whole and to prevent the culpable parties from escaping the consequences of their scheme.

---

[389] Letter from S. Kelly to Chairman Willie Phillips, at 4 (Oct. 6, 2023).

[390] Preliminary Findings at 14–15.

[391] *See Midwest Indep. Transmission Sys. Operator, Inc.*, 97 FERC ¶ 61,326 (2001), *reh'g denied,* 103 FERC ¶ 61,169 (2003) (Order Granting RTO Status and Accepting Supplemental Filings); *see also PJM Interconnection, L.L.C., et al.*, 96 FERC ¶ 61,061 (2001) (Order Provisionally Granting RTO Status).

[392] *See Coaltrain Energy, L.P.*, 155 FERC ¶ 61,204, at P 248 (2016) ("[B]y virtue of engaging in UTC transactions and benefiting from MLSA allocation, both of which operated under a Commission-approved tariff within PJM, a Commission-regulated RTO, we find the UTC trades at issue are under our jurisdictional purview."). In fact, American Efficient itself has stated that its business is "under FERC jurisdiction." ME-AFFIRMED-00016721.

## A. Modern Energy Group Has Been Directly Involved in Carrying Out the Scheme

Modern Energy Group and its subsidiaries are directly liable for this fraudulent scheme, based on their employees' activities, Modern Energy Group's external activities in support of American Efficient, and their receipt of millions of dollars in proceeds from the scheme. Modern Energy Group employees carried out the scheme, and the same small group of executives exercised control over both Modern Energy Group and American Efficient. In addition, Modern Energy Group raised funds from investors based on American Efficient's business activities, and American Efficient funneled tens of millions of dollars into companies throughout Modern Energy Group and its various subsidiaries.

The key personnel carrying out different elements of the scheme were employees of Modern Energy Group. The Head of Origination testified that, while his title is Head of Origination for American Efficient, his employment agreement is with Modern Energy Group.[393] Similarly, the Chief Markets Officer is both the Chief Markets Officer for American Efficient and a partner in Modern Energy Group and identified her specific employer as Modern Energy Staffing LLC.[394] The CEO of Modern Energy Group founded American Efficient (as Wylan) and interacted directly with PJM and MISO on American Efficient's behalf.[395] The other co-founder of Modern Energy Group served as Modern Energy Group's Executive Chairman and was identified by the Chief Markets Officer as being one of the "leaders of Wylan Energy" when she began working there[396] and by the Head of Origination as "kind of the acting CEO of Wylan Energy" in early 2017.[397] The Executive Chairman also tried to dismiss the Former Policy Director's

---

[393] Tr. 6:5–13, 11:18–13:13 (Head of Origination).

[394] Tr. 8:1–15, 37:8–38:23 (Chief Markets Officer).

[395] *See, e.g.*, ME-AFFIRMED-00003783 (Modern Energy Group CEO confirming wire transfers from PJM to American Efficient); ME-AFFIRMED-00003796 (Modern Energy Group CEO submitting corporate documentation to PJM); ME-MCEN-00000164 (Modern Energy Group CEO coordinating American Efficient's registration in MISO).

[396] Tr. 189:17–25 (Chief Markets Officer).

[397] Tr. 99:3–8 (Head of Origination).

concerns with American Efficient's Program when the Former Policy Director learned about the add-back mechanism in PJM.[398]

Beyond directly employing American Efficient's personnel, Modern Energy Group assisted American Efficient with the day-to-day operations of participating in the capacity markets. The former policy director testified that, as Senior Director for Policy for Modern Energy Group, her duties included answering "specific policy questions that each of" Modern Energy Group's subsidiaries might have.[399] The Former Policy Director estimated that, over time, approximately half of her working time was spent focused on issues for American Efficient specifically.[400] The Former Policy Director interacted directly with MISO's market monitor in the process that led up to MISO's disqualification of American Efficient in 2021.[401] The Head of Legal of Modern Energy Group also reviewed and signed off on American Efficient's submissions to PJM and MISO.[402]

Modern Energy Group also raised funds from investors by advertising its control over American Efficient's lines of business. An October 2017 pitch deck to potential investors in one of the Modern Energy Group funds identified American Efficient's leadership—including the Chief Markets Officer, the Head of Origination, and the CEO—as being part of Modern Energy Group.[403] In a private placement memorandum contemporaneous to the pitch deck, Modern Energy Group described Wylan as being the contracting entity for "energy efficiency investments that Modern and its investment vehicles make," and stated that Wylan would "facilitate investments on behalf of the"

---

[398] Tr. 57:4–64:24 (Former Policy Director).

[399] *Id.* at 32:4–33:8.

[400] *Id.* at 34:24–35:7.

[401] *Id.* at 88:6–91:24.

[402] *See, e.g.,* ME-AMEFF00042385 (outlining the review process for M&V submissions to PJM). The same counsel—in his role as "Head of Legal and Compliance Officer, Modern Energy Group LLC," but on behalf of American Efficient—also signed the affidavits accompanying American Efficient's productions to staff during the investigation.

[403] GS-FERC-00003116 at 11.

97

Modern Energy funds.[404]  These descriptions to potential investors show that Modern Energy held itself out as the entity ultimately controlling the activities of American Efficient and its subsidiaries.

In June 2020, Modern Energy Group formed MIH LLC to serve as a holding company for American Efficient LLC and its operating companies including Affirmed, Midcontinent, Maple, and American Efficient Origination.  Modern Energy Group contributed those companies to the new holding company on June 29, 2020, and MIH LLC recognized "the net assets and equity interests" of the companies "at a value equivalent to their carrying cost."[405]  Modern Energy is the sole member of MIH LLC.[406]

## B.    Modern Energy Group Should be Held Liable for Its Subsidiaries' Actions

For years, the Commission has applied its single entity doctrine to "disregard the corporate form in the interest of public convenience, fairness, or equity" when necessary to fulfill its statutory obligations.[407]  This doctrine is "flexible and practical in nature," and the relevant "inquiry is simply a question of whether the statutory purposes would be frustrated by the corporate form."[408]  As the Commission has explained, the doctrine gives it the "broad authority . . . to look beyond a subsidiary to its owner to achieve the

---

[404] GS-FERC-00003042 at 8.

[405] ME-AMEFF00052475 (MIH LLC and Subsidiaries, Consolidated Financial Statements as of December 31, 2020) at 8.

[406] *Id*.

[407] *San Diego Gas & Elec. Co. v. Sellers of Mkt. Energy & Ancillary Svcs.*, 127 FERC ¶ 61,269, at P 221 (2009); *see also Kansas Pipeline Co., v. Kansas Pipeline Operating Co.*, 81 FERC ¶ 61,005, at 61,010 (1997); *Transcon. Gas Pipe Line Corp.*, 58 FERC ¶ 61,023, at 61,045 (1992), *aff'd, Transcon. Gas Pipe Line Corp. v. FERC*, 998 F.2d 1313, 1320 (5th Cir. 1993); *Town of Highlands, N.C. v. Nantahala Power & Light Co.*, 37 FERC ¶ 61,149, at 61,356 (1986)*; see also Total Gas & Power North America, Inc.*, 176 FERC ¶ 61,026, at PP 73, 87 (2021) (explaining that "[u]nder the single entity doctrine, the Commission looks to whether the corporate form, intentionally or not, frustrates the purpose of a federal statute," and setting the issue for hearing to consider disputed facts related to "TGPNA's financial state, Total and TGPL's level of control over TGPNA's activities, and the extent to which corporate formalities have been observed, particularly in the companies' dealing with each other").

[408] *Town of Highlands*, 37 FERC ¶ 61,149 at 61,356.

agency's statutory mandate and to assure that statutory purposes are not frustrated."[409]
These principles apply regardless of the intent behind a particular corporate structure.[410]

The Commission's single entity doctrine is a variation of a theory that has deep
roots in regulatory law. Aside and apart from traditional agency law and common law
veil-piercing doctrines, "[i]t long has been established that the fiction of corporate
separateness of state-chartered corporations will not be permitted to frustrate the policies
of a federal statute."[411] There is a robust history of federal agencies achieving that end by
disregarding the corporate form under a different and less burdensome standard than that
called for under ordinary agency and veil-piercing principles.[412]

---

[409] *Id. See also Transcon. Gas Pipe Line Corp.*, 58 FERC ¶ 61,023 at 61,045
(applying single entity doctrine to reach parent corporation that used two subsidiaries to
make gas sales at rates that the parent was not permitted to offer).

[410] *San Diego Gas & Elec. Co.,* 127 FERC ¶ 61,269 at P 221.

[411] *Safety Light Corp.,* 41 N.R.C. 412, 457 (1995) (citing *Anderson v. Abbott*, 321
U.S. 349, 365 (1944)).

[412] *See, e.g., Anderson*, 321 U.S. at 365 (approving OCC's extension of liability to
shareholders of bank holding company because to allow corporate form to insulate
against liability would frustrate federal policy); *Pearson v. Component Tech. Corp.*, 247
F.3d 471, 484 n.2 (3rd Cir. 2001) (identifying "a general sense that federal courts are
more likely to pierce the veil in order to effectuate federal policy, lest state corporate laws
be permitted to frustrate federal objectives," and citing *Anderson*); *United States through
Small Bus. Admin. v. Pena*, 731 F.2d 8, 12 (D.C. Cir. 1984) (recognizing that "the
question whether a corporate veil ought to be pierced for purposes of applying some
federal statute is distinct from whether a corporate veil ought to be pierced for purposes
of allocating state tort or contract liabilities," and citing *Anderson* and its progeny);
*Sebastopol Meat Co. v. Sec'y of Agric.*, 440 F.2d 983, 985 (9th Cir. 1971) ("We do not
think that state law limitations on the alter ego theory or doctrine are necessarily
controlling in determining the permitted scope of remedial orders under federal
regulatory statutes" in proceeding under Packers and Stockyards Act); *Sasso v. M. Fine
Lumber Co.*, 144 F.R.D. 185, 190 (E.D.N.Y. 1992) (denying individual president's
motion to vacate judgment holding him liable for collection of pension contributions
under ERISA, noting that "even if a traditional [veil-piercing] standard cannot be met in
his particular case, Fine could still be held personally liable" ); *Improving Public Safety
Comm. In the 800 MHz. Band*, 25 F.C.C. Rcd. 13,874 at 13,887–89 (2010) (collecting
cases, noting that "this inquiry is distinct from the standards for 'piercing the corporate
veil' or finding an 'alter ego' under common law"); *Macmillan, Inc.*, 96 F.T.C. 208, at

When deciding whether to employ a single entity approach, regulatory agencies and courts generally follow a holistic "totality of the circumstances" analysis, with the overarching consideration being whether the corporate form, intentionally or not, functions to frustrate federal statutory or regulatory goals.[413] While there is no precise test for when a single entity approach should be employed, the Commission and courts have frequently focused on such factors as: the interconnectedness of business and/or ownership relationships;[414] whether the entities operated as a "single commercial enterprise;"[415] the ability (exercised or not) of one entity to exert control over the other;[416] whether the entities were affiliated in ownership and management;[417] whether the entities functioned as independent profit seeking corporations from each other;[418] and whether there were legal instruments governing their interrelations.[419]

Applying this "totality of the circumstances" standard, Modern Energy Group and its subsidiaries should be treated as a single entity with American Efficient for purposes of holding Modern Energy Group accountable for American Efficient's conduct. The same facts that demonstrate Modern Energy Group's direct liability support treating the corporate family as a single entity. Testimony from Company executives confirmed the interconnectedness of ownership and business relationships between American Efficient and Modern Energy Group, with Modern Energy Group regularly exercising significant

---

*77 (1980) ("Even latent power to control the policy of its subsidiary is sufficient to hold the parent company vicariously responsible for the acts of its subsidiary.").

[413] See, e.g., Anderson, 321 U.S. at 365 (to allow corporate form to insulate against liability would frustrate federal policy); Kansas Pipeline Co., 81 FERC ¶ 61,005 at P 61,011 (violations of regulations and orders constitute frustration of statutory policy); Town of Highlands, 37 FERC ¶ 61,149 at 61,355–56.

[414] Town of Highlands, 37 FERC ¶ 61,149 at 61,359.

[415] Schenley Distillers Corp. v. United States, 326 U.S. 432, 436–37 (1946).

[416] Beneficial Corp., 86 F.T.C. 119, at *33 (1975).

[417] Transcon. Gas Pipe Line Corp. v. FERC, 998 F.2d 1313, 1320–21 (5th Cir. 1993).

[418] Town of Highlands, 37 FERC ¶ 61,149 at 61,359.

[419] Transcon. Gas Pipe Line Corp., 998 F.2d at 1318.

control over American Efficient.[420]  Modern Energy Group and American Efficient share the same offices,[421] have the same corporate managers, and have overlapping staff.  And Modern Energy Group and the various holding companies between it and American Efficient received the financial benefits from the scheme, with American Efficient funneling tens of millions of dollars in proceeds to those entities.  Beginning in June 2022, American Efficient began receiving more than $1 million each week from PJM.[422]  From June 2022 to June 2023, American Efficient paid more than $47 million to MIH LLC, repaying the intercompany loans that had kept American Efficient afloat.[423]  The Former Policy Director testified that American Efficient was "the group that really provided the most revenue for Modern Energy Group."[424]

Modern Energy Group and its subsidiaries financially benefited from the fraudulent scheme, both by attracting outside investment and by collecting revenues American Efficient received from PJM and MISO.[425]  That money should be returned to PJM and MISO ratepayers.  Allowing Modern Energy Group and its subsidiaries to retain

---

[420] *See supra* notes 394–403 and accompanying text.

[421] Modern Energy Group and American Efficient use the same address—703 Foster Street, Durham, North Carolina 27702—in their respective Annual Reports filed with the North Carolina Secretary of State.  *Compare* https://www.sosnc.gov/online_services/business_registration/flow_annual_report/128192 45, *with* https://www.sosnc.gov/online_services/business_registration/flow_annual_report/143929 35 (last visited Dec. 4, 2024) .  *See also* Current Platforms: American Efficient, *available at* https://modern.energy/index.php/current-platforms#american-efficient (last visited Dec. 4, 2024) (describing American Efficient as being "[c]o-located at Modern Energy's headquarters in Durham, North Carolina").  In its Annual Report, American Efficient lists MIH LLC as its "Manager" and indicates that MIH LLC's address is also 703 Foster Street, Durham, North Carolina 27702.

[422] ME-AMEFF00052472  (ledger of payments to Wylan Energy LLC, and later to Affirmed Energy LLC).

[423] ME-AMEFF00052582.

[424] Tr. 110:6–23 (Former Policy Director) (estimating that the percentage of Modern Energy Group's revenues that came from American Efficient was near 85 percent).

[425] *See supra* notes 404–07 and accompanying text.

those ill-gotten gains would frustrate the Commission's regulatory mission under the FPA and the remedial purpose of the Anti-Manipulation Rule.

## VII.     AMERICAN EFFICIENT'S DEFENSES ARE NOT PERSUASIVE

In its untimely 1b.19 Response and in numerous written submissions and extensive meetings with staff, American Efficient has detailed its defenses to the above-described violations.[426]  Staff has considered these defenses and does not find them persuasive.

### A.     American Efficient's Causation Arguments Ignore the Purposes of the Capacity Markets and the Plain Text of the Tariffs

American Efficient's main argument has been that neither the MISO Tariff nor the PJM Tariff requires an EER to cause energy reductions.  As part of that effort, it has mischaracterized the applicable standard, claiming that staff's view of that standard requires EERs to prove that they were the but-for cause of the energy savings.[427]  But Enforcement's view of the "designed to achieve" language in the tariffs does not require EERs to exclude all other causes (as would be required under a but-for standard).  It requires only that the resource be a proximate cause of the reduction (or, at least, be designed to be a proximate cause).[428]  In other words, the EER must be *a* cause for the

---

[426] Staff has had numerous meetings and calls with American Efficient and its counsel to discuss the Company's defenses.  In particular, the company made lengthy oral presentations regarding those defenses on May 4, 2021, May 11, 2022, July 26, 2022, October 3, 2023, and November 7, 2023.  The Company also presented lengthy written defenses to Enforcement on June 21, 2022, and September 5, 2023.  The Company and its counsel also sent multiple letters addressing those defenses to the Commissioners.

[427] *See, e.g.*, Preliminary Findings Response at 41 (characterizing staff's "causation test" as requiring that an EER "demonstrate its program was the cause of the individual product purchase decisions, *i.e.*, but for the program, the products would not have been bought"); 1b.19 Response at 27 ("OE has never shown how any other [EER] meets the causation test it claims American Efficient has violated, where an EER provider allegedly must demonstrate its program was *the* cause of the individual product purchase decisions, i.e., but for the program, the products would not have been bought.") (emphasis in original).

[428] As staff wrote to the Company's counsel on October 19, 2022, causation can include "one of multiple, material causative factors in end-use customers' decisions to

102

energy reduction (the action must be a foreseeable outcome of the EER) but need not be *the only* possible cause for the reduction.

American Efficient has argued that it does not matter who or what causes the reductions, only that those reductions occurred and that it owns the environmental attributes for the products used by the consumers who reduced their energy consumption.[429] Accordingly, it claims ownership over all energy reduction related in some way to the hundreds of millions of products for which it purchased sales data and environmental attributes, even though it had nothing to do with the purchase, installation, and/or use of those products. Under the Company's view, it does not matter that the reductions would have occurred whether its Program existed or not (which is its justification for claiming capacity credits for historicals[430]), as long as it purchased the sales data and environmental attributes of the relevant products.[431]

In addition to ignoring the tariff language, the Company's view ignores the purpose of the capacity markets. The ability of EERs to cause reductions in electricity consumption is the very thing that makes them useful as capacity resources.[432] If the

---

purchase energy efficient products. Letter from T. Hettenbach to D. Applebaum, at 2 (Oct 19, 2022).

[429] *See, e.g.*, Preliminary Findings Response at 31–34. American Efficient tried to dismiss the MISO Tariff's definition of "Energy Efficiency (EE) Resources" as "specific projects resulting in installed measures on retail customer facilities that achieve a permanent reduction in electric energy usage . . . ." It claimed that this definition does not count because it is in Attachment UU, which sets out M&V Standards. But Attachment UU is not optional, and this clear binding language defines the types of reductions that can be attributed to EERs.

[430] Tr. 52:9–53:22 (Chief Markets Officer) (claiming that historical sales "are real savings that create real value and can be measured and verified in the ways that comply with the tariff").

[431] The majority of the causation discussion in the 1b.19 Response addresses how the Company calculates the MW savings that it attributes to end-use customers using energy efficient products as it assumes they will. *See* 1b.19 Response at 17–23. But the accuracy of these calculations is not the issue in this matter; the issue is that American Efficient's Program did not cause any of these reductions.

[432] *See, e.g.*, Letter from A. Iler to K. Bose, Docket No. ER11-4081, at 11 (July 20, 2011) ("Energy Efficiency Resources really do reduce Demand and so assist in meeting

103

reductions would have occurred anyway, there is no need to pay a capacity resource to make them happen. There is no evidence that demand in PJM and MISO was reduced by a single MW in response to the hundreds of millions of dollars that ratepayers gave to American Efficient. Without a causation requirement, programs like American Efficient's simply act as, to use the Former Policy Director's words, a "wealth transfer" from ratepayers to the Company.[433]

The plain language of the PJM and MISO Tariffs establishes that the projects making up the EERs must themselves cause (or be designed to cause) the reductions. Section 69A.3.2 of the MISO Tariff and Article 1 of the PJM RAA both define "Energy Efficiency Resource," in pertinent part, as a project "designed to achieve a continuous . . . reduction in electric energy consumption." Attachment UU of the MISO Tariff goes further, clarifying that EERs are "specific projects *resulting in* installed measures on retail customer facilities that *achieve* a permanent reduction in electric energy usage . . . ."[434] The projects themselves, not independent actions by unaffiliated customers, must achieve the claimed reduction, and American Efficient cannot passively claim credit for reductions that its project (which the Company has defined as the Program)[435] was not designed to achieve and (in MISO) which were not the result of its project. In other words, it only can take credit for the reductions that its project was designed to cause. The Company's argument that the PJM and MISO Tariffs lack any causation requirement or that the projects themselves do not have to cause the required reduction in electricity use has no basis in the plain language of those tariffs.

Staff recognizes that it is hypothetically possible, though practically unlikely, that the fees that American Efficient pays to its Program partners for the sales data and environmental attributes could have an ancillary effect of encouraging some employee at

MISO reliability standards."); *see also Advanced Energy Economy*, 161 FERC ¶ 61,245 at P 60 (stating that when "energy efficiency is offered directly into the wholesale capacity market" it causes "a reduction in demand and an increase in supply of capacity").

[433] Tr. 113:25–114:2 (Former Policy Director).

[434] MISO Tariff, Attachment UU (emphasis added). As discussed in section V.A.1 above, the causation standard further is reinforced by the NAESB standards that the Commission incorporated into its regulations and ordered ISO/RTOs to incorporate into tariffs.

[435] Preliminary Findings Response at 23.

a retail location to try to sell more energy efficient products.[436]  But even if the Program had such a side effect (of which American Efficient has produced no evidence), it still is not designed to decrease energy consumption at end-use customer sites.  There are many activities that may have side effects of reducing energy consumption (increasing utility rates, shutting down businesses, disconnecting ratepayers with overdue bills) but are not designed specifically to reduce consumption or to save energy.  The possibility of remote ancillary benefits (however unlikely) does not change the fundamental purpose of the Program.[437]  American Efficient's Program is designed to acquire and sell data and environmental attributes, not to reduce electricity use by end-use customers.

_____

[436] American Efficient has claimed that its Program creates "ancillary benefits" by providing price signals to Program partners that the capacity reductions related to a specific energy efficient product line has value.  *See* June 2022 Submission at 13–14.  But any purported benefits must be viewed in the context that many of American Efficient's retail partners are among the largest corporations in the world, with annual revenues in the hundreds of billions of dollars, and American Efficient is paying them for doing nothing other than providing sales data and environmental attributes.  Staff asked for evidence demonstrating that the retailers have changed sales practices in response to the Program, and American Efficient has not been able to provide anything beyond unsupported anecdotes.  It costs money to market energy efficiency products, which is why utility programs spend so much more than American Efficient on their programs.  If, for example, the Home Depot store in Washington, D.C., were to hire somebody even at minimum wage ($17.50 per hour) to try to sell more energy efficient products, that person would need to sell over 194 additional energy efficient products *every hour* for the store to break even at American Efficient's 9 cent/product fee.  It is easy to understand why retailers would accept such fees on their base sales, but it would be difficult to justify new initiatives based on the small per-unit fees American Efficient provides.

[437] Unable to provide evidence that its Program was causing reductions in energy consumption, American Efficient misrepresented ordinary business emails that it had received to claim that its micropayments had "facilitate[d] (or materially incentivize[d]') the spread of energy efficiency products."  1b.19 Response at 27 (footnote omitted).  Those emails included one from a large retailer to dozens of recipients (including representatives of multiple utility rebate programs) notifying them that it had pallets of a certain product in stock and was reducing the price by 50 cents.  *See* ME-AMEFF00022798.  The email does not suggest that this reduction resulted from any incentive from any company and certainly did not indicate that the retailer reduced the price by 50 cents in response to the few cents in micropayments it received from American Efficient.  Another was an excerpt of an email chain addressing micropayments, in which the Company representative later explained "I hate that the

105

## B.    American Efficient's Program is Unlike the EER Program Designs of Other Capacity Market Participants

During staff's investigation, American Efficient claimed that it operates in line with "standard practice for EERs in the wholesale capacity markets and for the energy efficiency industry generally,"[438] and that the violations staff has found in American Efficient's Program would make it so "many energy efficiency aggregations simply could not participate in the markets."[439]  But staff reviewed how other EER providers described their EER programs in state regulator filings, and those filings reveal that American Efficient's Program is markedly different from programs of those other EER providers.[440]

As is discussed in further detail in section V.A.1, American Efficient's program was not designed to cause reductions in energy use by end-use customers; rather, it was designed to obtain market data and environmental attributes of energy efficient products that its retailer partners had sold, with the ultimate goal of getting capacity payments from those sales.  Moreover, the Company's dealings are limited to supply chain partners. It has no plausible avenue to cause any such reductions because it has no connection, or nexus, with end-use customers.  Consequently, American Efficient has no claim to own a

_____

decision was made before me to call the Costco program 'marketing.' We are only paying people for Environmental Attributes."  *See* ME-AMEFF00023130 (excerpted from ME-AMEFF00023128).

[438] June 2022 Submission at 51.

[439] Preliminary Findings Response at 4.

[440] Staff's knowledge of other EER providers' programs, as discussed below, is based solely on staff's review of state commission filings.  Staff has not examined whether each program is wholly compliant with the relevant ISO/RTO tariffs, the Federal Power Act, or Commission regulations and orders.  Moreover, contrary to the Company's claims, staff has never asserted that all upstream and midstream programs should be driven from the capacity markets, *see* 1b.19 Response at 28–29.  Staff's conclusions in this matter have been limited to the specific failures in the design and implementation of American Efficient's Program.

However, staff's finding that American Efficient operates differently from other EER providers was echoed by ISO-NE during its disqualification of American Efficient from the FCA.  *See* Chief Markets Officer Test. Ex. 10 (telling the Chief Markets Officer that the Company's Program "is not substantially similar to mid-stream energy efficiency programs").

106

qualifying EER project of its own or rights to a qualifying EER project owned by an end-use customer. Other EER providers, even those who rely on the supply chain for part of their programs, may have valid claims to own qualifying EER projects in ways that American Efficient does not.

Take, for example, one Maryland utility that participates in the PJM capacity market as an EER provider through its programs under EmPOWER Maryland.[441] Even just looking at the residential lighting program that operates through the supply chain—which is just one segment of the suite of energy-efficiency initiatives this utility submitted as an EER to PJM—the contrasts with American Efficient's Program are stark. At the most basic level, the utility's program "mark[s] down the cost" of EE products "at the point-of-sale."[442] The incentives paid directly to consumers to drive additional sales—up to five dollars for standard LEDs, seven dollars for specialty LEDs, and up to eight dollars for LED fixtures—are an order of magnitude larger than the fees American Efficient paid its Program partners for sales that were happening anyway and, in some cases, had already occurred.[443]

Moreover, this Maryland utility's program does more than just mark down costs to encourage purchases of covered products. The utility's "[f]ield representatives will visit participating retail locations to verify promotional pricing is in place, provide training and education to store staff and customers, perform merchandising services through the placement of utility-branded point of purchase (POP) materials, and conduct in-store demonstrations."[444] Further, the utility's field representatives visit participating retailers to ensure the retailers' compliance with their obligations under the utility's program.[445]

The Maryland utility's program also reaches out to end-use customers outside of the stores where they may purchase products. The utility runs "targeted awareness advertising campaigns" across broadcast television, in movie theaters, on radio, on billboards, on pump-top ads at gas stations, through targeted email blasts to customer

[441] *See* "[Maryland Utility's] EmPOWER Maryland Program Filing for 2021–2023," Case No. 9648: *In the Matter of the 2021–2023 EMPOWER Maryland Program* (Md. Pub. Svc. Comm'n, Sept. 1, 2020).

[442] *Id.* at 30.

[443] *Id.* at 32.

[444] *Id.* at 30.

[445] *Id.* at 32.

email lists, via interactive ads on featured websites, interactive ads at the top of a user's Gmail inbox, interactive ads on streaming/online video platforms, and pushing search impressions on Bing/Google when customers search for lighting.[446]  The goal of this marketing campaign is to "[e]ncourage social and behavioral changes so that customers understand that increasing numbers of Maryland residents are making the switch to energy-efficient lighting."[447]

Also unlike American Efficient, this Maryland utility collects and analyzes program data to measure its program's effects.  The utility informed the Maryland Public Service Commission that "[r]esults from the previous program cycles have shown that advertising and special lighting discount promotions influence sales."[448]  The utility further broke down the effects of its program by seasons and by quarterly reporting periods.[449]

Many of these same contrasts appear when reviewing programs that the Company's Chief Markets Officer said were "materially identical" to American Efficient's Program,[450] including that of a Pennsylvania utility that qualified 1.456 MW

---

[446] *Id.* at 32–35.

[447] *Id.* at 32.

[448] *Id.*  American Efficient misleadingly cited a discussion in an EmPOWER Maryland analysis of data from California to suggest that consumers were not aware of rebates and were not influenced by a certain California utility's program.  *See* 1b.19 Response at 26.  In fact, EmPOWER Maryland's program design consultant cited that data in the context of explaining how the Maryland program was going to take additional steps to change consumer behavior and to justify why it was going to use participant studies to confirm that the program had caused such changes.  American Efficient's Program included no steps designed to change consumer behavior and no studies to evaluate whether it had caused any such changes.  Again, unlike EmPOWER Maryland, American Efficient's Program was not designed to cause any change in any behavior by any individual or entity other than for the Company to collect data and attributes that it could cash in for capacity payments.

[449] *Id.*

[450] Tr. 117:1–22 (Chief Markets Officer).

as EER capacity in PJM for delivery year 2023–24.[451]  The programs generating those savings were the Pennsylvania utility's commercial and residential lighting programs, as well as its low-income program.[452]  The commercial program included assisting contractors in developing project plans using energy efficient products, providing small commercial customers with no-cost assessments and recommendations of both energy efficient products and qualified installers, and immediate point-of-purchase rebates through midstream distributors.[453]  The residential program "provided upstream incentives to participating manufacturers to discount the prices" of energy efficient lighting products.[454]  The low-income program included "home energy assessments, education, customized kits of energy-saving items to customers, and managing the direct installation of energy-saving equipment in customers' homes."[455]

These utility programs differ significantly from American Efficient's Program, in precisely the areas where staff has identified American Efficient's violations.[456]  The upstream and midstream components of the utilities' programs fund instant rebates and product discounts, unlike American Efficient.  The Maryland utility also collects and analyzes the data necessary to provide proof that its program causes end-use customers to buy and use energy efficient products beyond the purchases those consumers may have made anyway.  The "projects" by the utilities—providing discounted products, advertising the benefits of those products, and educating consumers about how to use them—are significantly different from how American Efficient has defined its own.  The Pennsylvania utility's commercial and low-income programs have direct customer contact, using assessments and customer education to drive adoption of energy efficient technologies.  And there can be little doubt that direct installation of energy efficient

---

[451] "Annual Report for the Period June 1, 2022 through May 31, 2023, Program Year Fourteen (14), of [the Pennsylvania utility's] Act 129 Plan" at 16–18, Docket No. M-2020-3020824 (Pa. Pub. Util. Comm'n, Sept. 29, 2023).

[452] *Id.*

[453] *Id.* at D-2 (Appd'x D).

[454] *Id.* at H-2 (Appd'x H).

[455] *Id.* at 45.

[456] Enforcement has not reviewed these utility programs for purposes of assessing their compliance with the relevant tariff provisions.  Rather, staff's review of these utility programs was limited to assessing American Efficient's comparison of its Program to other EERs.

109

products by the utility company qualifies as a project involving "installation of more efficient devices or equipment," as required under both the PJM and MISO Tariffs.

**C. American Efficient Was Neither Honest nor Transparent with PJM or MISO, and "Approvals" of the Technical Elements and Representations in American Efficient's Submissions Do Not Excuse American Efficient's Violations**

By American Efficient's telling, the Company "has quite literally built its energy efficiency program through regular and detailed engagement with RTO staff over the lifespan of the Company."[457] According to the Company the "RTOs approved [its business] model many times based on the Company's descriptions and based on an accurate understanding of how it worked."[458] The Company claimed that "[i]n light of these consistent and robust exchanges between and amongst the Company and RTO staff, there is no reasonable question that the RTOs had full visibility into American Efficient's program."[459]

But in reality, American Efficient's communications with ISO/RTO staff were almost entirely about technical or administrative matters, and almost never about the Company's compliance with tariff rules.[460] And when the Company *did* discuss elements of its Program with ISO/RTO staff, the representations American Efficient made were deceptive and misleading.

---

[457] 1b.19 Response at 40; *see also* Preliminary Findings Response at 3 (stating that the Company stands on a "long, painstaking, and iterative history of working with [PJM and MISO] to achieve full compliance").

[458] 1b.19 Response at 41; *see also* June 2022 Submission at 47 (stating that American Efficient obtained "approval" from PJM and MISO on the basis of ISO/RTO staff's "complete information and full knowledge of American Efficient's business model, program design, legal interpretations, and technical methodologies").

[459] 1b.19 Response at 50.

[460] The Chief Markets Officer testified that she had participated in "around ten" in-person meetings with PJM during her time at American Efficient. Tr. 264:2–14 (Chief Markets Officer). However, she also testified that she could not "recall specifically" any questions that PJM had asked regarding "compliance with the relevant tariff provisions." *Id.* at 148:3–15.

110

1. **American Efficient Had Only Limited Communications with ISO/RTO Staff Concerning How the Company's Program Operated**

American Efficient produced documents reflecting communications with PJM, dating over a six-and-a-half-year span from January 2015 to July 2021, and communications with MISO from June 2016 to July 2021. The overwhelming majority of these communications concern the logistics of American Efficient's participation in each ISO/RTO's capacity markets.

a. **Communications with PJM**

The bulk of the communications with PJM were administrative in nature: American Efficient personnel seeking technical help with PJM's eRPM system,[461] American Efficient personnel asking where or in what format to input certain data,[462] American Efficient submitting annual certifications and paperwork,[463] American Efficient trying to resolve collateral issues,[464] and similar administrative matters.[465]

Each submission of an M&V plan or PIMV report often generated multiple emails, in a standard pattern. The first email was the plan or report submittal with supporting documentation,[466] followed by PJM staff's acknowledgement of receipt.[467] American Efficient often emailed to follow up on the status of PJM's review.[468] Once

---

[461] ME-AFFIRMED-00003329.

[462] ME-AMEFF00045190.

[463] ME-AFFIRMED-00012473.

[464] ME-AFFIRMED-00009320.

[465] Another significant portion of the produced emails reflect the Former Policy Director's leadership roles within PJM while employed by Modern Energy Group, such as participation on the Nominating Committee and involvement with the PJM Clean Energy Caucus. In these roles, the Former Policy Director was contributing to market design, policy, and tariff revision issues within PJM more broadly than just concerning energy efficiency.

[466] *See, e.g.*, ME-AFFIRMED-00000777.

[467] *See, e.g.*, ME-AFFIRMED-00003470.

[468] *See, e.g.*, ME-AFFIRMED-00007507.

111

PJM approved the submission, PJM generally emailed American Efficient to inform the Company of that approval.[469]  The approval email often was followed up by another email setting out the exact MW quantities that PJM approved in each zone, with instructions for using that information to participate in the corresponding auction.[470]  American Efficient sometimes responded with questions or attempts to resolve discrepancies between the MW quantities the Company had submitted and the MW quantities that PJM approved.

Outside of these administrative exchanges and the standard pattern of communications surrounding M&V or PIMV submissions, American Efficient's communications with PJM almost exclusively concerned technical elements of the submissions, and not the details of how American Efficient was purporting to acquire the energy reductions it was offering into the capacity markets.  For example, following American Efficient's submission of a PIMV report for the 2019–20 delivery year, PJM's reviewer emailed the Company's Chief Markets Officer with questions and concerns about American Efficient's proposal.[471]  The PJM Reviewer's questions were all about the underlying statistical assumptions and modeling that American Efficient had applied in its report: whether the Company's models accounted for greater market saturation of LED bulbs, how the Company had arrived at the coincidence factor it was applying for exterior bulbs, and so on.  This type of exchange occurred consistently throughout American Efficient's participation in PJM.[472]

Another example of this type of technical communication is one of the exchanges American Efficient highlighted in its 1b.19 Response.  The Company cited an April 2015 email where it asked PJM about the "eligibility of secondary data" and the "acceptability

---

[469] *See, e.g.*, ME-AFFIRMED-00003464.

[470] *See, e.g.*, ME-AFFIRMED-00003461.

[471] ME-AFFIRMED-00006994.

[472] *See, e.g.*, ME-AFFIRMED-00003156  (July 2015 email submitting documentation to support the coincidence factor and waste heat factor used in Wylan's submission); ME-AFFIRMED-00004246 (February 2016 email sending PJM load shapes based on a light-logger study performed in Pennsylvania in order to meet PJM's "requirements for coincidence factors"); ME-AFFIRMED-00005623 (February 2017 email asking PJM which FPR value would be used for ICAP to UCAP conversion in the upcoming auction); ME-AFFIRMED-00008217 (September and October 2017 emails asking for PJM's input on various statistical values to be used if American Efficient added insulation products).

of certain assumptions."[473]  The Company pointed out correctly (but unremarkably) that PJM offered a call to discuss these matters, and that the Company later sent a follow-up email to PJM attaching an "outline" of a lighting plan and raising the possibility of "modify[ing] our methodology."[474]  This communication concerned the technical aspects of the company's Program, including its savings methodologies and assumptions, and did not address any of the Program details that staff has found to be violative of the PJM Tariff.

Further illustrating the lack of evidence supporting American Efficient's claim that PJM fully understood the Company's Program, the Company cited an internal PJM email where one PJM employee emailed another PJM employee a document listing the MWs for "the WYLAN resources."[475]  American Efficient says that this shows that "PJM employees discussed American Efficient's planned participation in the PJM base residual auction."[476]  Staff has no reason to doubt that PJM employees discussed American Efficient, a major EER provider in PJM.  However, the cited email does nothing to support the Company's claims that PJM had "full visibility" into the Company's business model.

Only in a small handful of the emails produced by American Efficient did the Company and PJM discuss any of the program design issues identified in staff's factual findings above—and even then, the discussion centered mostly on the underlying statistical methodology of the Company's submissions or technical details of the capacity auctions, and not the Program's mechanics.  In February 2015, responding to one of American Efficient's first submissions to PJM, the PJM reviewer raised four issues preventing PJM from approving American Efficient's M&V plan: one issue was how an EER provider needed to "demonstrate to PJM that it has the legal authority to claim the demand associated with" the EER, but the other three issues were the value used for American Efficient's coincidence factor, the value used for American Efficient's waste heat factor, and the time period of the sales data American Efficient had used.[477]

---

[473] 1b.19 Response at 42-43.

[474] *Id*.

[475] 1b.19 Response at 49.

[476] *Id*.

[477] ME-AFFIRMED-00000701.  Specifically, the PJM reviewer pointed out that an EER provider could demonstrate its legal authority to claim energy reductions by

113

Later, in August 2016, American Efficient posed twelve questions to PJM staff, setting out what the Company described as its "business practices" and asking for confirmation from PJM that those practices were compliant.[478] American Efficient discussed this exchange at length in its 1b.19 Response.[479] However, only one of the twelve questions addressed how American Efficient claimed to acquire the environmental attributes it was offering as an EER; the remaining questions dealt with auction parameters, timing of eligibility to include certain products, and whether American Efficient could use "alternative methodologies" to calculate energy savings in its M&V/PIMV submissions. And in its response to the only question that addressed how American Efficient claimed to acquire capacity rights, PJM told the Company that it had not reviewed "Wylan's contract with its partners conferring capacity rights."[480] Instead, PJM affirmed the statements in its PIMV template—namely, that PJM "presumes" an EER has either (i) entered into contracts with end-use customers, or (ii) obtained a written statement from the end-use customer that no one else has the rights to claim the reductions[481]—and stated that "it is the responsibility of the EE provider to ensure that this claim [that the EER provider has legal authority to claim the demand reduction] is valid, and upon request by PJM, provide evidence to support this claim":

_____

submitting one of two written affirmations. The PJM reviewer requested that American Efficient "amend [its] plan to include one of" the affirmations of rights. Modern Energy Group's co-founder and CEO responded by saying "we will be sure to include the required language" in subsequent submissions.

[478] ME-AFFIRMED-00000655.

[479] 1b.19 Response at 44-47.

[480] ME-AFFIRMED-00000112.

[481] *See* EE Post-Installation Measurement & Verification Report Template, *available at* https://www.pjm.com/-/media/markets-ops/rpm/rpm-auction-info/post-installation-measurement-and-verification.ashx.

114

PJM does not review or endorse the internal business processes, quality or compliance controls of EE Providers who participate in the PJM Capacity Market. As such, PJM's responses to the following questions should not be interpreted as, or be provided to third parties as, implying any endorsement of those practices.

## 1. PJM's FAQ #7 for RPM Energy Efficiency

a.   Reference Quote: "An EE Resource Provider must first confirm with the end-use customer that the end-use customer does not have an explicit agreement with another EE Resource Provider to offer the EE installation into the PJM Capacity Market. The EE Resource Provider should also check with the end-use customer to determine whether there were any external sources of the funds required to provide the claimed EE quantity."

b.   Wylan Business Practice: Wylan has entered into a number of contracts that provide that all EE Resource rights from products governed by the contracts are transferred to Wylan. The end-use customers of such contracts cannot acquire title to such EE Resources because these contracts have explicitly transferred full title to Wylan prior to the first sale of specified EE Resource to end-use customers.

c.   Requested Clarification:  Wylan requests confirmation from PJM that Wylan's contract procedures supersede the FAQ #7 provision noted above.

**PJM Response:**  To affirm capacity rights for an EE resource, EE providers have the option to provide one of the following:

> 1. Submit to the Office of the Interconnection a written sworn, notarized statement of one of its corporate officers certifying that the EE Resource Provider has the legal rights and authority to claim the demand reduction associated with the EE installation(s) that constitute the Energy Efficiency Resource for the applicable Delivery Year.

> 2. Inserting the following statement directly into the Post-Installation Measurement & Verification Report: "By submitting this Post-Installation Measurement & Verification Report to PJM, [insert company name] affirms and acknowledges that it has the legal authority to claim the demand reduction associated with the EE installation(s) that constitute the Energy Efficiency Resource for the applicable Delivery Year."

It is the responsibility of the EE provider to ensure that this claim is valid, and upon request by PJM, provide evidence to support this claim.  PJM to date has not requested such supporting evidence from WYLAN in approving their prior post-installation M&V reports.  Not having had cause to review WYLANs's contract with its partners conferring capacity rights, PJM cannot comment as to nature of those contracts.

As PJM's response indicates, PJM not only did not review the Company's contracts, but it reiterated the requirement to obtain contractual rights and expressly disclaimed any endorsement of American Efficient's "business practices."[482]

---

[482] ME-AFFIRMED-00000112.   Note that this is the same response PJM had provided to American Efficient in 2015, as described immediately above.  *See* ME-AFFIRMED-00000701.

Evidence outside of American Efficient's communications with PJM confirms that there was not, as American Efficient claims, any sort of frequent or ongoing "dialogue between the Company and RTO staff to ensure and confirm the Company's compliance with tariff rules." In an interview with staff, one of the PJM reviewers confirmed that when PJM reviewed American Efficient's M&V plans and PIMV reports, PJM staff was looking at the products included and how energy savings were calculated from those products.[483] What's more, American Efficient knew that PJM's review focused on how the Company had calculated its numbers: American Efficient's Chief Investment Officer and future CEO told Investment Bank that PJM reviewed the "statistical methodology" in the plans and reports.[484]

### b.  Communications with MISO

American Efficient's communications with MISO reflect much the same substance as those with PJM. The predominant topics in the Company's email exchanges with MISO staff addressed technical assistance with submitting necessary documents,[485] American Efficient providing annual certifications,[486] American Efficient updating its contact information in MISO's systems,[487] MISO sending notifications of payments remitted to American Efficient,[488] and similar matters. When American Efficient wanted to expand its offerings in MISO to include new products and sent a white paper to MISO staff for feedback, MISO's response addressed formatting issues and the equations and calculations used to estimate energy savings.[489] Other communications with MISO staff

---

[483] Staff Interview Memo.

[484] GS-FERC-00023274 (Jan. 19, 2017 email to Investment Bank) ("PJM approves the statistical methodology we use in each Plan prior to every auction we bid into, and then again in each Report heading into a specific delivery year.").

[485] *See, e.g.*, ME-MCEN-00000513.

[486] *See, e.g.*, ME-MCEN-00000566.

[487] *See, e.g.*, ME-MCEN-00000418.

[488] *See, e.g.*, ME-MCEN-00000206.

[489] ME-MCEN-00000488.

116

addressed concerns with the statistical methodology in American Efficient's submissions.[490]

At the outset of American Efficient's participation in MISO in 2016, counsel for the Company asked MISO staff for a call to discuss how American Efficient could enter the MISO market,[491] and the Company sent MISO staff a draft M&V plan for feedback.[492]  In its 1b.19 Response, American Efficient claimed that during this period, "the Company initiated and engaged in an extensive dialogue over several months and held numerous meetings with senior MISO staff to discuss its business model, resolve outstanding questions on tariff interpretation, and confirm its compliance."[493]  In reality, those conversations centered on issues like "the smallest increment that may be submitted" in the auctions, how American Efficient could acquire GIS shapefiles of the different MISO zones, and the "form" and "structure"—not the substance—of the plans and reports American Efficient would submit.[494]  Like with PJM, American Efficient's communications with MISO were about the technical aspects of participating as an EER, and not on whether the Company's Program "result[ed] in" energy reductions or held the correct contractual rights in end-use customer projects.[495]

---

[490] *See, e.g.*, ME-MCEN-00001975 (discussing calculation of line loss); ME-MCEN-00000306 (asking questions about "latent multipliers" regarding envelope sealing, and seeking more detail regarding "the references in the footnotes used to support various parameters").

[491] ME-MCEN-00001775.

[492] ME-MCEN-00002334.

[493] 1b.19 Response at 49–50.

[494] ME-MCEN-00002295 (Chief Markets Officer's summary—and MISO staff's responses—of October 2016 call between American Efficient and MISO staff).

[495] The written record reflects between 15 and 20 meetings (either in person or via videoconference) with MISO staff.  To the extent the content of such meetings is knowable from the written record, the substance of those meetings with MISO appears to be similar to the Company's written communications with MISO.  For example, a series of meetings in November and December 2016 were to help American Efficient personnel get the Company registered with MISO's credit department. *See* ME-MCEN-00002211, ME-MCEN-00002116, ME-MCEN-00001751.  Additional meetings through 2017 sought technical assistance with the market participant systems, *see* ME-MCEN-

117

Finally, American Efficient also cited a November 2020 meeting with MISO in which it discussed "concerns on ensuring that energy efficiency is properly accounted for in MISO's capacity market" and issues surrounding double-counting of EERs.[496] Beyond the fact that those issues do not directly relate to the details of American Efficient's business model, MISO's disqualification of the Company from further participation in its markets just four months after these conversations occurred undercuts whatever value this evidence may have to the Company's claims that MISO approved the Program with a full understanding of its operation.

## 2. American Efficient's Deceptive Conduct Shows That the Company Did Not Engage with ISO/RTO Staff in Good Faith

Moreover, to the extent PJM or MISO were reviewing in detail the mechanics of the Program, they were reviewing a business model on paper that did not accurately reflect how it operated in reality. As detailed in section IV.E.2 above, the Program as described to PJM and MISO when the Company was looking to enter the capacity markets was one in which the Company reduced the price of energy efficient products: a business model that the Company may have contemplated in early days but never actually executed. Subsequent submissions to PJM and MISO referred back to previous submissions without highlighting how the Program was actually working. Almost none of the sample Program Agreements the Company submitted to PJM included details on the per-item amounts American Efficient was paying its Program partners.[497]

---

00000622, or to help the Company better understand "fine-grain details" of how the MISO auctions worked. *See* ME-MCEN-00000609.

[496] 1b.19 Response at 50.

[497] *Contrast* ME-AFFIRMED-00000125, ME-AFFIRMED-00000089, *and* PJM000001124 (three copies of Agreement Number 2016-1201, shared with PJM between April and June 2016, which did include the per-item payment amounts), *with* ME-AFFIRMED-00000253, ME-AFFIRMED-00000757, ME-AFFIRMED-00000800, ME-AFFIRMED-00000847, ME-AFFIRMED-00000893, ME-AFFIRMED-00000930, ME-AFFIRMED-00001027, ME-AFFIRMED-00001069, ME-AFFIRMED-00001136, ME-AFFIRMED-00001229, ME-AFFIRMED-00001289, ME-AFFIRMED-00001336, ME-AFFIRMED-00001990, ME-AFFIRMED-00002238, ME-AFFIRMED-00002327, ME-AFFIRMED-00002510, ME-AFFIRMED-00002693, ME-AFFIRMED-00003101, ME-AFFIRMED-00003426, ME-AFFIRMED-00003857, ME-AFFIRMED-00004572, PJM000001216, *and* PJM000003083 (23 submissions of 17 unique Program Agreements, submitted to PJM between August 2016 and April 2021, which did not include the per-item payment amounts).

118

Additionally, the sample Program Agreements that the Company included with its submissions included numerous provisions that American Efficient never utilized, such as providing Company logos on product packaging or putting Company marketing on point-of-purchase materials.[498]

Commission precedent does provide protection for entities that rely on ISO or RTO staff interpretations of ambiguous tariff requirements. But that protection is not absolute.[499] For one, the tariff language must be ambiguous;[500] here, neither the PJM Tariff nor the MISO Tariff is. When the entity poses an either-or question to ISO or RTO staff, and ISO/RTO staff affirmatively directs the entity to choose one option, the Commission has decided the entity was entitled to rely on that advice.[501] That is not the type of guidance American Efficient ever sought from PJM or MISO with regard to its fundamental business model.

At the core, however, even under American Efficient's articulation of the legal standard, reliance on ISO/RTO guidance as a defense requires providing the ISO or RTO "with complete, detailed, and transparent information about its program, activities, and

---

[498] Tr. 125:5–15 (Head of Origination) (Company never provided point-of-purchase materials); Tr. 125:16–126:1 (Head of Origination) (Company never added its logo to manufacturer materials or advertising).

[499] *N.Y. Indep. Sys. Operator, Inc. v. Astoria Energy, LLC*, 118 FERC ¶ 61,216, at P 36 (2007) ("*Astoria Energy*") (recognizing that under Commission precedent, "informal communications" with ISO/RTO staff "do not take precedence over the language of the filed tariffs," and citing to *Arco Oil & Gas Co.*, 22 FERC ¶ 61,293, at 61,515 (1983)).

[500] *MMC Energy, Inc. v. Cal. Indep. Sys. Operator Corp.*, 123 FERC ¶ 61,251, at P 84 (2008) (determining that "in order for the Commission to consider any representations that [a market participant] may have relied upon concerning the Tariff, we must find that the Tariff language is ambiguous"); *Astoria Energy*, 118 FERC ¶ 61,216, at P 36 (finding that, "given the ambiguous tariff language," the unsophisticated market participant "reasonably relied on the interpretations and assistance the administrator of the tariff offered it").

[501] *Astoria Energy*, 118 FERC ¶ 61,216, at P 36 (generator asked staff whether the NYISO tariff required using "unit design capacity" or "nameplate capacity," and staff advised the generator to use nameplate capacity).

119

interpretation" of tariff requirements.[502]  The information American Efficient gave PJM and MISO was not complete or detailed, and the Company's affirmative decision to withhold information from PJM about the Company's disqualifications from other markets precludes any conclusion that American Efficient was transparent.  The Company's years of deceitful conduct toward PJM and MISO cannot now serve as a shield from responsibility for that same deceitful conduct.

## D.    The Company's Economic Arguments are Inapplicable to American Efficient's Program

In its Preliminary Findings Response, American Efficient submitted a Declaration from an economic analyst, Dr. Todd Schatzki, that purported to "describ[e] how aggregation programs such as American Efficient's incentivize program partners to facilitate the spread of EE products to consumers via price decreases and increases in sales efforts as a matter of basic economic theory."[503]  But regardless of the merits of Dr. Schatzki's opinions on underlying economic theories, this submission failed to establish that American Efficient's Program causes reductions in energy consumption, that the Program has a nexus to end-use customers, or that the Company acquires the necessary contractual rights, as the tariffs require.

### 1.    American Efficient is not an aggregator of EERs

First and foremost, American Efficient's Program is not an aggregation program, even though American Efficient has repeatedly described itself as "a leading aggregator" of EERs.[504]  When pressed on this issue, American Efficient's witnesses admitted that the Company's Program does not aggregate rights from end-use customer projects.  The Head of Origination testified that the Company is "an aggregator of environmental attributes."[505]  The Chief Markets Officer testified that American Efficient is not an aggregator of customer projects as the term "project" appears in the tariff.[506]  She

---

[502] Preliminary Findings Response at 21.

[503] *See* 1b.19 Response at 27 n. 86 (citing Schatzki Declaration at ¶ 18); Preliminary Findings Response at 49–50 n.140 (citing to Schatzki Declaration at Sec. III.A).

[504] Preliminary Findings Response at 6; June 2022 Submission at 9.

[505] Tr. 15:21–16:2 (Head of Origination).

[506] Tr. 140:4–11 (Chief Markets Officer).

explained that, in her view, a customer's purchase and installation of an energy efficient product is not a "project" for tariff purposes unless the customer were to also take all steps necessary to participate in PJM's capacity market as an EER, including measuring the savings of the product, paying the $5,000 PJM membership fee, and posting the necessary collateral.[507]

While a market participant can meet the definitions of EERs by aggregating multiple energy efficiency projects that reduce consumption on facilities at end-use customer sites, aggregating customer projects requires a relationship with customers and rights to aggregate those customer projects.[508] But American Efficient defines its "relevant project," for purposes of tariff compliance, as:

> [T]he model described in detail in its M&V plans and PIMV reports encompassing the manufacture and sale of consumer products in concert with Program Partners, the Company's payments to Program Partners for every eligible energy efficiency product unit sold, and all the activities necessary to aggregate, measure, verify, and deliver the load reductions into capacity markets.[509]

Notably (and accurately) absent from this description is any reference to customers or customer projects.

As ISO-NE told the Company when rejecting American Efficient's claim to be an "aggregator," "aggregation in itself is not a basis for claiming capacity credit for savings."[510] In other words, aggregation in the abstract does not give rise to a valid EER.

---

[507] *Id.* at 139:21–140:3.

[508] *See, e.g.*, *Electric Storage Participation in Markets Operated by Regional Transmission Organizations and Independent System Operators*, Comments of Advanced Energy Economy, Docket No. RM16-23, at 45 (filed Feb. 13, 2017) ("Aggregation enables DER aggregators to serve smaller customers at a reasonable cost . . . .").

[509] Preliminary Findings Response at 23.

[510] Chief Markets Officer Test. Ex. 9 (August 16, 2019 memorandum from a Senior Analyst, System Planning for ISO-NE to the Chief Markets Officer) (continuing to state that "the majority of New England's demand resource providers are aggregators, and all of them—with the sole exception of Maple—demonstrate the changes in energy use that result from direct consumer participation in their EE program activities").

121

If the EER itself is not designed to cause reductions in end-use customer electricity consumption, it must aggregate energy savings from end-use customer projects that are so designed. And, naturally, it must have rights to those projects. American Efficient's Program contains none of these elements; consequently, Dr. Schatzki's opinions on aggregation programs have no bearing on American Efficient's Program.

### 2. Dr. Schatzki opined only on generalities and did not provide any conclusions specific to American Efficient's Program

Even if American Efficient could properly be considered an aggregator of EERs, though, Dr. Schatzki introduced a generalized theory, and nothing more: he did not discuss or examine evidence of the workings of the Company's Program or of its results.

In his Declaration, Dr. Schatzki opined that "upstream EER aggregators" generally "provide economic incentives that facilitate the adoption of EE products . . . as a matter of economic theory."[511] Dr. Schatzki said that upstream EER aggregators "provide volume-based compensation" that "creates incentives for increased uptake of EE products, whether through a lower price to end-user customers or incremental unit profits for EE products that incentivizes greater sales by supply-chain participants."[512] However, he cited no evidence that *American Efficient's* Program partners have ever used a single dollar from the payments they receive from the Company to lower prices to end-use customers or that those payments have incentivized the Program partners to sell more energy efficient products. Nor did Dr. Schatzki even opine that *American Efficient's* Program accomplishes the theoretical impacts he identifies.

Furthermore, one of the opinions Dr. Schatzki advanced in the Declaration—that even "a small change in price" would be "expected to change consumer behavior to some degree"[513]—was not shared by the Company executives most familiar with the operations of the Company's Program. The Chief Markets Officer testified that she did not know whether a five-cent difference in retail price would affect a consumer's choice on which product to purchase.[514] The Former CEO stated that while "a significant reduction in

---

[511] Schatzki Declaration at 11.

[512] Schatzki Declaration at P 17. *See also* 1b.19 Response at 27–28.

[513] Schatzki Declaration at 16.

[514] Tr. 106:13–107:7 (Chief Markets Officer). As stated repeatedly above, no element of the Company's Programs required—or even suggested—that partners provide any sort of markdown to consumers, and there is no evidence that any partner ever did.

122

cost" may be necessary to "drive more quantity" of "brand new" products, programs having that effect are "few and far between" and even disagreed that a discount of $100 would affect consumer behavior on larger items, such as refrigerators "unless the refrigerator was originally priced at $200 or $250."[515]

Moreover, the Former Policy Director testified that it is "broadly accepted in the industry," that it is "more like you need to reduce the cost [of a product] by a few dollars," to increase sales and that the "reactions" she heard within the Company were that it was "unlikely that anyone in the industry would accept th[e] argument [that the Program was causing additional sales] without some significant studies."[516] The Former Policy Director said she was unaware of the Company ever taking steps to conduct such a study and testified that she heard comments that "most of the team did not believe that argument and did not believe that those payments were causing initial energy efficiency to occur."[517]

Furthermore, Dr. Schatzki testified in his Declaration that for aggregation to be effective, "economic incentives" must be transmitted to end-use customers:

> Under the framework established by FERC (*e.g.*, in Order No. 2222), EER aggregators aggregate the permanent reductions in energy use associated with many individual energy efficiency projects. The effectiveness of this approach to energy efficiency relies on the transmission of economic incentives for energy efficiency from its origin (*e.g.*, RTO capacity markets) to end-use consumers via the aggregator.[518]

Dr. Schatzki is correct that an aggregator must provide compensation (consideration) to customers for the right to aggregate their projects. But American Efficient has never "transmitted" capacity payments or any other "economic incentives" to "end-use customers," and its Program was not designed to do so. American Efficient provides no

---

[515] Former CEO Interview at 1:12:00–1:22:00.

[516] Tr. 71:24–73:2 (Former Policy Director).

[517] Tr. 73:10–24 (Former Policy Director).

[518] Schatzki Declaration at P 16.

123

compensation to customers,[519] and as such, his testimony confirms that the Company's Program was not designed to be an aggregation of projects, at least not an "effective" one.

Dr. Schatzki's Declaration did not address the Company's Program. It presented a theory far removed from the facts surrounding American Efficient's business model and the relevant tariff requirements. It is of minimal relevance to the violations discussed herein.[520]

American Efficient's related claim that "[s]tudies also show that midstream programs may be particularly effective in light of low profit margins for distributors and retailers, such that 'even a small increase in profit from an incentive can give a retailer significant motivation to sell more-efficient equipment'" is equally unavailing.[521] The footnote that American Efficient attached to that claim does not cite any such studies or provide the source of the quote, but staff independently located an academic paper that included the text that the Company quoted.[522] The (government-run) midstream

---

[519] After the Former Policy Director realized that the Program did not reduce costs to customers, she and the CEO discussed "provid[ing] some incentive payments to bring down the cost to the consumers," but the "feedback [she] heard on that was that it was expensive" and no such change was ever implemented. Tr. 66:8–18 (Former Policy Director).

[520] Further, even if Dr. Schatzki had opined that American Efficient's Program did in fact accomplish the effects he asserts are theoretically possible, such a conclusion would not excuse American Efficient having told PJM and MISO that it knew the Program caused such effects years prior, before it had any evidence supporting the claim. The Supreme Court has held that the relevant inquiry for a fraudulent misrepresentation is "what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it." *United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 752 (2023) (emphasis in original) (citing to Restatement (Second) of Torts § 526) ("[T]he focus is not, as respondents would have it, on *post hoc* interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim."). The Company's post hoc analyses are irrelevant to the misrepresentations it made years ago.

[521] 1b.19 Response at 28.

[522] *See* Stephane de la Rue du Can, *et al.*, Design of incentive Programs for Accelerating Penetration of Energy-Efficient Appliances, 72 Energy Policy 56 (2014), *available at* https://www.sciencedirect.com/science/article/pii/S0301421514002705 (last visited Dec. 4, 2024).

programs highlighted in that single study included a Texas rebate program aimed at inducing HVAC contractors to use more efficient equipment in their projects and a California program that paid rebates to retailers to encourage them to sell more efficient products.[523]  The latter program paid $13.8 million in rebates for 1.3 million products, or approximately $10 per product.  Of particular note, the study instructed that an incentive program's net savings should be calculated as "the percentage of energy savings strictly attributable to the program" and should not include customer purchases that would have occurred in the absence of the program.[524]  It also cautioned that "[s]uccessful programs also depend on evaluation, monitoring, and verification, which in turn require a budget earmarked for those purposes,"[525] and "technologies with market penetration greater than 30–40 percent do not need to be financially incentivized."[526]

The proposition that governments can use rebates to incentivize midstream retailers and installers to sell more energy efficient products is unremarkable, as is the proposition that such midstream entities might require smaller per-unit rebates than end-use customers would require to spur changes in behavior.  But that does not mean that American Efficient's Program was designed to cause end-use customers to install more energy efficient products or that the miniscule payments that the Company made to partners for market data and environmental attributes were sufficient to cause behavioral changes.  Again, those payments were not calculated or designed to cause such changes, and they were orders of magnitude smaller than the size of the midstream rebates covered in that study.  As for the article's guidance that products with significant market penetration do not need incentives, staff notes that the concept of using caulk to seal cracks and reduce drafts is not a novel practice and that even back in 2020, almost half of all households in the United States used "mostly or all LED" lightbulbs for their indoor

---

[523] The Texas program offered contractors an $80/ton rebate for up to 5.4-ton energy efficient HVAC system, or up to $432 per HVAC system.  See Glenn Garland, *et al.*, Pickup Trucks and Broken Hearts: Analysis of a Texas Upstream A/C Incentive Program, Market Transformation: 6.101, 6.102, available at https://www.aceee.org/files/proceedings/2002/data/papers/SS02_Panel6_Paper09.pdf (last visited Dec. 4, 2024).

[524] de la Rue du Can, *supra* note 523 at 61.

[525] *Id.* at 64.

[526] *Id.* at 60.

lighting needs.[527]  Moreover, the United States Department of Energy has estimated that retailers can have margins of 24 percent or more on sales of major appliances like refrigerators and freezers, which undermines American Efficient's suggestion that a few cents of micropayments for these data and environmental attributes for these products provide material incentives to retailers.[528]  American Efficient conducted no evaluations or monitoring to determine whether its micropayments had an ancillary effect of inducing any behavioral change and has not been able to provide any evidence that they did induce any such change.

### E.  Whatever Contract Rights American Efficient Acquires From its Program Partners Are Not the Rights Required by the Tariffs

In its Preliminary Findings Response, American Efficient advanced several arguments to excuse its lack of contractual rights to the projects created by end-use customer actions.  American Efficient's primary argument was that it "acquires express, exclusive right and title to all environmental attributes (including capacity reductions) associated with the energy saving characteristics of energy efficient products through direct contracts with these supply-chain Program Partners who own those rights."[529]  American Efficient described that model as its "project"[530] and argues that "[t]here is no

---

[527] United States Energy Information Administration, Today in Energy: Nearly Half of U.S. Households Use LED Bulbs for All of Most of Their Indoor Lighting, http://www.eia.gov/todayinenergy/detail.php?id-51858a (last visited Dec. 4, 2024) (providing data from the Department of Energy's most recent Residential Energy Consumption Survey).

[528] *See, e.g.*, United States Department of Energy, Office of Energy Efficiency and Renewable Energy, Technical Support Document: Energy Efficiency Program for Consumer Products and Commercial and Industrial Equipment: Refrigerators, Refrigerator-Freezers, and Freezers (Feb. 2023).

[529] 1b.19 Response at 16; Preliminary Findings Response at 23.

[530] Preliminary Findings Response at 23.

126

tariff distinction between EER 'projects' and 'products.'"[531]  As discussed in section V.A.3 above, this simply is inaccurate.[532]

In a separate effort to overcome its lack of necessary contractual rights, American Efficient made several general claims about the transferability of certain attributes, none of which bear on American Efficient's Program or staff's investigation.  For example, pointing to the "ownership or equivalent contractual rights" language in the tariffs, American Efficient offered that "the PJM and MISO tariff requirements for EERs recognize that capacity reductions can be transferrable."[533]  That is an unremarkable statement that staff does not dispute.  However, American Efficient's contracts with its Program Partners do not in fact transfer either customer projects nor the capacity reductions associated with those projects to American Efficient.

American Efficient next argued that the phrase "contractual rights" as it appears in the MISO Tariff's definition of an EER—"a Planning Resource, in which the Market Participant possesses ownership or equivalent contractual rights, from an end-use customer project"—refers to EERs, not projects.  Specifically, the Company argued that "the provider must own or have contractual rights to the energy efficiency resource, not the end-use customer project."[534]  It argued further that "'end-use customer project'

_____

[531] Preliminary Findings Response at 29.  *See* 1b.19 Response at 15–16 (arguing that the tariffs do not require contractual rights to the end-use customer project but rather equivalent contractual rights in the load reductions from the energy efficiency products).

[532] The tariffs' focus on end-use customer projects also tracks the bounds of Commission jurisdiction.  As the United States Supreme Court held in *FERC v. Electric Power Supply Association*, the Commission's jurisdiction is limited to "rules or practices that '*directly* affect the [wholesale] rate.'"  577 U.S. 260, 278 (2016) (quoting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004) (emphasis in original)).  Rules or practices concerning reductions in demand are ones that directly affect the wholesale rate, but rules and practices concerning "electricity's inputs," like steel and fuel, do not.  *Id*. at 277–78.  End-use customer actions (*i.e.*, projects) reduce electricity demand, and the products are mere inputs to the customers' process of doing so.

[533] Preliminary Findings Response at 22.

[534] 1b.19 Response at 15 (emphasis in original); *see also* Preliminary Findings Response at 29 ("The plain language [] makes clear that the EER, *not the 'end-use customer project'* is the object of the clause "in which the Market Participant possesses ownership or equivalent contractual rights.")

127

modifies the type of Planning Resource that may qualify as an EER," and that "[n]o reasonable reading of this sentence requires contractual rights *in the end-use customer project*."[535]  As such, American Efficient read the MISO Tariff for the proposition that a market participant must possess ownership or rights in the EER, but not in the end-use customer project.[536]

But even that construction does not support American Efficient's Program.  The MISO Tariff still defines an EER as "a Planning Resource . . . from an end-use customer project," and therefore the result is the same.  If an EER is "from an end-use customer project," a market participant cannot possess ownership or equivalent contractual rights in an EER without possessing rights to the project(s) that it comprises.

With respect to the specific issue of the transferability of "environmental attributes," American Efficient argued that a "manufacturer, distributor, or retailer of an energy efficient product—the then-owner of the relevant product and all associated rights—can choose to sell the environmental attributes to that product separately from the underlying product."[537]  Staff does not dispute that there may be certain rights that an owner of an energy efficient product can sell.  But a seller cannot sell rights that it does not own, and American Efficient's theory inverts the flow of rights contemplated by the PJM and MISO Tariffs.  The tariffs establish that the rights to the project start with the end-use customer, tied to the end-use customer's actions of installing or using the energy efficient products.  American Efficient has no contractual relationship with that end-user and, once they have consummated the transaction selling the product to the customer, neither do American Efficient's Program partners.  Rather, the end-use customers alone, who have no knowledge of American Efficient's existence, much less its Program, purchase the "bundled" products at a store, including all the products' environmental attributes and their value as potential capacity resources.  And those end-use customers,

---

[535] 1b.19 Response at 15 (emphasis in original); Preliminary Findings Response at 29.

[536] Preliminary Findings Response at 28–29.  Using sleight-of-hand, the 1b.19 Response jumped from the proposition that "providers must own or have contractual rights to the energy efficiency resource" to the conclusion that "[t]he tariffs thus require 'equivalent contractual rights' or 'contractual authority' in the load reductions from the energy efficiency products."  1b.19 Response at 15.  But the latter does not follow from the former: the PJM and MISO Tariffs say nothing about energy efficiency products. The proper conclusion would be that the tariffs require ownership or contract rights in the load reductions from the end-use customer projects.

[537] 1b.19 Response at 16; Preliminary Findings Response at 23.

who have no privity with or even knowledge of American Efficient, have certainly taken no knowing or voluntary steps to transfer their project rights back upstream to a Program partner or to American Efficient. Because there is no relationship to transfer the rights from the end-user to the manufacturer or retailer, the Program partner has nothing to sell American Efficient, and American Efficient has nothing it can own to offer as an EER.

American Efficient also cited to a recent law review article entitled *Propertizing Environmental Attributes* to support its claim that capacity rights to energy savings are a type of transferrable environmental attribute.[538] However, the cited article was *funded by Modern Energy Group, American Efficient's parent company,* and Modern Energy Group played a direct role in shaping the content of the article.[539] Moreover, several statements in the article undermine American Efficient's Program. The authors advocate a "first-in-time rule" under which "the energy efficiency attribute [is] initially allocated to the first party to present the attribute for sale in a format that can be sold into the market."[540] But the fact that a capacity right to energy savings may be "transferrable" does not mean that those rights have in fact been transferred, and even the authors funded by Modern Energy concede, as they must, that a party claiming the rights to energy efficiency under such a rule would have to provide "proof of having contracted for the resource from the other immediately identifiable parties that might plausibly claim the resource."[541] The authors further acknowledge that such a group not only includes manufacturers, retailers, financers, and distribution utilities, but also homeowners and installers.[542]

The authors provide the following basis for a homeowner's claim to the energy efficiency attributes of the products they purchase:

> The homeowner might claim the avoided energy use based on
> the time that the homeowner invested in choosing the more

---

[538] 1b.19 Response at 16 n. 41; Preliminary Findings Response at 22 n. 45.

[539] Katrina Wyman & Adalene Minelli, *Propertizing Environmental Attributes*, 39 Yale J. Reg. 1391, 1391 n.†† (June 2022) ("Modern Energy, a diversified energy company that supplies distributed energy resources, provided funding to the Guarini Center for a project examining the property status of environmental attributes, including this article. This article benefitted from comments from Modern Energy [and others].").

[540] *Id.* at 1434.

[541] *Id.*

[542] *Id.* at 1432–33.

energy-efficient appliance, paying for the appliance, and installing and using it. In making this argument, the homeowner might seem to be appealing to the "labor" principle. The homeowner would be arguing that they created the energy efficiency through the time they took to buy and install the appliance, the funds they used to pay for the appliance, and their actual use of the energy-efficient appliance rather than a more energy-consuming one. The homeowner also might appeal to accession, arguing that they own the energy efficiency because they own the fridge.[543]

Nowhere in the article do the authors dispute the legitimacy of such homeowner claims. Indeed, the authors state that "[u]nder the first-in-time rule we recommend, homeowners would in theory be able to claim the energy efficiency if they met the market's requirements for selling it, including having a sufficient amount of energy efficiency and measurement and verification protocols."[544]

Significantly, the article's "first-in-time rule" is "recommended," rather than dictated or even suggested by the tariffs, or by contract law for that matter. Under such a regime, an individual who discovered a trove of retail appliance store sales receipts in the trash could lay claim to EER capacity payments merely by showing up first in a capacity auction to claim them.

But the article's model is also inconsistent with American Efficient's Program. The authors say that their proposed first-in-time rule "awards ownership based on the act of winning the race—not the status of being a manufacturer, an installer, a homeowner, utility, etc."[545] However, the theory of American Efficient's Program is that the rights to the capacity value of the included energy efficient products are retained by the retailer and manufacturer and that customers never get them. Under such a theory, it would be impossible for homeowners to engage in "the race" that the article's authors posit as the model for energy efficiency to participate.

Even more at odds with the operation of American Efficient's Program, the authors state their assumption that "[t]o help establish ownership, parties in practice

---

[543] *Id.* at 1433.

[544] *Id.* at 1437 n. 207.

[545] *Id.* at 1435.

presumably contract with other immediately plausible claimants."[546] This assumption is incorrect as it relates to American Efficient's Program. As discussed above, American Efficient does not make any effort to contract with homeowners or installers, both among the "immediately plausible claimants" that the authors identify.

American Efficient cannot change the terms of the tariffs by funding an academic article that provides a novel justification for its Program. However, the article American Efficient funded reflects a lack of understanding of the Company's Program and acknowledges the rights of project owners—homeowners and other customers who perform the labor resulting in energy savings—to the capacity benefits of their projects.

As with its defenses to its failure to meet other tariff requirements, American Efficient's defenses to its failure to obtain contractual rights to the energy efficiency projects are either irrelevant to staff's conclusions or supportive of staff's conclusions.

## F.    American Efficient Responds to the Nexus Requirement with a Series of Distractions

As discussed above, American Efficient's Program has no connection to end-use customers, their projects, their facilities, or their retail sites. The Chief Markets Officer succinctly confirmed this key point in her testimony, stating that American Efficient "does not have a relationship with end-use customers."[547] In its Preliminary Findings response, American Efficient did not argue that its Program has a nexus to end-use customers. Rather, the Company argued that there is no requirement for such a nexus in the tariffs, referring to the nexus requirement as "not in the tariffs"[548] or "not evident in the tariffs."[549]

More specifically, American Efficient argued that the tariffs do not expressly require rebates or payments to end users and that "there is no suggestion (let alone any statement) in the tariffs that an EER provider must give end users rebates or other payments."[550] However, staff's position is not that the tariffs require rebates or any

---

[546] *Id.* at 1435.

[547] Tr. 164:7–11 (Chief Markets Officer).

[548] Preliminary Findings Response at 54.

[549] *Id.* at 1.

[550] *Id.* at 38. *See also* 1b.19 Response at 24–25.

specific form of incentives. Rather, staff cited rebates or payments to end users in its Preliminary Findings as examples of ways in which a project might establish a requisite connection to end users.[551]

### G. American Efficient's Argument That Its Program Provides Necessary Information to the ISO/RTOs Is Unfounded

American Efficient claimed that it does not need to show causation because "the energy efficiency savings in fact occurred, and was [sic] brought to market by American Efficient—and only American Efficient."[552]  According to the Company, the Program provides market information that helps PJM and MISO to right size their capacity markets.  American Efficient's Former CEO summarized this position as follows: "[E]nergy efficiency's role in the markets, whether on the demand or the supply side, is to give the markets a better understanding of what's happening in the real world so they can have a better chance at accurately understanding what their needs will be at some future time."[553]  In other words, it does not matter who causes reductions in energy use, as long as American Efficient reports those reductions to the ISO/RTOs.

There are several problems with this argument.  The program that the Former CEO described is a market intelligence product.  It neither increases generation nor decreases load, but rather provides information that, in theory, can be incorporated into the load forecast.  However, PJM and MISO have existing sources of market information that they rely on to prepare the load forecasts, and those sources already include projections of new energy efficiency use that will occur naturally.  PJM subscribes to Itron's Energy Forecasting Group in addition to various United States Department of Energy sources to gain additional information regarding demand and projected energy efficiency.[554]  Even if there were value in such a program beyond the data PJM and MISO already incorporates into its load forecast, PJM and MISO have bought this additional market data from American Efficient at capacity prices, not at market research product prices. Staff notes that the capacity payments that American Efficient receives are over six times

---

[551] *See, e.g.*, Preliminary Findings at 38 ("Such a decrease can result from the installation of a new piece of equipment, a rebate that materially incentivizes purchase of an energy efficient product, an education campaign that induces consumers to change their consumption habits, or other projects that result in reduced energy consumption.").

[552] Preliminary Findings Response at 54.

[553] Former CEO Interview at 17:00.

[554] PJM Load Forecasting Whitepaper at 23–24.

the fees that American Efficient pays its partners for market data and environmental attributes.[555]  If PJM and MISO need additional product information, there are market research firms that can and do provide market intelligence, likely at a fraction of the costs.[556]  Moreover, the PJM and MISO Tariffs do not provide for payments to EERs for market intelligence; they allow capacity payments for projects that result in energy reductions.

## H.  Nothing in the PJM Stakeholder Process Regarding EERs Undermines Staff's Interpretation of the PJM Tariff

In November 2023, PJM commenced a stakeholder review of supply-side EERs through its Market Implementation Committee ("MIC"), which PJM presented as "an opportunity to make EE participation more effective by refining EE resource qualifications," and to update M&V requirements that had not been updated since introducing EERs to the PJM capacity market.[557]  American Efficient claimed in its 1b.19 Response that PJM's comments in the stakeholder process show that "PJM does not believe that its existing rules contain the requirements that OE claims American Efficient violated."[558]  More specifically, the Company claimed in its communications with staff that PJM's comments amounted to "admissions" by PJM that "confirm that PJM's tariff

---

[555] *See supra* notes 65–66 and accompanying text.  After paying Program partners fees for sales data, American Efficient registers the calculated EE savings in the capacity market for up to four delivery years.  Therefore, the difference between capacity revenue cleared versus Program partner fees paid is understated.

[556] ISO-NE soundly rejected American Efficient's identical argument years ago. *See* Chief Markets Officer Test. Ex. 9 (identifying data incorporated into the ISO-NE load forecast from "at least 45 federal standards-driven efficiency improvements," in addition to state programs and "changing consumer preferences," and rejecting as "unfounded" American Efficient's assertions "that Maple is improving the accuracy of [the] ISO's forecast, or that without Maple the ISO would be 'blind to the benefits'" of energy efficiency savings occurring through independent consumer actions).

[557] PJM Interconnection, "Problem/Opportunity Statement – Evaluation of Energy Efficiency Resources" (Nov. 1, 2023), *available at* https://pjm.com/-/media/committees-groups/committees/mic/2023/20231101/20231101-item-09-1---evaluation-of-energy-efficiency-resources---problem-statement.ashx.  As discussed below, the stakeholders considered multiple approaches in amending the PJM Tariff and an applicable manual and ultimately voted to remove EERs as a capacity product.

[558] 1b.19 Response at 10–12

133

contains no 'causation' requirement or no requirement for energy efficiency providers to have a direct connection with end-use purchasers of energy efficient products."[559] But the Company has misconstrued or misrepresented the developments themselves; the views that PJM actually expressed during the stakeholder process are consistent with staff's position.

American Efficient first claimed that a summary of a proposed change in the "Options Matrix" developed during the stakeholder process demonstrated that PJM did not believe the PJM Tariff contained a "causation requirement."[560] The Options Matrix identified the "status quo" for "EE Resource Qualification (what qualifies)" as the existing definition of EERs found in the PJM Tariff and manuals—including that the EER "must achieve" the claimed energy reduction.[561] The associated "Solution Option[]" summarized the proposed reforms to include adding that an "EE Provider program "can only be included if revenue from the wholesale capacity market caused the end use customer to install" the energy efficient technologies.[562] According to American Efficient, this was a "critical fact . . . reflect[ing] PJM's own understanding . . . that its tariff as currently written contains no 'causation' requirement."[563]

Similarly, in its 1b.19 Response, American Efficient cited a slide from PJM's April 3, 2024 presentation to stakeholders, in which PJM states its support for "several changes" including a "[d]emonstration that capacity revenues caused the installation of Energy Efficiency projects."[564] The Company also pointed to a July 10, 2024 presentation from PJM in which PJM stated that "proposed Energy Efficiency in the capacity market should only include EE that is purchased and installed because the EE

---

[559] April 3, 2024 letter from American Efficient to J. Burdick, J. Medovoy, J. Gebhart, and M. Christiansen ("April 2024 Letter"), at 3.

[560] March 12, 2024 email from D. Applebaum to J. Burdick and J. Medovoy ("March 12 Email").

[561] *See* March 6, 2024 Market Implementation Committee meeting materials, "Item 08D – Evaluation of Energy Efficiency Resources – Matrix – 3.6.24," (March 1, 2024), *available at* https://pjm.com/committees-and-groups/committees/mic.

[562] *Id.*

[563] March 12 Email.

[564] 1b.19 Response at 11.

revenue received from the wholesale market and provided to the consumer caused the EE to be purchased and installed."[565]

As an initial matter, staff notes that the Commission's interpretation of a tariff, not an ISO/RTO's, is what ultimately holds.[566] Even if PJM's views were what the Company claimed them to be,[567] that position would only be persuasive authority that is not binding

---

[565] *Id.* On August 12, 2024, PJM published on its website its initial proposed tariff amendments regarding EERs ("Initial PJM Tariff Proposal"). This proposal (which PJM never filed with the Commission) revised the definition of "EER" as consisting of projects "implemented exclusively in response to wholesale capacity revenues" and added a requirement that M&V plans "describe the methods and procedures the Capacity Market Seller intends to use for determining the amount of the load reduction achieved exclusively in response to wholesale capacity market revenue." August 13, 2024 Informational Markets & Reliability Committee meeting materials, "Item 01-2 – PJM Evaluation of EE Resources Proposal RAA OATT – Redline," at 1–3 (Aug. 12, 2024), *available at* https://pjm.com/committees-and-groups/committees/mrc.

PJM's Markets and Reliability Committee did not approve the Initial PJM Tariff Proposal, voting instead for an alternative proposal from PJM's market monitor that removed energy efficiency resources from PJM's capacity market. *See* MRC Summarized Voting Report (Aug. 21, 2024), *available at* https://pjm.com/-/media/committees-groups/committees/mrc/2024/20240821/20240821-mrc-summarized-voting-report.ashx. PJM's Members subsequently approved this alternative proposal, and PJM filed that proposal with the Commission. PJM Interconnection, L.L.C., Filing, Docket No. ER 24-2995 (filed Sept. 6, 2024). The Commission approved PJM's proposed amendments on November 5, 2024. *PJM Interconnection, L.L.C.*, 189 FERC ¶ 61,095 (2024). The Tariff now states that the provisions addressing EERs "shall be effective only through the 2025/2026 Delivery Year," and that "[t]hereafter, no Energy Efficiency Resources shall qualify to be offered into the RPM Auctions beginning with the 2026/2027 Delivery Year."

[566] *Astoria Generating Co, L.P & TC Ravenswood, LLC v. New York Indep. Sys. Operator, Inc.*, 151 FERC ¶ 61,044, at P 30 (2015) (recognizing that "while the Commission provides [ISO/RTOs] a great deal of discretion in interpreting their own tariffs, especially with respect to provisions lacking prescriptive detail, that does not relieve the Commission of its responsibility to determine whether [the ISO/RTO's] interpretation of its tariff is reasonable," and rejecting an ISO's interpretation that "did not conform to the explicit provisions of its tariff").

[567] When American Efficient argued that "PJM's public statements refute OE's claim that American Efficient violated tariff rules," 1b.19 Response at 2, it failed to

135

on the Commission.  In that regard, nothing that PJM has stated in a slide deck supersedes the current Tariff language defining "Energy Efficiency Resource" as "a project . . . designed to achieve a continuous . . . reduction in electric energy consumption . . . ."[568]

Furthermore, the PJM statements American Efficient cites are not inconsistent with the causation requirement that presently exists in the Tariff.  The cited statements discuss requiring a "demonstration" that the EER caused reductions and that those reductions were achieved "because [of] the EE revenue received from the wholesale market."  While the current Tariff language does not specify how the EER must cause reductions in energy consumption, it still requires that the EER be designed to cause the reductions it claims as capacity.[569]

American Efficient additionally claimed that the stakeholder process demonstrated a "shared understanding of PJM and industry participants" in opposition to staff's position regarding EERs' connections to end-use customers.[570]  The Company again pointed to summary language in the Options Matrix and asserted that because the matrix discussed a status quo of midstream programs using "studies as opposed to direct contact with end users for the purpose of validating" the installation of energy-efficiency

---

acknowledge that its agreement with PJM reduced its cleared capacity by 90 percent from delivery year 2024/2025 to 2025/2026.  *See supra* Table 2 & n. 86.

[568] RAA, Article 1, Definitions.

[569] Additionally, the language in the Initial PJM Tariff Proposal—that the project comprising an EER be "implemented exclusively in response to wholesale capacity market revenues"— would have established a link in the causal chain that would have differed from the link in the existing tariff language staff asserts the Company has violated.  Under the current language, the EER project must be designed to cause the claimed reductions in energy usage.  Under the Initial PJM Tariff Proposal, the capacity market revenue would have to have caused the EER provider to undertake the EER project.  The Initial PJM Tariff Proposal thus addressed a causation question upstream from the one relevant to the violation staff has identified: "what caused this project to exist," instead of "what effect is this project designed to have on energy consumption?"

[570] March 12 Email.

products, there was no "requirement for EER providers to have a direct connection with end-use purchasers of energy efficient products."[571]

Again, though, American Efficient misstated staff's actual position. Staff has never taken the position that the PJM Tariff requires "EER providers to have a direct connection with" end-use customers. As discussed above, other midstream and upstream EER programs that operate differently from American Efficient's Program can plausibly establish a nexus to end-use customer projects and plausibly claim the necessary contractual rights without direct end-use customer connections.[572] American Efficient's Program is entirely divorced from end-use customers and exists solely as a relationship between the Company and manufacturers, distributors, and retailers. The PJM Tariff does not necessarily require a "direct" connection to end-use customers—but it does require at least some connection to them.

Moreover, the purpose of a PJM related proposal to revise Manual 18B that was before stakeholders when PJM made the presentations that American Efficient cites was to increase the showing that EERs must make to demonstrate that they have the required contract rights. PJM proposed to establish a set of detailed, prescriptive methods for EER providers to demonstrate their compliance with the existing requirement that they own the relevant project or have contract rights to the energy reductions resulting from end-use customers' actions.[573] These new methods replaced the trust-based approach American Efficient had already abused by misleadingly quoting the language of the PIMV template and affirming that the Company held contractual rights that it, in fact, did

---

[571] *Id.*

[572] *See supra* Section V.A.2.

[573] February 21, 2024 MIC meeting, Manual 18B Revisions-Redline, at Section 4a.1 (Feb. 16, 2024), available at https://pjm.com/-/media/committees-groups/committees/mic/2024/20240221-special/item-01-2---manual-18b-revisions---redline.ashx.. The Initial PJM Tariff Proposal also contained language regarding verifications from end-use customers. PJM proposed adding prescriptive requirements for PIMV reports to both "demonstrate that the claimed energy efficiency project is installed at an end-use customer site," and "demonstrate that the Capacity Market Seller has obtained exclusive capacity rights from each end-use customer that installed the Energy Efficiency Resource such that no other energy efficiency provider can claim such Energy Efficiency Resource." PJM Initial Tariff Proposal at 4–5. The proposal also included adding a requirement for an EER provider to "submit an officer certification . . . attesting to the accuracy of" claims made in the PIMV report. *Id.* at 5.

137

not.[574]  Proposing a more specific procedure for EER providers to show that they satisfy a substantive tariff requirement does not change the substance of the requirement itself.

Finally, American Efficient also argued that because the PJM proposals were not approved in a vote by stakeholders in the Markets and Reliability Committee ("MRC"), the PJM stakeholders "either agree with American Efficient that [PJM's] proposals are not consistent with the current tariff or are comfortable with the [existing] market rules."[575]  This argument ignores that those earlier PJM proposals—which were limited to updating the EER manuals, and did not include any tariff changes—were approved in a vote of the MIC,[576] and that the subsequent vote in the MRC was preceded by a public lobbying campaign by American Efficient asking stakeholders to oppose PJM's proposals.[577]  American Efficient's lobbying effort did not argue that PJM's proposals were inconsistent with the PJM Tariff: it argued the proposed manual changes would "gut energy efficiency" in PJM.[578]  In addition, the Company's lobbying effort argued that the process to arrive at the package of proposals had been "hasty," and drew attention to the parts of PJM's proposal regarding the age of technical reference manuals that could be used to support M&V calculations[579]—both of which were topics around which much of the debate had centered during discussions in both the MIC and the MRC.[580]  The vote in

---

[574] *See supra* notes 181–84 and accompanying text (discussing American Efficient's misleading use of the PIMV template to affirm contractual rights).

[575] April 2024 Letter at 4.

[576] Draft Minutes of March 6, 2024 MIC meeting (reflecting the vote in favor of PJM's proposals), *available at* https://pjm.com/-/media/committees-groups/committees/mic/2024/20240403/20240403-draft-minutes---mic---3624.ashx. American Efficient's counterproposals were resoundingly defeated in a vote of the MIC, garnering only nine votes in support and nearly 200 against.

[577] Clayton, Bo, "Stakeholder Soapbox: PJM Moves to Wipe Out Energy Efficiency When It's Needed Most," RTO Insider (March 18, 2024), *available at* https://www.rtoinsider.com/74006-staheholder-soapbox-pjm-wipe-out-energy-efficiency-when-needed-most.

[578] *Id.*

[579] *Id.*

[580] *See* March 6, 2024 Market Implementation Committee meeting materials, "Item 02B – CPower Differences from PJM Proposal – Manual 18B – Presentation,"

the MRC was not a referendum on one particular reading of the PJM Tariff, and it has no bearing on what the plain language of the PJM Tariff requires.

## I.   PJM's Recent Filing in An Active Complaint Docket Does Not Support American Efficient's Position.

As discussed in note 2, *supra*, on May 31, 2024, the PJM IMM filed a complaint with the Commission against "Indicated Energy Efficiency Sellers" in PJM, a group which includes American Efficient (the IMM Complaint). Staff offers no opinion on the IMM Complaint or any of the legal arguments or factual assertions contained therein. Staff's investigation concerns only one company—American Efficient—and staff's analysis and conclusions are limited to American Efficient's violations of the PJM and MISO tariffs and other legal authorities, as established in this Staff Report. However, American Efficient raises arguments in its 1b.19 Response regarding the IMM Complaint and PJM's response to it. Notwithstanding the distinctness of the IMM's Complaint from staff's investigation of American Efficient, staff will address the Company's arguments related to it for purposes of addressing the Company's 1b.19 Response.

In its 1b.19 Response, American Efficient first attempts to treat staff's investigation and the IMM Complaint as one and the same, arguing that four factual allegations contained within the IMM Complaint are similar to four conclusions Enforcement reached with respect to American Efficient in its July 2023 Preliminary Findings letter.[581] However, Enforcement's Preliminary Findings set forth staff's independent conclusions with respect to American Efficient only. Staff has not investigated any other EER providers. Moreover, as discussed in Section VII.B, to the extent staff reviewed certain aspects of the programs of other EER providers to whom American Efficient compared itself, those programs appear to be highly distinguishable

---

(March 5, 2024) (proposing a longer age limit on eligible technical reference manuals than the three years proposed by PJM), *available at* https://pjm.com/-/media/committees-groups/committees/mic/2024/20240306/20240306-item-02b---cpower-differences-from-pjm-proposal---manual-18b---presentation.ashx; March 20, 2024 Markets & Reliability Committee meeting materials, "Item 03D – Vistra-JPower alternative" (March 20, 2024) (proposing staggered age limits for technical reference manuals), *available at* https://pjm.com/-/media/committees-groups/committees/mrc/2024/20240320/20240320-item-03d---vistra-jpower-alternative.ashx.

[581] 1b.19 Response at 9-10.

from American Efficient's Program.[582]  While staff takes no position on the IMM's allegations against other EER providers, staff has made no such conclusions in this investigation.

Next, American Efficient argues that PJM's response to the complaint confirms "that OE is wrong about what the PJM tariff requires."[583]  That is patently wrong.  The portions of the PJM response that American Efficient quotes address the practical difficulties of "conducting on-site audits for every location where EE is claimed."[584]  PJM says that such an approach would neither be feasible nor cost-effective" and "is not what the current rules in the governing documents ever contemplated or require."[585]  However, staff has never advocated for "on-site audits for every location where EE is claimed."  As such, it is impossible to fathom how American Efficient concludes that PJM's opposition to widespread on-site audits proves "that OE is wrong about what the PJM tariff requires."

The only other portion of PJM's response that American Efficient cited is PJM's statement that an FPA section 205 filing "is the more appropriate procedural vehicle to address many of the policy disputes raised in the Market Monitor's instant 206 complaint."[586]  On its face, this statement also fails to show "that OE is wrong about what the PJM tariff requires."  Considered in context, it helps American Efficient even less.

PJM made that statement after noting that "enhancements to the EE rules" were recently before stakeholders and that "[m]any of those prospective changes would

---

[582] Moreover, while American Efficient casts itself as an upstream and midstream EER provider, 1b.19 Response at 1, PJM's description of midstream and upstream EER programs in its response to the IMM Complaint would not include American Efficient's Program.  July 3, 2024 Comments of PJM Interconnection, LLC (Docket No. EL24-113-000) at n. 49 (indicating that midstream and upstream EER programs entail the distributor "pass[ing] along" "discounts on eligible efficient equipment" to contractors or customers).

[583] 1b.19 Response at 9-10.

[584] July 3, 2024 Comments of PJM Interconnection, LLC (Docket No. EL24-113-000) at 10.

[585] *Id.*

[586] 1b.19 Response at 10.

140

address the allegations made in the Market Monitor's Complaint."[587]  PJM then stated that it "intends to file proposed EE enhancements with the Commission in the coming months," and that a filing under FPA section 205 is the "more appropriate procedural vehicle" for "[s]uch prospective enhancements."[588]  In other words, PJM said that the better way to address "many" of the IMM's market-wide allegations is through "enhancements" to the rules and that, in its view, a filing under FPA section 205 is a "more appropriate" way to enhance the rules than a complaint.  Nothing about that position supports the assertion "that OE is wrong about what the PJM tariff requires."

## VIII.　　REMEDIES AND SANCTIONS

Staff recommends that the Commission order American Efficient to pay both a civil penalty and disgorgement of the gains resulting from its violations.  Imposition of a civil penalty for organizations like American Efficient is governed by the Commission's Revised Policy Statement on Penalty Guidelines[589] and the Revised Policy Statement on Enforcement.[590]  Enforcement's recommended civil penalty, described below, is within the Commission's statutory authority to impose penalties of up to $1,544,521 million per day per violation, which over the ten-plus years that the violations lasted in this case, translates to a statutory maximum civil penalty of nearly $5.8 billion.[591]

---

[587] July 3, 2024 Comments of PJM Interconnection, LLC (Docket No. EL24-113-000) at 11.

[588] *Id.*

[589] *Enforcement of Statutes, Orders, Rules, and Regulations*, 132 FERC ¶ 61,216 (2010) (Revised Policy Statement on Penalty Guidelines, attaching the FERC Penalty Guidelines).

[590] *Enforcement of Statutes, Regulations and Orders,* 123 FERC ¶ 61,156, at PP 54–71 (2008) (Revised Policy Statement on Enforcement).

[591] This calculation uses the date of American Efficient first submitting an M&V plan with material misrepresentations about its Program: March 13, 2014.  *See infra* Appendix A-3.  Even using a later date—such as May 15, 2014, the date American Efficient submitted an M&V plan claiming that its Program could "ensure that participants who are replacing retiring CFLs do not revert back to incandescent or halogen bulbs of lumen equivalence"—yields a statutory maximum well in excess of $5 billion, far greater than the civil penalty staff recommends in this Staff Report.

141

Staff's calculation of the disgorgement amount for American Efficient is based on evidence of capacity payments that American Efficient wrongfully received for cleared capacity amounts in both the PJM and MISO markets and for performance bonuses PJM awarded the Company in connection with Winter Storm Elliott. The total amount of those payments is then reduced by the estimated payments American Efficient made to its Program partners in both PJM and MISO. While these numbers are derived from data received from American Efficient through April 2024, to the extent these numbers constitute estimates, the Commission's Penalty Guidelines, as well as Commission precedent, hold that a "reasonable estimate" of loss is sufficient for assessing penalties and disgorgement.[592] Accordingly, staff's specific recommendations for a civil penalty and disgorgement are set forth below.

## A.  American Efficient Civil Penalty Analysis

### 1.  Application of the Statutory Factors

When determining a civil penalty, the Commission must assess two factors: (1) the seriousness of the violation and (2) the efforts to remedy the violation. American Efficient's violations are serious because they undermined the capacity markets by purporting to reduce energy consumption when the Program actually was designed to convert market data and environmental attributes into capacity payments without providing any measurable benefits to consumers or enhancing grid reliability. Despite both MISO and ISO-NE disqualifying American Efficient from their markets in whole or in full because the Program violated their tariffs, the Company continued to participate in PJM's market, and violate the PJM Tariff, with a substantially similar Program. The evidence also demonstrates that American Efficient knowingly or recklessly misled the ISO/RTOs to gain entry and retain access to those markets. Rather than attempting to remedy the violations, American Efficient persisted in its scheme and increased its offers into the PJM capacity market to such a degree that it now represents over 70 percent of the EER MWs cleared in PJM's auctions.[593] In the face of multiple disqualifications from other ISO/RTOs, and a FERC enforcement investigation, American Efficient increased, and had planned to continue to further increase its footprint in the PJM

---

[592] *See* FERC Penalty Guidelines § 2B1.1, Commentary Application Note 2(C) (in calculating penalty, the "Commission need only make a reasonable estimate of the loss"); *SEC v. First City Fin. Corp. Ltd.*, 890 F.2d 1215, 1321–32 (D.C. Cir. 1989) (exact information not required for disgorgement calculation).

[593] *See supra* Table 2 – American Efficient's Participation in PJM's Base Residual and Incremental Auctions.

capacity market.[594]  This is hardly the conduct of an entity that is seeking to reform or remedy the violations.

## 2. Application of the Penalty Guidelines

Next, staff applied the Commission's Penalty Guidelines in calculating a recommended civil penalty of $722 million for American Efficient.  Under the Guidelines, the first step in calculating a penalty is determining the base penalty, which is the greatest of (1) the amount calculated under the appropriate Chapter Two guideline, (2) the pecuniary gain to the organization from the violation, or (3) the pecuniary loss from the violation.[595] Here, staff established a base penalty based on the total market harm caused by American Efficient's scheme.  This approach included, (1) all capacity revenues American Efficient was awarded from cleared capacity in both the PJM and MISO markets and (2) bonus payments PJM awarded to American Efficient as a result of Winter Storm Elliott.[596]  This amounted to $515,974,266.[597]

The base penalty calculation is below:

---

[594] *See supra* note 90 and accompanying text ("Most significantly, Investment Company documents show that American efficient planned to dramatically increase its PJM capacity revenues.  In April 2022, shortly before the 2023/2024 BRA, American Efficient reported to Investment Company that it anticipated receiving between $806 million and $1.344 billion in capacity payments from PJM through the next five BRAs.").

[595] *See* FERC Penalty Guidelines § 1C2.2.

[596] These numbers are current through April 2024.

[597] This calculation of market harm includes the total $473,667,758 in capacity revenue that American Efficient cleared in PJM through the 2025/26 delivery year.

143

**Violation Level & Base Penalty Analysis**

| Factor | Level | Notes |
|---|---|---|
| Base Violation Level | 6 | Violations of the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2024), as well as MISO/PJM Tariff Sections. §2B1.1(a) |
| Size of Loss | 30 | American Efficient's conduct caused demonstrated losses of more than $400 million. §2B1.1(b)(1)(P) |
| Length of Violation | 6 | American Efficient's scheme continued for more than 250 days. §2B1.1(b)(2)(F) |
| TOTAL | 42 | A Violation Level of 42 corresponds to $72,500,000 million from the Violation Level Penalty Table. The base penalty is the greater of (1) $72.5 M (from the Violation Level Penalty Table); (2) pecuniary gain; or (3) the harm caused by conduct ($515,974,266). Thus, the base penalty is $515,974,266. §1C2.2(b) |

The next step in calculating the civil penalty is assigning a culpability score, which determines the minimum and maximum multipliers to be applied to the base penalty to arrive at a minimum to maximum penalty range. The culpability score begins at a starting level of five points and is increased or decreased based on factors set out in Section 1C2.3(b)–(g) of the Penalty Guidelines.

In determining American Efficient's culpability score, staff began with a base culpability score of five points and added five points due to high-level personnel involvement. As discussed above,[598] American Efficient's founders and CEO played a substantial role in creating this manipulative scheme and in perpetuating the conduct. Specifically, the CEO of Modern Energy Group (the parent company of American Efficient) founded American Efficient and interacted directly with PJM and MISO when seeking approval of the Program and participation in the capacity markets.

No mitigating factors are present to decrease the culpability score. To the extent American Efficient has a formal compliance program, it lacks procedural and substantive

---

[598] *See supra* section VI.A.

standards that assist in identifying non-compliance with ISO/RTO tariffs.  This is evidenced by the fact that the PJM add-back mechanism was incorporated in the 2019/2020 BRA, yet American Efficient did not become aware of it until the Former Policy Director, an employee who was not responsible for compliance with PJM's rules, brought it to management's attention.  When directly confronted with the serious concerns the PJM add-back mechanism posed for the effectiveness of the Program, Modern Energy Group's former executive chairman dismissed the Former Policy Director's concerns.[599]

Additionally, despite its partial disqualification in ISO-NE and complete disqualification in MISO, American Efficient continued to purchase environmental attributes for and data associated with energy efficient product sales within those ISO/RTOs  through March 2024.  American Efficient's Head of Origination testified that the Company was still doing so because the Company did not want to decrease the Program value for partners and because "[a]t some point in the future, perhaps there's a possibility that those assets may have some value."[600]  Indeed, American Efficient has explored the idea of expanding its Program into NYISO, CAISO,  and ERCOT as well.[601]

As explained above,[602] American Efficient failed to provide ISO-NE with the information and documentation it requested to adequately examine the Company's Program, and it did not self-report any violations.  Instead, in the face of ISO/RTO and Enforcement scrutiny, American Efficient continues to offer substantial amounts of alleged EER MWs into the PJM auctions.

American Efficient also failed to cooperate with staff throughout this investigation and, in several instances, sought to undermine the integrity of Enforcement's investigation.  As discussed above,[603] following receipt of American Efficient's Preliminary Findings Response, staff sought to take investigative testimony from key personnel at American Efficient, but American Efficient refused to make its employees voluntarily available for testimony and confirmed as much in a letter sent to the

---

[599] Tr. 57:4–67:24 (Former Policy Director).

[600] Tr. 201:1–17 (Head of Origination).

[601] Tr. 124:23–25 (Chief Markets Officer).

[602] *See supra* section IV.B.5.

[603] *See supra* section III.

145

Chairman.[604]  During her testimony, the Former Policy Director testified that American Efficient's General Counsel informed her that the Company was not cooperating in the investigation and noted his preference that she not cooperate either.[605]  Finally, despite expressly being denied an extension to submit its 1b.19 Response, American Efficient brazenly ignored the regulatory deadline and took it upon itself to unilaterally grant itself a 30-day extension.  This tactic was communicated to staff one hour before American Efficient's response was due.

---

[604] *See* Letter from S. Kelly to Chairman, at 5 (Oct. 6, 2023).

[605] Tr. 12:9–20 (Former Policy Director).

**Culpability Score Analysis**

| Factor | Points | Notes |
|---|---|---|
| Base Culpability Score | 5 | §1C2.3(a) |
| High-level personnel involvement *(0 to +5 points)* | 2 | CEO and founders participated in and were knowledgeable of the scheme. §1C2.3(b)(3) |
| Prior history | 0 | §1C2.3(c) |
| No violation of an order | 0 | §1C2.3(d) |
| No obstruction of justice | 0 | §1C2.3(e) |
| Effective compliance program in place at time of violation | 0 | Compliance Program lacking procedural or substantive standards in reviewing tariff requirements and identifying/implementing non-compliant language in M&V and PIMV submissions. §1C2.3(f) |
| No self-report | 0 | No self-report. §1C2.3(g)(1) |
| Full cooperation in investigation | 0 | §1C2.3(g)(2) |
| TOTAL | 7 | A Culpability Score of 7 implies minimum and maximum multipliers of 1.40 and 2.80. §1C2.4 |

In light of these factors, staff recommends that the Commission assess a civil penalty based on the market harm and based on the fact that American Efficient did not settle this matter.

147

**Final Culpability Score and Penalty Ranges**

| Scenarios Impacting Culpability Score [§1C2.3(g)(3) &(4)] | Range of Penalty Multipliers | Penalty Range (Base Penalty * Culpability Score Range) |
|---|---|---|
| If American Efficient settles and accepts responsibility. | 1.00 to 2.00 | $516 million to $1.032 billion |
| If American Efficient settles but does not accept responsibility. | 1.20 to 2.40 | $619.2 million to $1.238 billion |
| If American Efficient does not settle. | 1.40 to 2.80 | $722.4 million to $1.445 billion |

Staff recommends that the Commission assess American Efficient a civil penalty that is based on the market harm of American Efficient's conduct. Given that American Efficient did not settle, and did not accept responsibility, staff further recommends that the Commission assess American Efficient a civil penalty of $722 million. This recommendation is based on the Commission's Penalty Guidelines and is appropriate given the seriousness of the violation, the lack of any effort to remedy the violations, the harm caused to ratepayers, and the Company's conduct during the investigation.

**B.    Disgorgement**

Where an entity has committed a violation resulting in pecuniary gain, the Commission directs disgorgement of the full amount of the gain plus interest.[606] Over the course of its violative conduct and manipulative scheme, American Efficient has received hundreds of millions of dollars from PJM and MISO, and therefore from their ratepayers. Beyond the hundreds of millions of dollars in unjust profits, American Efficient also has received $26.8 million for "overperformance" during Winter Storm Elliott. A complete breakdown of the disgorgement through April 2024 is provided below.

---

[606] *See* FERC Penalty Guidelines § 1B.1(a); *Revised Policy Statement on Enforcement*, 123 FERC ¶ 61,156 at P 43 ("Requiring disgorgement is consistent with long-standing Commission practice . . . and the practice of other enforcement agencies . . . .") (citations omitted).

| Description | Payments Through April 2024 |
|---|---|
| Payments from PJM to Affirmed (Capacity) | $154,590,213 |
| Payments from PJM to Affirmed (Performance Bonus) | $26,813,005 |
| Payments from Investment Bank to Affirmed (Capacity Monetization) | $133,303,219 |
| Payments from MISO to Midcontinent | $15,493,503 |
| **Revenue Total** | **$330,199,941** |
| PJM Partner Payment Deduction | ($63,768,616) |
| MISO Partner Payment Deduction (prior to disqualification) | ($13,377,446) |
| **PJM and MISO Partner Payment Deduction** | **($77,146,062)** |
| **Net Total** | **$253, 053,879** |

American Efficient (or Investment Bank) received approximately $5.2 million in additional capacity payments from PJM related to the Program in May 2024. It has continued to receive approximately $8 million in capacity payments from PJM related to the Program every month since and is scheduled to receive the same monthly amount for the remainder of the 2024/25 Delivery Year. In addition, it currently is scheduled to receive approximately $5,063,162 every month for the 2025/26 Delivery Year. Staff does not have data regarding any Partner Payments related to PJM that should be deducted from these payments to calculate additional unjust profits, but the Company can provide such data in any answer that it files.

Accordingly, consistent with Commission precedent, staff recommends that American Efficient disgorge (1) $253,053,879, plus interest, and (2) disgorge additional unjust profits received between April 2024 and the date of any future Commission order directing disgorgement. Such additional unjust profits can be calculated as the sum of all capacity payments received by American Efficient from PJM after April 2024 plus any additional Capacity Monetization payments made by Investment Bank after April 2024 minus additional Program Payments made after April 2024 by American Efficient related to PJM.

## C. Ability to Pay

American Efficient has made several assertions about its ability to pay both the disgorgement amount and the civil penalty calculated in accordance with the Penalty Guidelines and the Revised Policy Statement on Enforcement. If, during the Order to Show Cause proceeding, American Efficient provides complete documentation of the income, assets, and liabilities of itself and related Modern Energy entities and potential funding from its financial partners (Investment Bank and Investment Company), the Commission has the discretion to order a different payment amount.[607]

## IX. CONCLUSION

For the reasons discussed above, Enforcement recommends that the Commission direct American Efficient to show cause why it has not violated the PJM and MISO Tariffs and Section 1c.2 of the Commission's regulations, which prohibits the manipulation of wholesale electricity markets. Staff further recommends the Commission direct American Efficient to show cause why it should not disgorge $253,053,879 in unjust profits and additional unjust profits received after April 2024, plus interest, and direct American Efficient to show cause why it should not pay a civil penalty of $722 million.

---

[607] *See* FERC Penalty Guidelines § 1C3.2 (Reduction of Penalty Based on Inability to Pay); *see also Greenhat*, 175 FERC ¶ 61,138, at P 1 n.4 (2021) ("Under Section 31(d)(4) of the FPA, 16 U.S.C. § 823b(d)(4), the Commission may 'compromise, modify, or remit, with or without conditions, any civil penalty which may be imposed . . . at any time prior to a final decision by the court of appeals . . . or by the district court."); *id.* at Appendix A, page 110 (2021). Respondent should submit copies of all financial account statements since it began operating and nominating EERs in the capacity markets, along with an accounting of the Respondent's assets, liabilities, and income certified by a Certified Public Accountant. *See id.* at n.357. Such materials can be filed under seal to protect their confidentiality while also allowing the Commission to evaluate them, and staff to respond to them. *See id.*

# APPENDIX A-1: Relevant provisions of PJM Tariff

**PJM Open Access Transmission Tariff**

Attachment DD:

- 5.5 Eligibility for Participation in RPM Auctions

    - A Capacity Market Seller may submit a Sell Offer for a Capacity Resource in a Base Residual Auction, Incremental Auction, or Capacity Performance Transition Incremental Auction only if such seller owns or has the contractual authority to control the output or load reduction capability of such resource and has not transferred such authority to another entity prior to submitting such Sell Offer. Capacity Resources must satisfy the capability and deliverability requirements of RAA, Schedule 9 and RAA, Schedule 10, the requirements for Demand Resources or Energy Efficiency Resources in Tariff, Attachment DD-1 and RAA, Schedule 6, as applicable, and, for the 2018/2019 Delivery Year and subsequent Delivery Years, the criteria in Tariff, Attachment DD, section 5.5A.

- 5.5A Capacity Resource Types

    - (a) Capacity Performance Resources: Capacity Performance Resources are Capacity Resources which, to the extent such resources cleared in a Reliability Pricing Model Auction or are otherwise committed as a Capacity Resource, are obligated to deliver energy during the relevant Delivery Year as scheduled and/or dispatched by the Office of Interconnection during the Performance Assessment Intervals. As further detailed in Tariff, Attachment DD, section 10A, Capacity Performance Resources that fail to meet this obligation will be subject to a Non-Performance Charge, unless excused pursuant to Tariff, Attachment DD, section 10A(d). Subject to 5.5A(a)(i), the following types of Capacity Resources are eligible to submit a Sell Offer as a Capacity Performance Resource: internal or external Generation Capacity Resources; Annual Demand Resources; Capacity Storage Resources; Annual Energy Efficiency Resources; and Qualifying Transmission Upgrades

    - **

    - (d) Base Capacity Resources: For the 2018/2019 and 2019/2020 Delivery Years, following types of Capacity Resources eligible to submit a Sell Offer as a Base Capacity Resource: Generation Capacity Resources, Capacity Storage Resources, Annual Demand Resources, Base Capacity Demand Resources, and Base Capacity Energy Efficiency Resources. Each

151

resource that clears a RPM Auction as a Base Capacity Resource must provide energy output to PJM if called during Performance Assessment Intervals occurring in the calendar months of June through September, including any necessary recall of such capacity and energy from service to areas outside the PJM Region. As further detailed in Tariff, Attachment DD, section 10A, Base Capacity Resources that fail to meet this obligation will be subject to a Non-Performance Charge, unless excused pursuant to Tariff, Attachment DD, section 10A(d)

o (e) Seasonal Capacity Performance Resource: For the 2020/2021 Delivery Year and subsequent Delivery Years, a Seasonal Capacity Performance Resource shall mean a Summer-Period Capacity Performance Resource or WinterPeriod Capacity Performance Resource, as defined below.

▪ i) Summer-Period Capacity Performance Resource: For the 2020/2021 Delivery Year and subsequent Delivery Years, the following types of Capacity Resources are eligible to submit a Sell Offer as a Summer-Period Capacity Performance Resource: Summer Period Demand Resource, Summer-Period Energy Efficiency Resource, and Capacity Storage Resource, Intermittent Resource, or Environmentally-Limited Resource that has an average expected energy output during summer peak-hour periods consistently and measurably greater than its average expected energy output during winter peakhour periods. To the extent such resource clears an RPM Auction or is otherwise committed as a Summer-Period Capacity Performance Resource, it is obligated to deliver energy as scheduled and/or dispatched by the Office of Interconnection during Performance Assessment Intervals occurring in the calendar months of June through October and the following May of the Delivery Year, and must satisfy the requirements of a Capacity Performance Resource for such period of time. As further detailed in Tariff, Attachment DD, section 10A, Summer-Period Capacity Performance Resources that fail to meet this obligation will be subject to a NonPerformance Charge, unless excused pursuant to Tariff, Attachment DD, section 10A(d).

**PJM Reliability Assurance Agreement (RAA)**

<u>Article I – Definitions</u>

- "Annual Energy Efficiency Resource" shall mean a project, including installation of more efficient devices or equipment or implementation of more efficient processes or systems, meeting the requirements of Reliability Assurance Agreement, Schedule 6 and exceeding then current building codes, appliance standards, or other relevant standards, designed to achieve a continuous (during the summer and winter periods described in such Schedule 6 and the PJM Manuals) reduction in electric energy consumption that is not reflected in the peak load forecast prepared for the Delivery Year for which the Energy Efficiency Resource is proposed, and that is fully implemented at all times during such Delivery Year, without any requirement of notice, dispatch, or operator intervention.
- "Base Capacity Energy Efficiency Resource" shall mean, for the 2018/2019 and 2019/2020 Delivery Years, a project, including installation of more efficient devices or equipment or implementation of more efficient processes or systems, meeting the requirements of RAA, Schedule 6 and exceeding then-current building codes, appliance standards, or other relevant standards, designed to achieve a continuous (during the summer peak periods as described in Reliability Assurance Agreement, Schedule 6 and the PJM Manuals) reduction in electric energy consumption that is not reflected in the peak load forecast prepared for the Delivery Year for which the Base Capacity Energy Efficiency Resource is proposed, and that is fully implemented at all times during such Delivery Year, without any requirement of notice, dispatch, or operator intervention.
- "Energy Efficiency Resource" shall mean a project, including installation of more efficient devices or equipment or implementation of more efficient processes or systems, meeting the requirements of RAA, Schedule 6 and exceeding then-current building codes, appliance standards, or other relevant standards, designed to achieve a continuous (during the periods described in Reliability Assurance Agreement, Schedule 6 and the PJM Manuals) reduction in electric energy consumption that is not reflected in the peak load forecast prepared for the Delivery Year for which the Energy Efficiency Resource is proposed, and that is fully implemented at all times during such Delivery Year, without any requirement of notice, dispatch, or operator intervention. Annual Energy Efficiency Resources, Base Capacity Energy Efficiency Resources and Summer-Period Energy Efficiency Resources are types of Energy Efficiency Resources.
- "Summer-Period Energy Efficiency Resource" shall mean, for the 2020/2021 Delivery Year and subsequent Delivery Years, a project, including installation of more efficient devices or equipment or implementation of more efficient processes

153

or systems, meeting the requirements of Reliability Assurance Agreement, Schedule 6 and exceeding then-current building codes, appliance standards, or other relevant standards, designed to achieve a continuous (during the summer peak periods as described in Reliability Assurance Agreement, Schedule 6 and the PJM Manuals) reduction in electric energy consumption that is not reflected in the peak load forecast prepared for the Delivery Year for which the Summer-Period Energy Efficiency Resource is proposed, and that is fully implemented at all times during such Delivery Year, without any requirement of notice, dispatch, or operator intervention.

## Schedule 6

- L. Energy Efficiency Resources
  - o 1. An Energy Efficiency Resource is a project, including installation of more efficient devices or equipment or implementation of more efficient processes or systems, exceeding then-current building codes, appliance standards, or other relevant standards, designed to achieve a continuous (during peak summer and winter periods as described herein) reduction in electric energy consumption at the End-Use Customer's retail site that is not reflected in the peak load forecast prepared for the Delivery Year for which the Energy Efficiency Resource is proposed, and that is fully implemented at all times during such Delivery Year, without any requirement of notice, dispatch, or operator intervention.
  - o 2. An Energy Efficiency Resource may be offered as a Capacity Resource in the Base Residual or Incremental Auctions for any Delivery Year beginning on or after June 1, 2011. No later than 30 days prior to the auction in which the resource is to be offered, the Capacity Market Seller shall submit to the Office of the Interconnection a notice of intent to offer the resource into such auction and a measurement and verification plan. The notice of intent shall include all pertinent project design data, including but not limited to the peak-load contribution of affected customers, a full description of the equipment, device, system or process intended to achieve the load reduction, the load reduction pattern, the project location, the project development timeline, and any other relevant data. Such notice also shall state the seller's proposed Nominated Energy Efficiency Value.
- The measurement and verification plan shall describe the methods and procedures, consistent with the PJM Manuals, for determining the amount of the load reduction and confirming that such reduction is achieved. The Office of the Interconnection shall determine, upon review of such notice, the Nominated

154

Energy Efficiency Value that may be offered in the Reliability Pricing Model Auction.

**APPENDIX A-2: Relevant provisions of MISO Tariff**

**MISO Tariff, Module A**

<u>Section 1.P</u>

- "Planning Resource": A Capacity Resource, Energy Efficiency Resource, or Load Modifying Resource that can be used to satisfy PRMR

\* \* \*

**MISO Tariff, Module E-1**

<u>Section 69A.3.2</u>

- An Energy Efficiency Resource is a Planning Resource, in which the Market Participant possesses ownership or equivalent contractual rights, from an end-use customer project (including the installation of more efficient devices or equipment or implementation of more efficient processes or systems) . . . exceeding then-current building codes, appliance standards, or other relevant standards, designed to achieve a continuous reduction in electric energy consumption during On Peak daylight hours . . . . ZRCs from EE Resources will be grossed-up by the amount of avoided transmission losses in accordance with Section 68A.8.b and also by the applicable PRM in accordance with Section 68A.2EE. Resources shall not require notice, dispatch, or operator intervention, such that the EE Resource will reduce the total amount of electrical energy needed, while delivering a comparable or improved level of end-use service, in accordance with the BPM for Resource Adequacy. The additional requirements for EE Resource measurement and verification are found in Attachment UU.

<u>Section 69A.4.4</u>

- EE Resources: The Seasonal Accredited Capacity for a qualified EE Resource will be determined by the Transmission Provider based upon submitted measurement and verification documents, as provided in the BPM for Resource Adequacy

<u>Section 69A.4.5</u>

- Attributes of ZRCs
  - A Market Participant that owns or possesses equivalent contractual rights to a qualified Planning Resource can convert the convertible Seasonal Accredited Capacity of the Resource (Seasonal Accredited Capacity MW) as determined in section 69.A.3.1.g into ZRCs through the MECT in order to offer such ZRCs into a PRA. Market Participants also can unconvert and/or transfer ZRCs through the MECT to another Market Participant, as described in the BPM for Resource Adequacy.

156

- A. Eligibility for Zonal Resource Credits for a Capacity Resource that is a Planning Resource that is not Intermittent Generation or Dispatchable Intermittent Resource.
  - For a Capacity Resource that is not Intermittent Generation or Dispatchable Intermittent Resource the amount of Capacity that is eligible to be converted to Zonal Resource Credits shall be the convertible Seasonal Accredited Capacity value of the Capacity Resource.

Section 69A.7.1

- PRA Procedures
  - a. Participating ZRCs in the PRA: All Market Participants that own or have contractual rights to the Planning Resources that are represented within an LRZ or ERZ and have converted Seasonal Accredited Capacity to ZRCs, will have an option to (consistent with withholding provisions) submit offers into the PRA for such ZRCs, to the extent that the Market Participant has not submitted a FRAP, or RBDC Opt Out, as described in Section 69A.9.

* * *

**MISO Tariff Attachment UU, Energy Efficiency Resources: Measurement & Verification Procedures**

- Energy Efficiency (EE) Resources are specific projects resulting in installed measures on retail customer facilities that achieve a permanent reduction in electric energy usage while maintaining a comparable quality of service. The EE Resource must achieve a permanent, continuous reduction in electric energy consumption (during the defined EE Performance Hours) that is not reflected in the peak load forecast used for the Planning Resource Auction for the Season(s) in the Planning Year for which the EE Resource is proposed. . . . Examples of EE Resources are efficient lighting, appliance, or air conditioning installations; building insulation or process improvements; and permanent load shifts that are not dispatched based on price or other factors.
- The M&V Plan is a document that defines project-specific M&V methods and techniques that will be used to determine and verify the expected Coincident Peak Demand reduction (*i.e.*, the demand reduction) resulting from an EE Resource.

**APPENDIX A-3: Misrepresentations in submissions to PJM and MISO**

MISREPRESENTATIONS IN SUBMISSIONS TO PJM

| Submission Date | Submission | Did not disclose amounts of per-unit micropayments | Described program mechanics as "Discount," "buy down," or reducing retail prices | Claimed to cause changes in consumer behavior | Claimed micropayments were incentives | Claimed contract rights using PIMV template language (PIMVs only) |
|---|---|---|---|---|---|---|
| 2014.03.13 | M&V for 2016-17 BRA (PJM000000707) | XX** | XX | | | n/a |
| 2014.05.15 | M&V for 2017-18 BRA (PJM000001089) | XX** | ** | XX | | n/a |
| 2014.10.13 | M&V for 2015-16 3rd Incremental Auction (PJM000000688) | XX** | ** | XX | XX | n/a |
| 2016.01.26 | M&V for 2016-17 3rd Incremental Auction (Residential) (ME-AFFIRMED-00001661) | XX** | ** | XX | | n/a |
| 2016.01.29 | M&V for 2016-17 3rd Incremental Auction (Commercial) (ME-AFFIRMED-00004379) | XX** | ** | XX | XX | n/a |
| 2016.04.11 | M&V for 2019-20 BRA (ME-AFFIRMED-00001642) | XX** | ** | XX | XX | n/a |

158

| Submission Date | Submission | Did not disclose amounts of per-unit micropayments | Described program mechanics as "Discount," "buy down," or reducing retail prices | Claimed to cause changes in consumer behavior | Claimed micropayments were incentives | Claimed contract rights using PIMV template language (PIMVs only) |
|---|---|---|---|---|---|---|
| 2016.04.22 | Initial PIMV for 2016-17 Delivery Year (ME-AFFIRMED-00001613) | XX** | XX@@ | XX | XX | XX |
| 2016.05.03 | Revised PIMV for 2016-17 Delivery Year (ME-AMEFF00044967) | | XX## | | XX | XX |
| 2016.06.10 | M&V for 2017-18 2nd Incremental Auction (PJM000001102) | | XX## | | XX | n/a |
| 2016.08.11 | M&V for 2018-19 1st Incremental Auction (PJM000001192) | XX | XX## | XX | XX | n/a |
| 2017.01.26 | M&V for 2017-18 3rd Incremental Auction (ME-AFFIRMED-00004550) | XX | XX | XX | XX | n/a |
| 2017.04.07 | M&V for 2020-21 BRA (ME-AFFIRMED-00000871) | XX | XX | XX | XX | n/a |
| 2017.04.10 | PIMV for 2017-18 Delivery Year (ME-AFFIRMED-00000908) | XX | XX | XX | XX | XX |

159

| Submission Date | Submission | Did not disclose amounts of per-unit micropayments | Described program mechanics as "Discount," "buy down," or reducing retail prices | Claimed to cause changes in consumer behavior | Claimed micropayments were incentives | Claimed contract rights using PIMV template language (PIMVs only) |
|---|---|---|---|---|---|---|
| 2017.06.01 | M&V for 2018-19 2nd Incremental Auction (ME-AFFIRMED-00000825) | XX | XX | XX | XX | n/a |
| 2017.08.10 | M&V for 2019-20 1st Incremental Auction (ME-AFFIRMED-00001047) | XX | XX | XX | XX | n/a |
| 2018.01.25 | M&V for 2018-19 3rd Incremental Auction (ME-AFFIRMED-00001004) | XX | | XX | XX | n/a |
| 2018.03.29 | PIMV for 2018-19 Delivery Year (ME-AFFIRMED-00000735) | XX | XX | XX | XX | XX |
| 2018.04.09 | M&V for 2021-22 BRA (ME-AFFIRMED-00000778) | XX | | XX | XX | n/a |
| 2018.06.06 | M&V for 2019-20 2nd Incremental Auction (ME-AFFIRMED-00003403) | XX | | XX | XX | n/a |
| 2018.08.11 | M&V for 2020-21 1st Incremental Auction (ME-AFFIRMED-00002671) | XX | XX | XX | XX | n/a |

160

| Submission Date | Submission | Did not disclose amounts of per-unit micropayments | Described program mechanics as "Discount," "buy down," or reducing retail prices | Claimed to cause changes in consumer behavior | Claimed micropayments were incentives | Claimed contract rights using PIMV template language (PIMVs only) |
|---|---|---|---|---|---|---|
| 2019.01.25 | Initial M&V for 2019-20 3rd Incremental Auction (ME-AFFIRMED-00001376) | XX | | XX | XX | n/a |
| 2019.02.13 | Revised M&V for 2019-20 3rd Incremental Auction (ME-AFFIRMED-00003075) | XX | | XX | XX | n/a |
| 2019.05.07 | PIMV for 2019-20 Delivery Year (ME-AFFIRMED-00001267) | XX | | | XX | XX |
| 2019.06.07 | M&V for 2020-21 2nd Incremental Auction (ME-AFFIRMED-00001200) | XX | | | XX | n/a |
| 2019.07.09 | Initial M&V for 2022-23 BRA (ME-AFFIRMED-00001091) | XX | | | | n/a |
| 2019.08.05 | M&V for 2021-22 1st Incremental Auction (ME-AFFIRMED-00003810) | XX | | | XX | n/a |
| 2020.01.23 | M&V for 2020-21 3rd Incremental Auction (ME-AFFIRMED-00002163) | XX | | | | n/a |

161

| Submission Date | Submission | Did not disclose amounts of per-unit micropayments | Described program mechanics as "Discount," "buy down," or reducing retail prices | Claimed to cause changes in consumer behavior | Claimed micropayments were incentives | Claimed contract rights using PIMV template language (PIMVs only) |
|---|---|---|---|---|---|---|
| 2020.05.06 | PIMV for 2020-21 Delivery Year (ME-AFFIRMED-00001959) | XX | | | | XX |
| 2020.06.04 | M&V for 2021-22 2nd Incremental Auction (ME-AFFIRMED-00002545) | XX | | | | n/a |
| 2021.01.22 | M&V for 2021-22 3rd Incremental Auction (ME-AFFIRMED-00002436) | XX | | | | n/a |
| 2021.01.29 | PIMV for 2021-22 Delivery Year (PJM000003091) | XX | | | | XX |
| 2021.04.15 | Revised M&V for 2022-23 BRA (ME-AFFIRMED-00000180) | XX | | | | n/a |

**NOTES:** ** - No sample program agreement submitted with M&V/PIMV filing

162

| Submission Date | Submission | Did not disclose amounts of per-unit micropayments | Described program mechanics as "Discount," "buy down," or reducing retail prices | Claimed to cause changes in consumer behavior | Claimed micropayments were incentives |
|---|---|---|---|---|---|
| 2017.02.28 | M&V for 2017-18 PRA (ME-MCEN-00000108) | XX | XX | XX | XX |
| 2017.03.10 | PIMV for 2017-18 PRA (ME-MCEN-00001290) | ** | XX | | XX |
| 2018.01.15 | M&V for 2018-19 PRA (ME-MCEN-00000061) | XX | XX | XX | XX |
| 2018.01.15 | PIMV for 2018-19 PRA (ME-MCEN- 00000094) | ** | XX | | XX |
| 2019.01.20 | PIMV for 2019-20 PRA (MISO_DRMCEN_NCS0005215) | ** | | | XX |
| 2019.01.30 | M&V for 2019-20 PRA (MISO_DRMCEN_NCS0005226) | XX | | XX | XX |
| 2020.01.29 | M&V for 2020-21 PRA (MISO_DRMCEN_NCS0001933) | XX | | | |
| 2020.01.29 | PIMV for 2020-21 PRA (MCEN-PE_0001116) | ** | | | |

**NOTES:** ** - No sample program agreement submitted with M&V/PIMV filing

163